UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ELECTRIC POWER SUPPLY ASSOCIATION, DYNEGY INC., EASTERN GENERATION, LLC, NRG ENERGY, INC., and CALPINE CORPORATION, | ) ) ) ) ) ) | |
| Plaintiffs | ) ) | Case No. 17-cv-01164 |
| v. | ) ) | Judge |
| ANTHONY M. STAR, in his official capacity as Director of the Illinois Power Agency, and BRIEN J. SHEAHAN, JOHN R. ROSALES, SADZI MARTHA OLIVA, MIGUEL DEL VALLE, and SHERINA MAYE EDWARDS, in their official capacities as Commissioners of the Illinois Commerce Commission, | ) ) ) ) ) ) ) ) ) ) ) | Magistrate |
| Defendants | ) | |

## **COMPLAINT**

1.     This case arises from unlawful Illinois legislation, the so-called Future

Energy Jobs Act ("FEJA"),[1] to the extent it amended the Illinois Power Agency

Act ("IPAA"), 20 ILCS 3855,[2] in a manner that intrudes on the exclusive authority

---

[1] FEJA, Public Act 099-0906 (12/7/16), available at
http://www.ilga.gov/legislation/publicacts/99/PDF/099-0906.pdf.  This lawsuit only challenges
the portions of FEJA that amended IPAA to create the Zero Emissions Credit program for
nuclear generators.
[2] The FEJA amendments to IPAA become effective on June 1, 2017, and all citations in this
Complaint are to the post-June 1 version of the IPAA.

of the Federal Energy Regulatory Commission ("FERC") over "the sale of electric energy at wholesale in interstate commerce" pursuant to the Federal Power Act ("FPA"), 16 U.S.C. § 824(b)(1).

2.     FERC has determined that competitive market forces best set wholesale energy prices and thus has mandated and approved auction-based markets for wholesale electric energy sales in Illinois and across regions which serve over two-thirds of the population of the United States.  Under this system, the forces of competition have benefited consumers but have impaired the financial viability of the Clinton and Quad Cities nuclear generating plants, to the point where Exelon, the owner of both of these plants, decided to close them unless the State bailed them out with billions of dollars in subsidies, to be paid by Illinois electricity consumers.

3.     Seeking to change the results of the FERC-approved market-based auction system, the Illinois General Assembly enacted FEJA, *inter alia*, to prop up these two uneconomic nuclear power plants and keep them in the market for at least ten more years, via so-called Zero Emissions Credits ("ZECs").  Unless enjoined or eliminated, these credits will result in Illinois' captive ratepayers overpaying an estimated $235 million per year over ten years to Exelon.

4.     The ZEC program invades FERC's exclusive regulatory field by directly altering the revenue to be paid to the nuclear generators.  The ZECs

2

provide the nuclear plants with substantial out-of-market payments for each MWh of electricity they produce, thus effectively replacing the auction clearing price received by these plants with the alternative, higher price preferred by the Illinois General Assembly.

5.     Under FEJA's ZEC program, the actual dollar amount of the ZECs is expressly tethered to the price of electricity in the FERC-regulated wholesale markets.  That is, nuclear generators are entitled to ZECs if, but only if, wholesale electricity prices are at a level that the "environmental benefits" of the nuclear plants will "cease to exist" without subsidies.  20 ILCS 3855/1-75(d-5)(1)(C). Furthermore, the amount of the subsidies is to be adjusted as wholesale prices fluctuate, and there is no entitlement to any ZECs if wholesale market prices established under FERC's auspices rise above a specified level.  *Id*. (d-5)(1)(B).

6.     If the ZEC program goes into effect, as it is scheduled to do in June 2017, it will profoundly disrupt the FERC-approved energy market auction structure and result in the transfer of hundreds of millions of dollars a year of ratepayer funds to Exelon at the expense of other generators that would have been economically viable without discriminatory subsidies.  Those very same subsidies that artificially sustain a few uneconomic units impair the financial outlook for generators that are competing on the basis of FERC regulated market rules.  The shareholders-owners of these companies invested capital because the Federal

3

Power Act prohibits rates that are "unjust, unreasonable, unduly discriminatory or preferential," as the rates in the FEJA undoubtedly are. 16 U.S.C. § 824e.

7. At current wholesale prices, for every megawatt hour ("MWh") of energy the subsidized nuclear plants sell into the FERC-jurisdictional market, the nuclear units will receive a premium of more than 70 percent from the Illinois ratepayers through ZECs. That is, for each MWh sold, they will receive the locational price of energy, which is currently around $18 and $25 per MWh at Quad Cities and Clinton respectively, plus a 2017 $16.50 ZEC payment subsidy (with possible increases in future years), funded entirely by Illinois consumers. As a result, in 2017 the Clinton and Quad Cities plants will be paid a total of $34.50 or $41.50 per MWh of energy that they sell in FERC-regulated wholesale markets, while a competing energy generator at the same location would receive just $18 or $25 per MWh. The bonus payments to the subsidized nuclear plants are scheduled to adjust over the ten-year life of the program, changing based on current wholesale capacity and energy prices.

8. The ZEC payments will disrupt the economically efficient functioning of the FERC-regulated energy and capacity market auctions. The artificial retention of uneconomic nuclear units in the market has a dramatic effect on wholesale market prices subject to FERC's exclusive jurisdiction.

4

9.      The prospect of these out-of-market payments has already caused Exelon to reverse its decision to close the Clinton and Quad Cities facilities, preventing the Illinois energy markets from reaching the efficient market equilibrium that the FERC-mandated wholesale markets would have otherwise produced.

10.      If the ZECs go into effect, Illinois's *retail* ratepayers will be forced to fund an effort by the General Assembly to artificially depress *wholesale* market prices, which disrupts the FERC-approved auctions and market processes. The nuclear plants will not retire as scheduled, but will continue to bid into the wholesale market auctions, with the incentive and ability to offer their supply of electricity into the auctions at artificially lower prices (*i.e.*, at prices that do not fully cover their costs). The result of these below-cost bids will be below market prices in the wholesale market. This will harm other generators, including the Plaintiffs, because the lower auction prices will result in lower revenues. In the long term, lower prices will force some generators who are more efficient than the ZEC recipients to exit the market and will deter potential new generators – including generators of renewable sources of energy – from entering the market.

11.      Paradoxically, the artificially suppressed wholesale market prices are likely to result in higher energy bills for retail ratepayers as they are forced to pay the nuclear subsidy as a charge on their retail electric bills. Consumers will also

5

experience higher wholesale prices over the long-run, since providers of capital will be unwilling to enter the markets without adding a significant risk premium to reflect the fact that the State is undermining FERC's ability to provide just and reasonable rates.

12.     The ZEC program is unlawful because it operates in the area of FERC's exclusive jurisdiction, and federal law thus field preempts it under the Supremacy Clause of the United States Constitution.  On field preemption grounds, the Supreme Court recently invalidated similar Maryland measures in *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016).  Moreover, the ZEC program is conflict-preempted, as it stands as an obstacle to the intended functioning of the FERC-jurisdictional markets.  The ZEC program results in a mix of energy resources that will be far less economically efficient than if the markets were allowed to work as designed.

13.     The ZEC program is also invalid under the dormant Commerce Clause.  The ZECs solely benefit certain in-state wholesale producers of nuclear energy in Illinois, to the disadvantage of out-of-state producers who compete in the wholesale market.  The General Assembly has thus failed to regulate evenhandedly to effectuate a legitimate local public interest, and the effects of its regulation on interstate commerce are more than incidental.  For all of these reasons, the Court should enter appropriate declaratory and injunctive relief.

14.     Although the reduction of carbon emissions is important, this can be achieved much more effectively by means that would neither discriminate against interstate or international commerce nor frustrate the progress competitive markets have been delivering in the form of environmental benefits.  If Illinois truly believes that Clinton and Quad Cities require additional revenues to achieve environmental goals, it is entitled to petition FERC to adopt market rule changes or take other steps to increase market prices to levels sufficient to allow the nuclear generators to recover their costs.

## PARTIES

15.     Plaintiff Electric Power Supply Association ("EPSA") is the national trade association representing leading competitive independent power producers and marketers, and is incorporated under the laws of the District of Columbia. EPSA's member companies are involved in competitive wholesale and retail electricity markets, with significant financial investments in electric generation and electricity marketing operations in Illinois and throughout the United States. EPSA seeks to bring the benefits of competition to all power customers.  Many EPSA members actively participate in the Illinois-area FERC-regulated wholesale electricity auctions.[3]

---

[3] The views expressed in this filing represent the position of EPSA as an organization, but not necessarily the views of any particular member with respect to any issue.

16.     Plaintiff Dynegy Inc. ("Dynegy") owns and operates more than 31,000 MW of power-generating capacity throughout the Midwest, Northeast, Mid-Atlantic and Texas and two retail electric companies serving businesses and residents in Illinois, Ohio, and Pennsylvania.  In Illinois, Dynegy owns 12 power plants, totaling more than 9,000 MW of generation.  Dynegy's retail companies serve approximately 840,000 Illinois residential customers through municipal, township and county aggregation, and approximately 20,000 Illinois commercial and industrial customers.  Through subsidiaries, Dynegy actively participates in the Illinois-area FERC-regulated wholesale electricity auctions.

17.     Plaintiff Eastern Generation, LLC ("Eastern") owns and operates, through its subsidiaries, 72 generating units at seven facilities with a total average capacity of 4,961 MW.  The facilities are located in Illinois, Michigan, New York, and Ohio.  Eastern actively participates in the Illinois-area FERC-regulated wholesale electricity auctions.

18.     Plaintiff NRG Energy, Inc. ("NRG") is the largest independent power producer in the United States with over 50,000 MW of diverse resources – powered by solar, wind, nuclear, gas, coal, oil, and cogeneration – and is one of the nation's largest competitive retail energy suppliers, with roughly three million retail customers.  In Illinois, NRG owns six power plants, totaling approximately

4,326 MW of generation. Through its ownership of these resources, NRG actively participates in the Illinois-area FERC-regulated wholesale electricity auctions.

19.     Calpine Corporation ("Calpine") is a Delaware corporation engaged, through various subsidiaries, in the development, financing, acquisition, ownership, and operation of independent power production facilities and the wholesale and retail marketing of electricity in the United States and Canada. Calpine has a fleet of 81 power plants in operation or under construction, representing approximately 26,000 MW of generating capacity, including the Geysers geothermal facilities, the largest geothermal complex in the world, located in Northern California. Through wholesale operations and its retail business, Calpine's subsidiaries serve customers in 24 states, Canada, and Mexico. Calpine subsidiaries own the Zion Energy Center in Illinois and actively participate in the MISO and PJM FERC-regulated wholesale electricity auctions.

20.     Defendant Anthony M. Star is the Director of the Illinois Power Agency ("IPA), which has specific authority to implement and enforce the FEJA ZEC program. Mr. Star is sued here only in his official capacity.

21.     Defendants Brien J. Sheahan, John R. Rosales, Sadzi Martha Oliva, Miguel del Valle, and Sherina Maye Edwards are Commissioners of the Illinois Commerce Commission ("ICC"), which has specific authority to implement and

enforce the FEJA ZEC program. The commissioners are sued here only in their official capacity.

## JURISDICTION AND VENUE

22. This Court has jurisdiction over the subject matter of this case, under 28 U.S.C. § 1331, because the claims arise under federal law, specifically the Supremacy Clause and the Commerce Clause of the U.S. Constitution, and under 28 U.S.C. § 1983.

23. This Court has the authority to grant the requested declaratory relief under 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, and authority to grant the requested injunctive relief under 28 U.S.C. § 1651(a) and Federal Rule of Civil Procedure 65.

24. This Court has jurisdiction to order prospective relief in the form of a declaratory judgment or an injunction against Defendants in their official capacities as officials of the Illinois agencies responsible for implementing and administering the challenged ZEC program. *Ex parte Young*, 209 U.S. 123, 129 (1908).

25. Venue is properly in this district pursuant to 28 U.S.C. § 1391, because the Defendants reside in this district, as the IPA has its headquarters in this district, and the ICC has a major office here.

## FACTS

**Exclusive Federal Jurisdiction Over the Wholesale Electricity Market**

26.     Under the FPA, FERC has exclusive regulatory authority, to the exclusion of state and local governments, over "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1); *see also id.* § 824(d) (defining a "wholesale sale as a sale of electric energy to a buyer "for resale" to another buyer). This exclusive authority extends to the imposition of any charges "in connection with" wholesale rates, and the enacting of any "rules and regulations affecting or pertaining to such rates or charges." *Id.* §§ 824d(a), 824e(a).

27.     The scope of interstate regulation has grown over the years, as technological developments made it increasingly possible to transmit energy over long distances. Local delivery networks gave way to the modern "grid" network, with electricity constantly moving in interstate commerce throughout the United States.

28.     FERC is exclusively empowered to regulate the interstate wholesale market to ensure, *inter alia*, that rates are "just and reasonable." 16 U.S.C. § 824d(a). In determining whether a state regulation interferes with this authority, courts consider "the *target* at which the state law *aims*," and "measures aimed directly at interstate purchasers and wholesales for resale" are preempted. *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1599 (2015). State actions that "*directly*

11

affect the wholesale rate" are likewise invalid. *FERC v. Electric Power Supply Ass'n*, 136 S. Ct. 760, 772 (2016) (quotation omitted). The Supremacy Clause preempts any state regulation that effectively alters the wholesale rate a generator will receive. *Hughes*, 136 S. Ct. at 1297-99.

### The FERC Regulatory Regime, MISO, and PJM

29.     Instead of directly setting wholesale rates, FERC has opted to regulate by using market-based auctions that are administered to establish the "just and reasonable rates" the FPA requires. FERC has explained that it relies on market processes "to bring more efficient, lower cost power to the Nation's electricity consumers." *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils.*, FERC Order No. 888, 61 Fed. Reg. 21,540, 21,541 (May 10, 1996).

30.     FERC authorizes and regulates "independent system operators" ("ISOs") and "regional transmission organizations" ("RTOs") to oversee the interstate auctions that are part of such market processes. The largest part of the state of Illinois is in a region where wholesale electricity is bought and sold via auctions conducted by an ISO called the Midcontinent Independent System Operator, Inc. ("MISO"), which serves all or parts of 15 U.S. states (as far south as Louisiana) and the Canadian province of Manitoba. The remainder of the state, including Chicago and parts of northern Illinois, is in a region where wholesale

12

electricity is bought and sold via auctions conducted by an RTO called PJM

Interconnection, L.L.C. ("PJM"), which serves all or parts of thirteen states (as far

east as New Jersey) and the District of Columbia. The energy suppliers in MISO's

and PJM's wholesale auctions include generators and demand-response entities

(aggregators of customers capable of reducing their electric demand) located inside

and outside of Illinois. MISO's and PJM's auctions are interstate wholesale

markets regulated by FERC.

31.     MISO and PJM operate two distinct types of wholesale auctions:

energy and capacity (among others, which have less direct bearing on this

Complaint). There are two types of energy auctions – "day-ahead" and "real-

time."

*Energy Markets*

32.     With respect to the energy market, the goal of both the day-ahead and

real-time auctions is to ensure that the MISO and PJM "dispatch" (that is, turn on

and regulate the output level of) sufficient generation resources to meet the actual

amount of power used by consumers – or "load" in energy parlance – at any given

moment. Unlike most other commodities, electricity cannot at this time be

economically stored in appreciable quantities. If the amount of generation on the

system falls short of demand levels, the grid operator will take a series of FERC-

mandated steps to limit the negative consequences, starting with voltage reductions

13

or "brownouts" and ending, in more severe cases, with load shedding or "rotating blackouts" to restore balance. If these measures to reduce load to meet available supply are not successful, uncontrolled widespread blackouts may result.

33.     MISO and PJM aim to prevent a supply/demand mismatch by running sophisticated day-ahead and real-time energy markets that take into account physical limitations on the transmission lines, generator availability, predicted energy usage, and many other factors. Because the transmission system has various physical limitations, the price of power varies by location, with electricity costing more in some parts of Illinois than in others.

34.     In the day-ahead energy market, generators bid the price at which they are willing to generate a particular quantity of electricity for next-day delivery. In the real-time energy markets, MISO and PJM prices increase or decrease, signaling the need for participating generators to produce more or less electricity as real-time conditions change.

35.     In the energy auctions, MISO and PJM accept bids from generators, beginning with the lowest and moving up until enough bids are accepted to fully satisfy the demand. MISO and PJM determine separate energy prices, every five minutes, for hundreds of individual locations across their respective territories. The price of the final bid that satisfies all demand for a given location is known as the "market clearing price" or "locational-based marginal price" and is paid

uniformly to all successful supply-side bidders in that location. The wholesale price of electricity in both the day-ahead and real-time energy markets can rise very steeply at times of peak demand. Markets naturally deploy the most efficient and cheapest generators first; additional quantity must be provided by less efficient generators that cost more to run.

36. Unlike other types of generators, which can be turned on and off, or adjusted quickly to produce more or less energy, as conditions warrant, nuclear generators run continuously at maximum output. Because they have no alternative to selling their output in the MISO and PJM energy auctions, they typically bid into the day-ahead markets as "price takers," meaning that they will sell their entire output at whatever clearing price the market determines, even during times of oversupply when the price may be negative (in which case the generators would actually pay money for the right to download their output to the grid). Large inflexible units such as these nuclear units can actually frustrate system operators and can trigger a need to curtail intermittent renewables during such times. A large price-taking unit significantly decreases energy-market prices paid to competitors, as it injects large quantities of energy into the grid, which lowers market-clearing prices. As long as energy market prices, on average, are higher than the nuclear unit's marginal operating costs, this may be financially sustainable for a nuclear unit, since the total revenues earned will exceed the unit's costs of production.

Recent decreases in natural gas fired energy production costs, however, largely driven by access to cheap shale gas, have decreased prevailing energy prices below the level necessary to keep some nuclear units operating.

### *Capacity Markets*

37.     In order to ensure that MISO and PJM have the electricity-producing resources (the generating capacity) they need to operate the grid reliably, MISO and PJM operate capacity auctions.  On an annual basis, MISO and PJM calculate how much generating capacity is needed to allow the electric grid to run reliably under forecasted peak demand and in the presence of significant losses of generating and transmission facilities.  MISO and PJM establish the amount of electricity generation capacity that retail electric suppliers ("load serving entities" or "LSEs") in their respective territories are required to purchase in order to meet customer demand under peak conditions.  LSEs can meet their capacity obligations either through bilateral contracts with generation-owners (or with generation that they own), or through the MISO and PJM administered auction markets for reliability products known as capacity (the "Installed Capacity" or "ICAP" auctions), which FERC established.

38.     In contrast to the energy auctions, where *electricity itself* is bought and sold, capacity auctions are for the purchase and sale of *options* to purchase electricity.  MISO or PJM, as a buyer of a capacity market option, receives the

16

right, at its sole discretion, to call upon the seller of the option (a power generator) to produce a specified amount of energy if and when needed. Each generator that sells capacity in the MISO and PJM capacity markets is required to participate in the day-ahead energy market, and to respond in real-time, if conditions warrant. While the buyer of an option – in this case, MISO or PJM – need not exercise its option to require the seller to produce energy, the capacity markets ensure that the grid will have the *ability* to furnish the amount of energy needed by consumers at any given moment in time.

39.    The amount of capacity that LSEs are required to purchase in the MISO and PJM capacity markets is determined through rigorous reliability planning processes overseen by FERC. Under FERC oversight, MISO purchases annual capacity obligations one month before the relevant delivery period. PJM, by contrast, purchases capacity three years ahead. Either way, each ISO/RTO determines the required amount of capacity in its respective territories according to the FERC-approved rules governing the capacity market, which results in a zonal capacity market price (*i.e.*, the auction may result in separate prices for each of the various sub-zones within the MISO and PJM regions). FERC also approves key parameters of the capacity market auction, including the installed reserve margin and total quantity of capacity to be procured. In PJM, FERC has approved the use of an administratively determined "downward sloping" demand curve that

establishes the price LSEs are required to pay for capacity in various reliability scenarios and in various locations. In MISO, FERC has approved the use of a "vertical" demand curve to determine the price-quantity pair.

40. As supplies of capacity are reduced (signaling a heightened risk to reliability), capacity prices increase to induce additional infrastructure investments. As supplies of capacity become more abundant (signaling a potential over-supply), capacity prices decrease, leading to the potential closure of inefficient generating units. Under FERC's auspices, MISO and PJM have carefully calibrated their rules to ensure that consumers receive the desired level of electrical-system reliability at the lowest possible price. Over time, the FERC-approved market design is self-correcting and leads to efficient economic equilibrium. The costs of capacity purchased in the MISO and PJM capacity auctions are apportioned to LSEs on a volumetric-share basis.

41. In the capacity auctions, generators offer to sell a certain amount of capacity at a certain price at a certain location. As with the energy auctions, the capacity offers in each of the capacity zones are "stacked" from lowest to highest, and bids are accepted until the requisite total demand has been met. The last and highest offer price needed to meet the demand in each zone establishes the market-clearing price for that zone. Any generator that offered at or below this price "clears" in the market and is paid the clearing price. Such a generator in turn is

generally obligated to deliver, if called upon in the day-ahead or real-time energy markets, the amount of electricity to match the capacity that had cleared the auction in that generator's accepted offer. The generators whose offers are above the clearing price receive no payment and have no delivery obligation.

42.     The auction's stacking mechanism creates an incentive for capacity providers to be efficient and cost effective in order to be selected. It creates price signals for new capacity to enter the market for generators that can supply capacity at prices below the clearing price. On the other hand, the market provides price signals for existing generators to exit the market if they are unable to beat the clearing price.

*Total Market Compensation*

43.     The total compensation a generator receives in the market is the sum of its energy market and capacity market revenues (as well as ancillary services, which account for only a small part of a generator's total earning potential).

44.     An uneconomic generator will likely remain in the market if it receives a State subsidy of its energy and/or capacity market earnings rather than retire because it is no longer competitive. In both cases, because subsidized

generators would be uneconomic in the absence of the subsidy, the subsidy distorts wholesale market price signals and directly interferes with the way in which FERC intends wholesale markets to function.

## How Zero Emission Credits Distort the Wholesale Market

45. The Illinois ZEC program created by FEJA distorts the functioning of the FERC-regulated energy and capacity markets in the MISO and PJM regions and nationwide.

46. Under the ZEC subsidy program, an uneconomic nuclear generator receives a higher price per MWh of energy it sells into the wholesale energy market than the rate established pursuant to FERC-approved market rules. Illinois retail ratepayers fund the difference between the wholesale energy rate authorized by FERC and the higher, subsidized rate, established by the State. This state-determined "revised" price contradicts FERC's determination that MISO- and PJM-determined clearing prices are the just, reasonable and not unduly discriminatory or preferential rate. Under the stacking mechanism used to set prices in the MISO and PJM markets, moreover, the artificial retention of the uneconomic nuclear generators in the wholesale markets adds additional (uneconomic) supply in the energy market, which harms competitors (and economic efficiency) by artificially reducing wholesale energy prices and forcing otherwise economic generation (*i.e.*, non-subsidized generation that is more

20

efficient than the nuclear units at issue) to inefficiently leave the market. In addition, the ZEC subsidies will deter the entry of new efficient suppliers, including suppliers of renewable energy, and the long-term result will be higher prices to consumers and businesses.

47.     Forced subsidization of the nuclear generators by retail customers equally distorts wholesale *capacity* market auction outcomes. Under the stacking mechanism, the retention of otherwise uneconomic producers artificially increases the supply of capacity, which directly leads to lower prices. Exelon expressly announced that the Clinton and Quad Cities plants would shut down unless the ZEC program was enacted. The artificial retention of generators in the capacity market that should have retired contravenes the economically efficient market structure that MISO and PJM designed and FERC approved.

48.     In addition, FERC has previously acted to prevent the exercise of buyer-side, or monopsony, market power from infecting the capacity market. Buyer-side market power occurs when a state entity or other large buyer of capacity is able to effectuate the receipt of an above market payment to a limited quantity of supply in order to enable that supplier to enter or remain in the market at an artificially low price and at the same time cause a centralized market clearing price reduction such that the entity (or the customers upon which it seeks to benefit) will realize a net savings on the balance of their in-market purchases

needed to serve their needs.  These uneconomic units, in turn, lower capacity prices in the FERC-jurisdictional market by suppressing the clearing price in the auction, which reduces a buyer's total payment for capacity.  Because capacity market prices are sensitive to even small shifts in the supply/demand balance, the effect of lower capacity prices and corresponding decrease in total capacity market costs can be large.  To prevent this economically inefficient outcome, FERC has been vigilant in protecting the capacity markets from distortion by means of state subsidies that would undercut the critical investment price signals from the auction markets.  FERC has recognized that if left unchecked, state subsidies would lead to higher prices overall to the detriment of consumers over the long run.

49.    In this case, by artificially retaining the otherwise uneconomic nuclear units, Illinois is using the ZEC subsidy to exert a large depressive effect on energy and capacity prices.  While artificially depressed (below-market) energy and capacity prices may save Illinois ratepayers money in the short run, these savings will be offset by both the increased costs of the ZECs themselves and by the enormous forgone benefits of competition and the ability to retain and attract more efficient generation over the long run.  In fact, PJM has calculated the benefits of competitive markets to its consumers.  PJM finds its services offer approximately $2.8 billion to $3.1 billion per year to consumers[4] – in other words, the ZEC

---

[4] http://www.pjm.com/about-pjm/~/media/about-pjm/20151016-value-proposition.ashx.

payments result in the erosion of significant benefits that are not just theoretical, but actually quantified by PJM. Regardless of the short-run or long-run effect, Illinois – like Maryland in *Hughes* – has taken action to alter what the state views as unsatisfactory consequences of the prices set by the wholesale markets under FERC's exclusive jurisdiction.

50. Artificially suppressed prices threaten the viability of more efficient existing generators, including Plaintiffs, and discourage investment in efficient new, flexible generators better suited to integrate weather-dependent, zero-carbon renewable generating resources like wind and solar. The suppressed prices also lower the market revenues received by wind and solar renewables that are the real long-term no-carbon solution, and so the consumer backed incentives paid under legitimate Renewable Energy Credit ("REC") programs will also have to increase. Accordingly, not only will the ZEC program ultimately lead to higher consumer costs over the long run, but it will also stifle the unquestionable environmental benefits derived from competitive electric markets.

51. The Illinois ZEC program is easily distinguishable from the Renewable Energy Credit ("REC") programs many states have enacted. These programs vary significantly from state to state but, under a typical REC program, qualified renewable generators (such as solar, wind, and biomass) earn RECs for

each MWh of electricity they generate. LSEs are required to acquire a certain number of RECs each year or make an Alternative Compliance Payment.

52.    RECs differ from ZECs in several important respects. RECs are created by *all* qualified renewable generators, without regard to economic need. The price of RECs is not fixed by the State and is not tethered in any way to wholesale electricity prices. Rather, RECs are competitively traded outside of the wholesale energy markets, so that their value varies based on supply and demand, including the competitive interactions among alternative qualified suppliers of renewable generation (based on the overall economics of their respective technologies, their specific generating units, and their own operational efficiencies).

53.    In contrast, Illinois' ZEC program is different in every respect:

• ZECs are not available to all qualified renewable generators, but rather just to certain nuclear plants specifically selected through an IPA "procurement process" on the basis of economic need rather than the value of a particular attribute.

• The value of ZECs is fixed by the State rather than by competitive markets.

• The value of ZECs is expressly tied to the price of electricity in the FERC-regulated wholesale markets, and the amount of the subsidies is adjusted as wholesale prices fluctuate.

**FEJA's Illinois ZEC Program**

54.     Among Illinois's six nuclear generating plants, only Clinton, a single-reactor plant in Clinton, IL, and Quad Cities, a two-reactor plant in Cordova, IL, are currently operating unprofitably.  Exelon, the owner of both of these plants, has announced that the two plants lost $800 million in the last seven years.  Clinton sells its output in the MISO wholesale markets and Quad Cities sells its production in PJM wholesale markets.

55.     Quad Cities is so inefficient that its bid did not clear in the PJM capacity auction for the 2019-2020 planning year and thus it will not receive capacity revenue for that period.  Clinton's bid did clear MISO's 2016 one-year forward capacity auction, but these capacity revenues were insufficient to avoid continued losses.

56.     Both of these nuclear plants are Exempt Wholesale Generators ("EWGs") under the Public Utility Holding Company Act, 42 U.S.C. § 16451 *et seq*.  An EWG is a person engaged "exclusively in the business of owning or operating, or both owning and operating, all or part of one or more eligible

facilities and selling electric energy at wholesale." *Id.* § 79z–5a.  These nuclear

facilities thus can only sell the energy they produce into the wholesale market.

57.     In 2016, after hundreds of millions of dollars in losses, Exelon

announced it was "forced to retire" the Clinton and Quad Cities plants, as the

expected revenues from the sale of capacity and energy into the MISO and PJM

markets were insufficient to cover its costs of continued operation.  Citing its status

as a large taxpayer and employer, Exelon said it would consider reversing its

decision and keeping these two plants open only if the State enacted "adequate

legislation" to provide billions of dollars in ratepayer-funded subsidies.

58.     In response to extensive lobbying by Exelon and local politicians, the

Illinois General Assembly included the ZEC program in FEJA.  Although

"environmental protection" was the legislature's asserted goal, the clear and actual

purpose of FEJA was to save jobs and local tax revenues associated with these

plants, as demonstrated by the very name of the law – Future Energy **Jobs** Act.

FEJA is not environmental legislation; it is just a mechanism to provide out-of-

market funding to Clinton and Quad Cities.

59.     Under FEJA, only nuclear plants specifically selected through an IPA

"procurement process" are eligible to receive the ZEC subsidies.  20 ILCS 3855/1-

75(d-5)(1)(C).  Although the law states that the IPA is to award ZEC contracts to

the "winners" of the procurement process, with the winners to be determined on

26

the basis of "public interest criteria," *id*., the process is a sham, as Clinton and Quad Cities have been pre-determined to be the "winners" of the ZEC contracts.

60.    FEJA directs the IPA to consider reports under House Resolution 1146.  One report under House Resolution 1146 titled "Potential Nuclear Power Plant Closings" specifically identifies Exelon's Quad Cities and Clinton's nuclear units.  The report concluded that the facilities needed higher prices to cover their costs.  FEJA provides that "the selection of winning bids shall take into account the incremental environmental benefits resulting from the procurement, such as any existing environmental benefits that are preserved by the procurement . . . and would cease to exist if the procurements were not held, including the preservation of zero emission facilities."  20 ILCS 3855/1-75(d-5)(1)(C).  As "preservation of zero emission facilities" is to be the key factor in the "public interest" determination, all other facilities are effectively excluded, as no other Illinois nuclear plant is in danger of closing.

61.    Indeed, when he signed the bill into law, Governor Rauner expressly stated, "The Future Energy Jobs bill protects taxpayers, ratepayers, and *the good-paying jobs at the Clinton and Quad Cities' plants*."[5]  Furthermore, Exelon itself has boasted that FEJA "ensures the continued operations of Clinton and Quad

---

[5] http://www.exeloncorp.com/newsroom/governor-rauner-signing-of-future-energy-jobs-bill (emphasis added).

Cities for at least 10 years."[6]  Exelon reversed its decision to close these two plants on the very day the governor signed the law, and within days it announced plans to fast track multiple capital projects at these plants.[7]  In an earnings call on February 8, 2017, Exelon stated that it had already recognized anticipated Illinois ZEC revenue in its financial statements.[8]  This plainly shows that Exelon's plants are the pre-determined winners of the so-called "competitive procurement process."

62.    The ZEC program excludes all other zero-carbon resources in Illinois and elsewhere, and thus no others will receive compensation for their zero-carbon attributes.  Once the ZEC subsidy is taken into account, the uneconomic nuclear resources (Clinton and Quad Cities) will receive a higher level of wholesale market compensation than other nuclear generators operating in Illinois, all of which are now profitable without subsidies.  Thus, FEJA simply serves to maintain the uneconomic capacity and energy from the Clinton and Quad Cities units in the FERC-regulated wholesale markets, notwithstanding the fact that wholesale market price signals are indicating that these units should be retired.

63.    The exact amount to be paid to Clinton and Quad Cities is to be determined by a complicated formula that is tethered to FERC-regulated wholsale prices in both the MISO and PJM energy and capacity markets.  For 2017, these

---

[6] http://www.exeloncorp.com/newsroom/fejb-econ-impact-rls.
[7] http://www.exeloncorp.com/newsroom/governor-rauner-signing-of-future-energy-jobs-bill.
[8] http://seekingalpha.com/article/4043975-exelon-exc-q4-2016-results-earnings-call-transcript.

two nuclear generators will receive an additional $16.50 for each MWh of electricity they produce and sell. The $16.50 price is said to be based on the "Social Cost of Carbon," as determined by a federal interagency working group. 20 ILCS 3855/1-75(d-5)(1)(B). Beginning in 2023, this price will increase by $1.00 each year. *Id.* Beginning in 2018, the price is also subject to a "Price Adjustment," which is determined by the amount "by which the market price index for the applicable delivery year exceeds the baseline market price index for the consecutive 12-month period ending May 31, 2016." *Id.* Both the "market price index" and the "baseline market price index" are based on the sum of specified PJM and MISO forecast energy and capacity prices. *Id.* The essence of the formula is that the ZEC payments will go down if FERC-regulated energy and capacity prices go down.

64. The ZEC pricing formula is set forth in its entirety in Exhibit A. It can be summarized as shown in this table:



The ZEC program thus establishes a new state-created energy price "adder" granted only to the "winners" of the IPA procurement program. The adder will not occur unless the "winning" nuclear generators sell their energy into the wholesale markets, and thus the adder is directly tethered to the wholesale price of electricity.

65. The price-suppressive effects of the ZECs on the FERC-regulated wholesale markets also impermissibly discriminate against other non-carbon emitting technologies. Under FEJA's ZEC program, a small hydroelectric dam producing zero-emission energy will receive the FERC-determined energy price,

but would not qualify for ZECs.  Other generators of renewable energy and out-of-state entities are similarly disadvantaged, substantially burdening interstate (as well as international) commerce.

66.     If the ZEC program goes into effect as planned in June 2017, Plaintiffs will incur many millions of dollars in damages, because the subsidies will enable the nuclear generators, who compete against Plaintiffs in interstate markets, to continue operating money losing facilities, and selling uneconomic capacity and energy into the FERC-regulated auctions, causing the auctions to return significantly lower prices.  Plaintiffs will lose auctions they otherwise would have won, and they will receive less revenue from auctions they do win.

67.     The State of Illinois, the IPA, and the defendant IPA director are immune from damages liability.  Accordingly, the harm to Plaintiffs from implementation of FEJA's unconstitutional ZEC program will be irreparable.

## CLAIMS FOR RELIEF

### COUNT I
### FIELD PREEMPTION – SUPREMACY CLAUSE

68.     Plaintiffs herein incorporate all previous allegations.

69.     Under the Supremacy Clause, if Congress enacts a federal law regulatory scheme and intends to fully occupy the field it has chosen to regulate, any state law in this field is "field preempted" and thus invalid, without regard for the impact of the state regulation upon the national interest.

31

70.    FEJA's ZEC program is field preempted.  Under the FPA, 16 U.S.C.

§ 824(b), FERC has exclusive jurisdiction over the sale of electric energy, the sale

of capacity at wholesale in interstate commerce, and wholesale electricity rates.

FERC also has exclusive jurisdiction over measures that affect, pertain to, or are

connected with wholesale electricity rates.  *Id*. §§ 824d(a), 824e(a).  Federal law

exclusively occupies the entire field of wholesale electricity sales.

71.    MISO and PJM's energy and capacity auctions are wholesale

interstate markets for the sale of electricity, and they fall within the field of

FERC's exclusive authority.  FEJA's ZEC program invades that field because it

directly affects the wholesale clearing price of electricity sales in the MISO and

PJM auctions.

72.    Specifically, the nuclear generators offer into the MISO and PJM

auctions. Under FERC-approved rules, all generators whose offers "clear" receive

the market clearing price, which is the wholesale market price.  The ZEC

requirement invades FERC's exclusive regulatory field by directly altering the

revenue to be paid to the nuclear generators.  The ZECs provide the nuclear plants

with substantial out-of-market payments for each MWh of electricity they produce,

thus effectively replacing the auction clearing price received by these plants with

the alternative, higher price preferred by the Illinois General Assembly.

73.     The FERC-determined price paid to competing generators in the energy market is also suppressed by the uneconomic retention of the nuclear units, which also frustrates FERC's market design, causing a concomitant lowering of the clearing price to be paid to plaintiffs and other competitors.

74.     Finally, the continued operation of the otherwise non-economic nuclear generators has a direct and significant price suppressive effect in the capacity market, frustrating FERC's goals of ensuring electric reliability through the capacity market.  But for the subsidy, these units would leave the market, temporarily decreasing the amount of supply in the market, and increasing prices until the market responded with the necessary level of investment in new generation, thereby finding a new equilibrium level.  The turnover of generating units is essential to delivering the benefits of competition to consumers as state of the art technologies replace less efficient, less flexible, more costly resources.

75.     FEJA's ZEC program is therefore field preempted, because (a) FERC has exclusive jurisdiction to set wholesale prices, yet the ZEC program guarantees the favored generators a higher price than the competitive market price set by FERC; and (b) the ZEC program interferes with FERC's exclusive jurisdiction over wholesale prices by directly affecting the behavior of participants in both energy and capacity auctions and the ultimate outcome of those auctions.

## COUNT II
## CONFLICT PREEMPTION – SUPREMACY CLAUSE

76.     Plaintiffs herein incorporate all previous allegations.

77.     Even in the absence of field preemption, any state law or regulation is "conflict preempted" and thus invalid if it conflicts with federal law, frustrates the purpose of a federal law, or is an obstacle to full implementation of federal law. A state measure may be conflict preempted even if its impact on federal law is only indirect or incidental.

78.     FEJA's ZEC program is conflict preempted by the FPA. FERC, the agency charged with implementing the FPA, has determined that market-based processes – approved and overseen by FERC – are the best way to bring more efficient, lower cost power to the Nation's electricity consumers. The auction market process creates an incentive for capacity providers to be efficient and cost effective in order to be selected. It creates price signals for new capacity to enter the market if it can supply capacity at prices below the clearing price. At the same time, the market provides price signals for existing suppliers to exit the market if they are unable to beat the clearing price.

79.     FEJA's ZEC program enables the nuclear generators to offer in the auction markets at a lower price, below actual costs, over a lengthy ten-year period of time. At the expense of industrial progress, the clearing price of the auctions will thus be artificially suppressed for an entire decade. The offers of some

34

generators will be rejected, both existing and new, even though (absent the nuclear generators' subsidized participation) they would have cleared the auction. The generators whose offers are accepted will be under-compensated, because the clearing price will be artificially lower than what a competitive market process – as established by FERC – would have produced, and lower than the actual cost to provide the capacity service.

80.     FEJA's ZEC program will disrupt market signals. The subsidized nuclear generators, even though uneconomic, will stay in operation; generators that are otherwise economic will exit the market because they are receiving an artificially suppressed price and thus lower revenues; and investors will be discouraged from financing and building new economic generators. Supply will then be reduced, and new investors will be deterred from entering a marketplace plagued by subsidized distortions.

81.     The ZEC program also interferes with FERC's decision to structure the wholesale markets for capacity and energy on market-based principles in order to encourage the exit of uneconomic generating capacity – when a generator's costs exceed its revenues – to encourage the entry, when appropriate, of more efficient generators. It is clear from FEJA's ZEC program that Illinois simply disagrees with FERC's determination that the markets should determine the fate of the uneconomic nuclear generators.

35

82. FEJA's ZEC program will also affect interstate and international wholesale markets outside Illinois and the MISO and PJM. Because the ZEC program will artificially suppress the MISO and PJM auction prices, generators will prefer, where possible, to sell in wholesale markets other than MISO and PJM. This shift will increase supply and reduce prices in those other markets, and thus the ZECs will have market-distorting ripple effects throughout the national market and beyond Illinois's borders.

83. If Illinois truly believes that Clinton and Quad Cities require a subsidy to achieve environmental goals, it is entitled to petition FERC to adopt market rule changes or take other steps to increase market prices to levels sufficient to allow the nuclear generators to recover their costs. Instead of following this course, the Illinois General Assembly has opted to disregard FERC's exclusive jurisdiction over wholesale electricity rates.

84. FEJA's ZEC program therefore stands as a formidable obstacle to FERC's regulatory scheme, which depends upon fair competition and the functioning of competitive auction markets without interference from out-of-market subsidies to achieve just and reasonable rates. Under the Supremacy Clause, Illinois may not supplant FERC's scheme with its own preferred approach.

## COUNT III
### DORMANT COMMERCE CLAUSE, UNDER 28 U.S.C. § 1983

85. Plaintiffs herein incorporate all previous allegations.

86.     The FEJA's ZEC program is invalid under the dormant Commerce
Clause, U.S. Const. art. I, § 8.  Under this provision, states cannot discriminate
against interstate commerce nor can they unduly burden interstate commerce, even
in the absence of federal legislation regulating the activity.  Any state action that
burdens interstate commerce is invalid if the burden is clearly excessive in relation
to the putative local benefits.  A state action is invalid if it does not regulate
evenhandedly to effectuate a legitimate local public interest, or if its effects on
interstate commerce are more than incidental.

87.     Although states have the authority to regulate the retail sale of
electricity within their own borders, the wholesale sale of electricity involves
interstate commerce, which the state may not regulate.  MISO and PJM's
wholesale markets are interstate and international in nature, as they involve the sale
and transmission of energy and capacity from generators located in other states and
in Canada, and the purchase of such commodities by customers in other states.

88.     FEJA's ZEC program was enacted for political reasons in an attempt
to save jobs and property tax revenues at the subsidized generators.  Illinois's
attempts to preserve local industry from the rigors of interstate competition are
prohibited by the Commerce Clause.

89.     Although the reduction of carbon emissions is important, this can be
achieved more effectively by means that would neither discriminate against

37

interstate or international commerce nor frustrate the progress competitive markets have been delivering in the form of environmental benefits.

90.    FEJA's ZEC program is directly discriminatory, as only favored Illinois nuclear plants will receive subsidies.  Although all nuclear facilities connected to MISO or PJM are purportedly eligible to apply for ZEC subsidies, the procurement criteria have been rigged so that only Clinton and Quad Cities may be selected as the "winning bidders."  Moreover, the program is not even-handed with respect to other technologies that could produce carbon-free electricity and with respect to out-of-state generation.  It therefore violates the Commerce Clause.

91.    Even if the ZEC program is not deemed discriminatory, it is still invalid under the Commerce Clause because it imposes market-distorting burdens on interstate and international commerce that far outweigh the purported local benefits.  As detailed above, the ZECs would cause more efficient interstate generators to leave the market and discourage the entry of new competitors.

92.    In fact, the purported local benefits are largely illusory. Artificially suppressed prices – achieved through ratepayer subsidies provided to uneconomic nuclear generating units – will ultimately lead to reduced supply and higher prices, as they will deter the development of newer, more efficient market entry needed to moderate higher prices. The ZEC program will hurt Illinois consumers and businesses and will cost jobs.

93.     Implementing the FEJA's ZEC program deprives plaintiffs of their Commerce Clause "rights, privileges, or immunities" within the meaning of 28 U.S.C. § 1983.  Plaintiffs have been injured by these deprivations and are entitled to redress under § 1983.  *Dennis v. Higgins*, 498 U.S. 439 (1991).

## **PRAYER FOR RELIEF**

In light of the foregoing, Plaintiffs seek:

A.     a declaration that the portions of FEJA establishing the ZEC nuclear subsidies are invalid because they are preempted by federal law and violate the Commerce Clause;

B.     a permanent injunction preventing Defendant from implementing FEJA's ZEC program;

C.     reasonable attorneys' fees and costs, including pursuant to 28 U.S.C. § 1988; and

D.     all such other relief to which the Court may find Plaintiffs are entitled.

By:*/s/Leonard A. Gail*
       Leonard A. Gail

Jonathan S. Massey (*pro hac vice* pending)
MASSEY & GAIL, LLP
1325 G Street, NW
Suite 500
Washington, DC 20005
Telephone: (202) 652-4511
jmassey@masseygail.com

Jonathan D. Schiller (*pro hac vice* pending)
David A. Barrett (*pro hac vice* pending)
BOIES SCHILLER & FLEXNER, LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Telephone: (212) 446-2300
jschiller@bsfllp.com
dbarrett@bsfllp.com

Leonard A. Gail
Suyash Agrawal
Paul J. Berks
MASSEY & GAIL, LLP
50 East Washington Street
Suite 400
Chicago, IL 60602
Telephone: (312) 283-1590
jmassey@masseygail.com
sagrawal@masseygail.com
pberks@masseygail.com

*Attorneys for Plaintiffs*

Stuart H. Singer (*pro hac vice* pending)
William T. Dzurilla
(*pro hac vice* pending)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone (954) 356-0011
ssinger@bsfllp.com
wdzurilla@bsfllp.com

Edward J. Normand (*pro hac vice* pending)
Jason C. Cyrulnik (*pro hac vice* pending)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
enormand@bsfllp.com
jcyrulnik@bsfllp.com