**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ELECTRIC POWER SUPPLY ASS'N, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.  17-cv-01164 |
| v. | ) | |
| | ) | Judge Manish Shah |
| ANTHONY M. STAR, in his official capacity | ) | |
| as Director of the Illinois Power Agency, *et al.*, | ) | Magistrate Judge Susan Cox |
| | ) | |
| Defendants. | ) | |

# STATE DEFENDANTS'
# MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Thomas Ioppolo
*tioppolo@atg.state.il.us*
Assistant Attorney General
100 W. Randolph St., 11th Floor
Chicago, IL 60601
(312) 814-7198

Richard S. Huszagh
*rhuszagh@atg.state.il.us*
Assistant Attorney General
100 W. Randolph St., 12th Floor
Chicago, IL 60601
(312) 814-2587

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.     Standards Governing a Motion to Dismiss. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.    Illinois' ZEC Program Is Not Preempted by the FPA. . . . . . . . . . . . . . . . . . . . . . . . . 7

     A.    Illinois' ZEC Program Is Not Field-Preempted by the FPA Because It Does
           Not Set Rates for or Regulate Interstate Sales of Wholesale Power, And the
           FPA Does Not Occupy the Entire Field of Activities that Have an Incidental
           Effect on the Rates for Such Sales. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     B.    The FPA Does Not Invalidate Illinois' ZEC
           Program Under Conflict Preemption Principles. . . . . . . . . . . . . . . . . . . . . . . . . . 13

     C.    Plaintiffs Do Not Have a Cause of Action to Enjoin Implementation of
           Illinois' ZEC Program on the Ground that It Is Preempted by the FPA. . . . . . . . . 16

III.    Illinois' ZEC Program Does Not Violate the Dormant Commerce Clause. . . . . . . . . . . 17

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

*Cases*                                                                                   Page(s)

*Alliance of Auto Mfrs. v. Gwadosky*, 430 F.3d 30 (1st Cir. 2005)..........................22

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008)...........................................13

*Am. Ref-Fuel Co.*, 105 FERC ¶ 61004 (2003)..............................................15

*Arizona v. United States*, 132 S. Ct. 2492 (2012)........................................9

*Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378 (2015)....................16-17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).................................................7

*Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984)..........15

*City of Arlington v. FCC*, 133 S. Ct. 1863 (2013).......................................15

*City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978)..............................19-20

*Construction Materials Recycling Ass'n Issues & Educ. Fund v. Burack*,
     686 F. Supp. 2d 162 (D. N.H. 2010)...............................................22

*DeHart v. Town of Austin, Ind.*, 39 F.3d 718 (7th Cir. 1994)..........................8, 9

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012)....................16

*English v. General Electric Co.*, 496 U.S. 72 (1990)................................8, 9, 13

*Ex parte Young*, 209 U.S. 123 (1909)................................................16, 17

*FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760 (2016)................2, 3, 10, 11, 14

*Flying J, Inc. v. Van Hollen*, 621 F.3d 658 (7th Cir. 2010)..........................13, 16

*FPC v. Louisiana Power & Light Co.*, 406 U.S. 62 (1972)...............................12

*General Motors v. Tracy*, 519 U.S. 278 (1997)..........................................20

*H. P. Hood & Sons v. DuMond*, 336 U.S. 525 (1949).....................................19

*Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985)...........8

*Hughes v. Alexandria Scrap*, 426 U.S. 794 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288 (2016). . . . . . . . . . . . . . . . . . . . 3, 4, 10, 12

*Huron Portland Cement Co. v. Detroit*, 362 U.S. 440 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Ill. Commerce Comm'n v. FERC*, 721 F.3d 764 (7th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355 (1986). . . . . . . . . . . . . . . . . . . . . . . . . 8

*Maine v. Taylor*, 477 U.S. 131 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

*Mason v. SmithKline Beecham Corp.*, 596 F.3d 387 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . 13

*McCauley v. City of Chicago*, 671 F.3d 611 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981). . . . . . . . . . . . . . . . . . . . . 20, 22

*Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354 (1988). . . . . . . . . . . . . . . . . . . 12

*New York v. FERC*, 535 U.S. 1 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493 (1989). . . . . . . . . . 13

*Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 12

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*,
   699 F.3d 962 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 16

*Reeves, Inc. v. Stake*, 447 U.S. 429 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Rice v. Norman Williams Co.*, 458 U.S. 654 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
   550 U.S. 330 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

*Virginia Office for Protection & Advocacy v. Stewart*, 131 S. Ct. 1632 (2011). . . . . . . . . . . . 16

*Wheelabrator Lisbon, Inc. v. Conn. Dep't of Pub. Util. Control*,
   531 F.3d 183 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14, 15

*WSPP Inc.*, 139 FERC ¶ 61,061 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Wyeth v. Levine*, 555 U.S. 555 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Zero Zone, Inc. v. U.S. Dep't. of Energy*, 832 F.3d 654 (7th Cir. 2016). . . . . . . . . . . . . . . . . . 23

### Statutes and Court Rules

U.S. Const. art. 6, cl. 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-17

15 U.S.C.A. §§ 717 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

16 U.S.C. § 824. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 9, 10

16 U.S.C. § 824d. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9, 14, 15

16 U.S.C. § 824e. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 14, 15

20 ILCS 3855/1–10. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6

20 ILCS 3855/1–75(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

20 ILCS 3855/1–75(d–5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Ill. P.A. 99–906. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

V. Arroyo, *et al.*, *State Innovation on Climate Change: Reducing Emissions*
    *from Key Sectors While Preparing for A "New Normal"*,
    10 Harv. L. & Poly Rev. 385, 388 & n. 14 (2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

American Lung Association, *www.lung.org/healthyair/outdoor/air-pollution*
    (visited April 4,2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## Introduction and Summary of Argument

In this action, plaintiffs Electric Power Supply Association, *et al.* (collectively, "Plaintiffs") claim that the provisions in Illinois Public Act 99–0906 (the "Act") that promote the continued operation of nuclear power plants, and thereby avoid the emission of airborne pollutants, through a program of ratepayer-supported zero-emission credits ("ZECs") are (1) preempted by the Federal Power Act, 16 U.S.C. §§ 791 *et seq.* (the "FPA"), and (2) violate the dormant Commerce Clause. These claims are without merit as a matter of law, and Plaintiffs' action should be dismissed.

Plaintiffs rightly do not dispute that state laws that encourage the generation of renewable energy in light of the environmental benefits of such energy are legally valid. Complaint (Doc. 1), pars. 51-52. They insist, however, that Illinois' program, which is built on a fundamentally similar framework — where the environmental benefits of specific forms of power generation are "unbundled" from the energy itself and represented as credits that are sold to utilities, which pass the cost along to utility ratepayers — is legally invalid. Plaintiffs' various claims are unconvincing.

Although the FPA gives the Federal Energy Regulatory Commission ("FERC") authority to regulate interstate sales of wholesale electric power, it also expressly preserves the States' regulatory authority over other matters, including the generation of electric power and retail sales of such power. 16 U.S.C. § 824. Illinois' ZEC program regulates the latter category of activities and thus falls comfortably within the authority reserved to the States. The program does not encroach on FERC's exclusive jurisdiction by setting rates for, or otherwise regulating, interstate sales of wholesale power. Nor does it conflict with any exercise of FERC's federal law authority to ensure that rules or practices directly affecting wholesales rates within its jurisdiction are just and reasonable. Instead, although Illinois' ZEC program may have an incidental effect on FERC-approved wholesale rates, the program lawfully implements Illinois' state law authority to promote

environmental benefits relating to the generation and retail sale of electric energy. For similar reasons, the Court should conclude that Plaintiffs do not even have a cause of action for an injunction against implementation of Illinois' ZEC program on the ground that it is preempted by the FPA. Finally, the Act does not unconstitutionally interfere with interstate commerce, either on its face or by imposing severe burdens on interstate commerce that are clearly excessive compared to the Act's environmental benefits.

## Background

Legal Framework

Federal regulation of the electric power industry is governed by Subchapter II of the FPA, 16 U.S.C. §§ 824 *et seq.*[1] Section 824 of Title 16 (FPA § 201) gives FERC regulatory authority over "the transmission of electric energy in interstate commerce" and the "sale of electric energy at wholesale in interstate commerce." 16 U.S.C. §§ 824. At the same time, Section 824 specifically reserves to the States authority over "any other sale of electric energy" (primarily retail sales), as well as regulation "over facilities used for the generation of electric energy or over facilities used in local distribution only for the transmission of electric energy in intrastate commerce." 16 U.S.C. § 824(a),(b); see also *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 766, 775 (2016) ("*EPSA*").

---

[1] *New York v. FERC*, 535 U.S. 1, 5, 9 (2002), summarizes much of the industry and regulatory background relevant to the present dispute.

In 1935, when the FPA became law, most electricity was sold by vertically integrated utilities that had constructed their own power plants, transmission lines, and local delivery systems. . . . Competition among utilities was not prevalent.

. . .

Since 1935, and especially beginning in the 1970's and 1980's, the number of electricity suppliers has increased dramatically. Technological advances have made it possible to generate electricity efficiently in different ways and in smaller plants. In addition, unlike the local power networks of the past, electricity is now delivered over three major networks, or "grids," in the continental United States.

Section 824d (FPA § 205) directs FERC to ensure that "rates and charges" for the interstate transmission and for interstate sales of wholesale energy, and all "rules and regulations affecting or pertaining to such rates and charges," are "just and reasonable." 16 U.S.C. § 824d; see also *EPSA*, 136 S. Ct. at 773. Section 824e (FPA § 206) further provides that if FERC determines, after an administrative proceeding, that any rate for, or any rule or practice affecting, the interstate transmission or interstate wholesale sale of energy is "unjust" or "unreasonable," it "shall fix the same by order." 16 U.S.C. § 824e; see also *EPSA*, 136 S. Ct. at 773-74.

In recent years, FERC has adopted a more market-based approach to regulating interstate transmission and wholesale sales of electric power.[2] Under this approach, in large parts of the country interstate sales of wholesale electric *energy* and of future electric *capacity* (which seeks to ensure sufficient future supply to meet anticipated demand) are conducted through auctions run by Independent System Operators and Regional Transmission Organizations (collectively, "RTOs"). See *Ill. Commerce Comm'n v. FERC*, 721 F.3d 764, 770 (7th Cir. 2013) ("*ICCv. FERC*"). Pursuant to a FERC-approved policy, RTOs accept bids for energy on a daily basis and for future energy capacity through annual auctions, starting with the lowest bid until the anticipated need is met. The price for the last-accepted bid, referred to as the "clearing price" (or locational marginal price), then applies to *all* accepted bids. See *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1290, 1293 (2016). (If generators bypass these markets and enter into "bilateral contracts" with utilities, FERC has the authority to ensure that the prices are just and reasonable. *Id.*) Illinois is served by two RTOs: PJM Interconnection, LLC ("PJM"), which covers much of northern Illinois and large parts

---

[2]    See, e.g., *New York v. FERC*, 535 U.S. at 10-14 (upholding FERC Order No. 888, which ordered "functional unbundling" of wholesale generation and transmission services, pursuant to which, *inter alia*, each utility was required "to state separate rates for its wholesale generation, transmission, and ancillary services, and to take transmission of its own wholesale sales and purchases under a single general tariff applicable equally to itself and to others").

of the eastern United States, and the Midcontinent Independent System Operator, or "MISO," which covers most of Illinois and much of the Midwest.  See *ICC v. FERC*, 721 F.3d at 770 & Fig. 1.

In 1997, Illinois enacted a law to restructure its electric energy industry, which had the effect of largely separating out the elements of electric generation, supply (the retail sale of electric power itself), and distribution (the transmission of electricity to the ultimate retail consumers), thus giving customers the ability to choose their energy supplier while retaining the regulated utility's distribution service.  See Illinois Public Act 90–561 (adding Article XVI to the Illinois Public Utilities Act, 220 ILCS 5/16–101 *et seq.*); 220 ILCS 5/16-111(g)(3); see generally *Commonwealth Edison Co. v. ICC*, 775 N.E.2d 113, 121 (Ill. App. 2002).  (Many other States have pursued a similar restructuring of their electric power markets.  *Hughes*, 136 S. Ct. at 1292.)

In 2007, Illinois adopted a statutory program to promote renewable energy, codified in Section 1–75(c) of the Illinois Power Agency Act.  (20 ILCS 3855/1–75(c).)[3]  In simplified terms, Illinois' program established state law property interests in the environmental benefits of renewable energy (e.g., reduced consumption of fossil fuels and corresponding reduction of airborne emissions, including greenhouse gases) distinct from the underlying energy itself.  These property interests take the form of "renewable energy credits" ("RECs") that are measured in terms of the energy output associated with the creation of those benefits (usually megawatt hours ("MWhs")), but are "unbundled" from that energy and traded in separate transactions from the sale of that energy.  See, e.g., 20 ILCS 3855/1–10 (eff. June 1, 2017).  Each Illinois utility must acquire RECs matching a statutory percentage of its retail sales of electricity, with the prescribed percentage increasing progressively until it reaches 25% in 2025.  20 ILCS 3855/1–75(c) (2014).  Those purchases occur

---

[3]      Similar programs have also been adopted by a majority of States.  See V. Arroyo, *et al.*, *State Innovation on Climate Change:  Reducing Emissions from Key Sectors While Preparing for A "New Normal"*, 10 Harv. L. & Poly Rev. 385, 388 & n. 14 (2016).

4

through procurement events conducted by the IPA, with competitive bidding by REC sellers, and winning bids subject to ICC approval. 20 ILCS 3855/1–75(a)-(b); 220 ILCS 5/16–111.5(c)(1)-(2). The utilities, as buyers of RECs, then pass the corresponding cost along to their Illinois retail customers. 220 ILCS 5/16–111.5(*l*).

The Act, which became law on December 7, 2016 and has a June 1, 2017 effective date, added new subsection (d–5) to Section 1–75 of the Illinois Power Agency Act. 20 ILCS 3855/1-75(d–5). This amendment created a program to promote the environmental benefits associated with the continued generation of nuclear power, which generates no greenhouse gases or other airborne pollutants, by unbundling those benefits and converting them into credits, similar to the REC program. In the Act, the Illinois General Assembly made a series of detailed legislative findings regarding the zero-emission standards it adopted. It found, in particular, that:

- Reducing emissions of carbon dioxide and other air pollutants, such as sulfur oxides, nitrogen oxides, and particulate matter, is critical to improving air quality in Illinois for Illinois residents.

- Sulfur oxides, nitrogen oxides, and particulate emissions have significant adverse health effects on persons exposed to them, and carbon dioxide emissions result in climate change trends that could significantly adversely impact Illinois.

- Preserving existing zero emission energy generation and promoting zero emission energy generation is vital to placing the State on a glide path to achieving its environmental goals and ensuring that air quality in Illinois continues to improve.

Ill. P.A. 99–0906, § 1.5, Zero emission standard legislative findings, (1), (2), (4). Relying on a report by the Illinois Commerce Commission, the Illinois Power Agency, the Illinois Department of Commerce and Economic Opportunity, and the Illinois Environmental Protection Agency, the General Assembly also found that "nuclear power plants are among the most reliable sources of energy, which means that electricity from nuclear power plants is available on the electric grid all hours of the day and when needed, thereby always reducing carbon emissions." *Id.*, finding (6).

5

Based on these findings, the Act requires Illinois electric utilities to acquire ZECs equal to 16% of the electricity they distribute each year. 20 ILCS 3855/1–75(d–5); 20 ILCS 3855/1–10 (defining "zero emission facility").[4] They must acquire ZECs from qualifying nuclear power plants that are interconnected with the MISO or PJM systems, and may then pass along the corresponding costs to their customers as distribution surcharges. *Id.*, sub-§ (d–5)(2). Under the Act, the IPA, subject to ICC review and approval, will select nuclear power generators eligible to sell ZECs based on specified public-interest criteria, including: "minimizing carbon dioxide emissions that result from electricity consumed in Illinois"; "minimizing sulfur dioxide, nitrogen oxide, and particulate matter emissions that adversely affect the citizens of this State"; and "the incremental environmental benefits resulting from the procurement, such as any existing environmental benefits that are preserved by the procurements held under this [Act] and would cease to exist if the procurements were not held, including the preservation of zero emission facilities." *Id.*, sub-§ (d–5)(1)(C).

The price of ZECs is set by a statutory formula that includes a base price of $16.50 per MWh (identified as the "social cost of carbon," as determined by the U.S. Interagency Working Group on Social Cost of Carbon's price, August 2016 Technical Update). *Id.*, sub-§ (d–5)(1)(B)(i). That figure is then adjusted by a factor derived from indexes of futures prices for wholesale energy and capacity in the PJM and MISO areas. *Id.*, sub-§ (d–5)(1)(B). The effect of this factor, which may only lower the price of ZECs, is that if wholesale energy and capacity prices go up, thereby likely increasing a nuclear power plant's operating income from producing and selling energy and capacity and decreasing its need for ZEC revenues to stay in operation, those ZEC revenues — and the corresponding economic cost passed along to Illinois customers — go down. *Id.*

---

[4]    New subsection (d–5) identifies this 16% figure as "the average of the percentage targets" for the REC program (set forth "in subparagraph (B) of paragraph (1) of subsection (c) of Section 1–75 of this Act") "for the 5 delivery years beginning June 1, 2017."

The Lawsuit

Plaintiffs are the Electric Power Supply Association ("EPSA"), an association of independent power generators located in multiple states, and several individual companies (Dynegy Inc., Eastern Generation, LLC, NRG Energy, Inc., and Calpine Corp.) that operate power-generating facilities in Illinois and other States, including non-nuclear plants in the PJM and MISO systems. Complaint (Doc. 1), pars. 15-19. Plaintiffs allege that the Act will injure them by causing lower prices for wholesale electricity. *Id.*, pars. 49-50. They claim that the Act is unconstitutional because it is preempted by the FPA and violates the dormant Commerce Clause. *Id.*, pars. 69 *et seq.*

## Argument

## I. Standards Governing a Motion to Dismiss.

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In reviewing the sufficiency of a complaint under this standard, the court must accept as true all well-pleaded factual allegations. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). However, legal conclusions and "conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *Id.*

## II. Illinois' ZEC Program Is Not Preempted by the FPA.

Plaintiffs' claim that Illinois' ZEC program is preempted by the FPA is without merit as a matter of law and should be dismissed. As described above, the ZEC program promotes the environmental benefits of emission-free nuclear power by unbundling those benefits from electric power itself, giving them an economic value, and allowing their creators to receive that value. Plaintiffs ask the Court to disregard these facts about how and why the program actually operates and focus instead on the indirect and incidental effects that this program may have on FERC-regulated prices for interstate sales of wholesale electric power. But the ZEC program does not

7

regulate rates, prices, or other transaction terms for wholesale sales of energy, and the incidental effect the program may have on such rates leaves it within Illinois' reserved authority over public health, power generation, and retail sales of electric energy expressly recognized by the FPA.

Pursuant to the Supremacy Clause of the U.S. Constitution (U.S. Const. art. 6, cl. 2), federal law preempts state law, rendering it inoperative, only in limited situations: (1) when the express language of a federal statute declares that preemption; (2) when Congress intends the federal government to occupy a field exclusively, such as when the federal regulatory scheme is so pervasive that it may be assumed Congress "left no room for the States to supplement it"; or (3) when state law actually conflicts with federal law because it is impossible to comply with both, or because state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English v. General Electric Co.*, 496 U.S. 72, 78-79 (1990) (citations and internal quotation marks omitted); see also *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 984 (7th Cir. 2012); *DeHart v. Town of Austin, Ind.*, 39 F.3d 718, 721 (7th Cir. 1994). "Pre-emption may result not only from action taken by Congress itself," but also from "a federal agency acting within the scope of its congressionally delegated authority." *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 369 (1986); see also *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715-16 (1985). Courts apply a presumption that state law is not preempted. *Wyeth v. Levine*, 555 U.S. 555, 565 & n.3 (2009); *Hillsborough County*, 471 U.S. at 715-16; *Planned Parenthood of Ind.*, 699 F.3d at 984.

In this case, Plaintiffs do not claim that the FPA expressly preempts the Illinois ZEC program. Nor do they claim that implied preemption of that program — either field preemption or conflict preemption — results from any regulatory action by FERC. Instead, they claim such implied preemption based only on the FPA's text. That claim lacks merit.

A. **Illinois' ZEC Program Is Not Field-Preempted by the FPA Because It Does Not Set Rates for or Regulate Interstate Sales of Wholesale Power, And the FPA Does Not Occupy the Entire Field of Activities that Have an Incidental Effect on the Rates for Such Sales.**

Plaintiffs' field preemption claim fails because Illinois' ZEC program does not regulate, or set rates for, interstate wholesale sales of electric power. Instead, the program operates within the realm that the FPA specifically reserves to the States, which expressly encompasses the authority to regulate power generation and retail sales of electric energy. 16 U.S.C. § 824(a),(b). The fact that the program's implementation may have an incidental "effect" on FERC-regulated rates for interstate wholesale sales of electric power does not bring it within FERC's exclusive authority under the FPA.

Plaintiffs' field preemption claim (as distinguished from their conflict preemption claim) requires the Court to conclude that Congress intended not to allow *any* regulation — even regulation that supplements and is *consistent with* federal law — in the "area" in which the ZEC program operates. See *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1595 (2015); *Arizona v. United States*, 132 S. Ct. 2492, 2502 (2012). In addition, where a field preemption claim arises in an area traditionally regulated by the States, as it does in this case, "congressional intent to supersede state laws must be clear and manifest." *English*, 496 U.S. at 79 (citation and internal quotation marks omitted); see also *DeHart*, 39 F.3d at 722. The text and structure of the FPA do not satisfy these standards.

As noted above, the FPA establishes separate, but interrelated, categories of federal and state authority with respect to the regulation of electric power. On the one hand, the FPA establishes FERC jurisdiction over interstate sales of wholesale electric power, 16 U.S.C. § 824; directs FERC to ensure that the rates for such sales, as well as the rules affecting such rates, are just and reasonable, 16 U.S.C. § 824d; and gives FERC authority both to determine, in administrative

9

proceedings, whether any such rates, or any rules or practices affecting such rates, are "unjust" or "unreasonable," and, if it makes such a determination, to "fix" that situation "by order," 16 U.S.C. § 824e(a); see also *EPSA*, 136 S. Ct. at 767, 773-74. On the other hand, the FPA expressly preserves the States' historic regulatory authority over activities other than the interstate transmission of electric energy and interstate sales of wholesale electric power, including, specifically, power generation and retail sales of electricity. 16 U.S.C. §§ 824(a), 824(b)(1); see also *EPSA*, 136 S. Ct. at 767-78; *Oneok*, 135 S. Ct. at 1599. (*Oneok* applied the Natural Gas Act, 15 U.S.C.A. §§ 717 *et seq.* (the "NGA"), but the Court has treated that Act and the FPA as functionally similar for preemption purposes. *Hughes*, 136 S. Ct. at 1298 n.10.)

As a practical matter, activities subject to federal and state regulation, respectively, often affect each other. See *EPSA*, 136 S. Ct. at 766 ("the wholesale and retail markets in electricity are inextricably linked"). Consequently, the Supreme Court has narrowly construed the field in which FERC's authority is exclusive, in the sense that States may not even exercise concurrent authority consistent with FERC's actions. See *Hughes*, 136 S. Ct. at 1297; see also *Oneok*, 135 S. Ct. at 1599 (describing limited nature of field preemption). With respect to interstate sales of wholesale power, that category encompasses setting wholesale rates and regulating the terms of those interstate wholesale transactions. *Hughes*, 136 S. Ct. at 1297. But the Court has also rejected the contention that anything that *affects* wholesale sales or rates is categorically beyond the States' power. Thus, in *Oneok*, the Court, in a case involving the NGA, held that field preemption did not bar state law antitrust claims alleging that the defendants submitted false information to the natural-gas indices that affect both retail and wholesale prices for natural gas. 135 S. Ct. at 1599. See also *EPSA*, 136 S. Ct. at 774.

In light of these principles, Plaintiffs' field preemption claim lacks merit. Illinois' ZEC program does not set rates for interstate wholesale sales of electric power or regulate those sales. And the fact that the ZEC program may have an incidental effect on rates for interstate sales of wholesale electricity does not bring that program within FERC's exclusive regulatory authority. To the contrary, the ZEC program operates firmly within the States' traditional domain of authority recognized by the FPA, including the authority to regulate the generation and retail sale of electric power.

The ZEC program recognizes, and creates property interests in, the environmental benefits of zero-emission power generation. It gives the power generators that create those benefits, and whose cessation of operations would trigger the production of emissions by alternative power sources, the right to sell those interests at a defined price that reflects their value. And it imposes the ultimate economic burden of paying for those environmental benefits on retail electric consumers, while minimizing that burden, and at the same time avoiding a windfall to the nuclear plants that create the environmental benefits and corresponding ZECs, when rising energy prices increase those plants' operating revenues. Each aspect of this program operates within the scope of the States' authority recognized by the FPA and outside FERC's exclusive authority under the FPA to set rates for and regulate interstate sales of wholesale power. See *Wheelabrator Lisbon, Inc. v. Conn. Dep't of Pub. Util. Control*, 531 F.3d 183, 190 (2d Cir. 2008) (rejecting field preemption claim relating to "the regulation of renewable energy credits" where, among other things, FERC "explicitly acknowledge[d] that state law governs the conveyance of RECs"); cf. *EPSA*, 136 S. Ct. at 776 (noting that FERC's demand-response rule — which balances supply and demand not by increasing *supply*, but by letting power *consumers* commit to reduce their *demand* and to bid those commitments into RTO wholesale auctions — was within FERC's grant of regulatory authority

11

where "every aspect of the regulatory plan happens exclusively on the wholesale market and governs exclusively that market's rules").

The Supreme Court's opinion in *Hughes* does not support a contrary conclusion, for in that case the state law practice the Court found preempted "disregard[ed]" a FERC-approved rate for wholesale sales of energy capacity in RTO auctions "[b]y *adjusting* an interstate wholesale rate" and substituting for it a separate price for such sales mandated by state law. 136 S. Ct. at 1290 (emphasis added); *id.* ("Maryland's program guarantees CPV the contract price rather than the auction clearing price"). Thus, the holding in *Hughes* — assuming it treated FERC's rate-setting authority as being within FERC's exclusive jurisdiction[5] — does not extend to Illinois' ZEC program, which does not regulate the rate or other transaction terms for interstate sales of wholesale power, and instead exclusively regulates separate sales of credits that represent the environmental benefits of nuclear power generation.

Equally unsound is Plaintiffs' claim that the FPA impliedly occupies the entire field of regulation and precludes any state rules for activity that *affects* rates for interstate sales of wholesale electricity. That claim is refuted by the Supreme Court's holding in *Oneok*, which not only acknowledged that FERC and the States both possess authority that may affect rates for interstate sales of wholesale electricity, but specifically rejected the proposition that field preemption precludes any state rules that may affect such rates or sales. 135 S. Ct. at 1600-01 (holding, under NGA, that field preemption did not bar state law antitrust claims alleging that defendants submitted false information to natural-gas indices that affect both retail and wholesale prices for natural gas).

---

[5]     *Hughes*, which referred to both field preemption and conflict preemption principles, 136 S. Ct. at 1297, did not explicitly ground its holding on the former, but may fairly be understood as applying field preemption. But cf. *Oneok*, 135 S. Ct. at 1601-02 (describing *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354 (1988), and *FPC v. Louisiana Power & Light Co.*, 406 U.S. 621(1972), as being based on conflict preemption).

In sum, the law provides no support for Plaintiffs' claim that, under field preemption principles, the FPA prohibited Illinois from adopting the ZEC program and regulating the creation and sale of environmental benefits from nuclear power generation. Plaintiffs' field preemption claim is defeated by the very structure of the ZEC program, which separates the environmental benefits of nuclear power generation from that power itself, and controls only the creation, purchase, and sale of those environmental benefits, embodied in ZECs, while leaving it to FERC to regulate the rates for interstate wholesale sales of that power.

### B. The FPA Does Not Invalidate Illinois' ZEC Program Under Conflict Preemption Principles.

There is likewise no merit to Plaintiffs' alternate contention that FERC's authority under the FPA invalidates Illinois' ZEC program under conflict preemption principles. To sustain that claim, Plaintiffs must show an "actual conflict" between the program and federal law. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76-77 (2008); see also *English*, 496 U.S. at 90; *Mason v. SmithKline Beecham Corp.*, 596 F.3d 387, 390 (7th Cir. 2010). They have not done so. A mere "hypothetical or potential conflict is insufficient" to meet this requirement. *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982); see also *Flying J, Inc. v. Van Hollen*, 621 F.3d 658, 662 (7th Cir. 2010). But that is all Plaintiffs allege.

As described above, the ZEC program regulates economic transactions in state law property interests representing environmental benefits (i.e., ZECs), which are outside the scope of FERC's authority over interstate sales of wholesale energy. Actions in compliance with the ZEC program therefore do not actually conflict with any mandate or prohibition in the FPA. See also *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493, 514-15 (1989) (holding that, in light of "Congress' decision that the interstate natural gas industry should be subject to a dual regulatory

scheme," "conflict-pre-emption analysis must be applied sensitively in this area, so as to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role.").

Nor is there any merit to the suggestion that the ZEC program actually conflicts with the FPA because actions pursuant to the program may "affect" rates for interstate sales of wholesale energy within FERC's jurisdiction. Although the FPA does give FERC authority over rules and practices "affecting" such rates, 16 U.S.C. §§ 824d, 824e, the Supreme Court, as noted above, has limited the scope of that "near-infinite" jurisdiction to reach only rules and practices that "directly affect" a wholesale rate. *EPSA*, 136 S. Ct. at 774. And *EPSA* gives that term a practical scope much smaller than Plaintiffs attribute to it, holding that the demand-response plan FERC adopted in that case fell within this authority because "*every* aspect of the regulatory plan happens *exclusively* on the wholesale market and governs *exclusively* that market's rules." *Id.* at 776 (emphasis added). By contrast, no action taken under the ZEC program occurs in the FERC-regulated wholesale market.

It is highly significant, if not dispositive, that FERC itself has expressly acknowledged this distinction and held that state renewable-energy programs that divorce generation-related environ-mental benefits from electric power, creating property interests in those benefits (typically in the form of RECs) and regulating transactions in those benefits, without also regulating interstate sales of wholesale power, are outside FERC's regulatory authority. Specifically, in *WSPP Inc.*, 139 FERC ¶ 61,061 (2012), par. 24, FERC concluded, based on available information, that "when an unbundled REC transaction is independent of a wholesale electric energy transaction, . . . the unbundled REC transaction does not affect wholesale electricity rates, and the charge for the unbundled RECs is not a charge in connection with a wholesale sale of electricity." Based on this conclusion, FERC held that "unbundled REC transactions fall outside of the Commission's jurisdiction" *Id.*, par. 18; see

14

also *Wheelabrator Lisbon, Inc.*, 531 F.3d at 190 (recognizing that FERC has "explicitly acknowledge[d] that state law governs the conveyance of RECs"); *Am. Ref-Fuel Co.*, 105 FERC ¶ 61004 (2003) ("States, in creating RECs, have the power to determine who owns the REC in the initial instance, and how they may be sold or traded[.]"). That determination by FERC is particularly relevant here because its interpretation of its own statutory authority is entitled to great deference. See *City of Arlington v. FCC*, 133 S. Ct. 1863, 1871, 1874-75 (2013) (holding that deference under *Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984), applies to agency's interpretations concerning scope of its statutory authority).

Plaintiffs' allege that ZECs are unlike RECs in several respects: that RECs are available to any entity that generates renewable energy, but ZECs are available only to nuclear power plants that would cease operations; the value of ZECs is fixed by statute, rather than by competitive markets; and the value of ZECs may go down if FERC-regulated prices for wholesale energy and capacity go up. Complaint (Doc. 1), pars. 51-53. But these differences (assumed to be true for purposes of Defendants' motion to dismiss) do not change the critical fact that ZECs, like RECs, are property interests created by state law that represent environmental benefits, not electric power, and are exchanged in transactions that do not convey electric power or adjust the consideration paid for such power. See *Wheelabrator Lisbon, Inc.*, 531 F.3d at 190; *WSPP Inc.*, 139 FERC ¶ 61,061, pars. 18, 24; *Am. Ref-Fuel Co.*, 105 FERC ¶ 61004, par. 23.

Even if, however, actions taken under the ZEC program could be considered to directly affect wholesale rates within FERC's jurisdiction, Plaintiffs' claim erroneously assumes that such actions necessarily conflict with federal law, and therefore are preempted. That assumption is refuted by the FPA itself, which specifies that FERC may act only against rules or practices affecting wholesale rates that are "unjust" or "unreasonable." 16 U.S.C. §§ 824d, 824e. Thus, the FPA itself recognizes

15

that *some* rules or practices that affect wholesale rates are *not* unjust or unreasonable, and so do not, by definition, conflict with the FPA. Plaintiffs' argument therefore posits an absurd scenario in which state laws that *are* just and reasonable, and thus consistent with the FPA, nonetheless somehow stand as an obstacle to the accomplishment of federal objectives and consequently are categorically preempted. That is obviously wrong.

This flaw in Plaintiffs' argument highlights another problem with their conflict preemption claim: the absence of any FERC order that actually conflicts with the Act or with any actions taken pursuant to it. The hypothetical possibility of such an order cannot be the basis to establish an actual conflict. See *Rice*, 458 U.S. at 659; *Flying J, Inc.*, 621 F.3d at 662.

### C. Plaintiffs Do Not Have a Cause of Action to Enjoin Implementation of Illinois' ZEC Program on the Ground that It Is Preempted by the FPA.

Plaintiffs' preemption claim against Illinois' ZEC program should be dismissed for the additional reason that the Supremacy Clause does not itself create a cause of action, *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1383-84 (2015), and an equitable action for an injunction against application of state law in violation of a federal statute, under the doctrine of *Ex parte Young*, 209 U.S. 123, 155-56 (1909), is not available here. Such an action is limited to situations in which (a) a party who would be a defendant in an enforcement proceeding under state law has a defense under federal law and brings a prophylactic action to enjoin that proceeding, *Virginia Office for Protection & Advocacy v. Stewart*, 131 S. Ct. 1632, 1642 (2011) (Kennedy, J., concurring) (stating that cause of action for injunction under *Ex parte Young* applies to cases involving "the pre-emptive assertion in equity of a defense that would otherwise have been available in the State's enforcement proceedings at law"); see also *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 620 (2012) (Roberts, J. Dissenting); *Planned Parenthood of Ind.*, 699 F.3d at

982-83; or (b) the federal statute contains judicially administrable criteria for deciding the preemption issue, *Armstrong*, 135 S. Ct. at 1385. Neither condition is present here.

First, as non-nuclear power generators and putative competitors of the entities that will be awarded ZECs under the Act, Plaintiffs do not, and realistically could not, allege that they will be injured as the target of any state enforcement proceedings under the Act. Thus, they do not have a cause of action for an *Ex parte Young* injunction as a preemptive defense to such an action. Second, FERC's broad and open-ended prescription that rates for interstate sales of wholesale power, and rules and practices affecting such rates, be "just and reasonable" presents exactly the type of "judicially unadministrable" standard that *Armstrong* rejected as the basis for an implied right of action to seek injunctive relief. *Armstrong*, 135 S. Ct. at 1385 (holding that Medicaid Act did not support cause of action for injunction to enforce its requirement that reimbursement rates to providers be "consistent with efficiency, economy, and quality of care").

## III. Illinois' ZEC Program Does Not Violate the Dormant Commerce Clause.

As noted above, in the Act the General Assembly made a series of detailed legislative findings regarding zero emission standards. For example, the legislature found that reducing emissions of carbon dioxide and other air pollutants, such as sulfur oxides, nitrogen oxides, and particulate matter, is critical to improving air quality in Illinois for Illinois residents; that these chemical compounds have significant adverse health effects and contribute to climate change; and that preserving zero-emission energy generation is vital to insuring that the State's air quality continues to improve. Ill. P.A. 99–0906, § 1.5, Zero emission standard legislative findings, (1), (2), (4). The legislature also found that the existing renewable portfolio standard "has been successful in promoting the growth of renewable energy generation to reduce air pollution in Illinois," and that it was desirable that Illinois "expand its commitment to zero emission energy generation," including

17

nuclear power. *Id.*, finding (3). The General Assembly, relying on a report prepared by the Illinois Commerce Commission, the Illinois Power Agency, the Illinois Department of Commerce and Economic Opportunity, and the Illinois Environmental Protection Agency, further found that "nuclear power plants are among the most reliable sources of energy, which means that electricity from nuclear power plants is available on the electric grid all hours of the day and when needed, thereby always reducing carbon emissions." *Id.*, finding (6).

These public health findings are well-grounded in scientific fact. There can be no question that particle pollution can increase the risk of heart disease, lung cancer, and asthma attacks. Infants, children, those over age 65, and those with a particular history of chronic obstructive pulmonary disease are at risk. High ozone levels caused by nitrogen oxides and volatile organic compounds contribute to respiratory and cardiovascular disease. Both particulate emissions and ozone originate from burning fossil fuels. See American Lung Association, *www.lung.org/healthyair/outdoor/air-pollution* (visited April 4,2017). In addition, the adverse effects of human-caused climate change trends from carbon emissions are well known and were also referenced in the legislative findings. Ill. P.A. 99-0906, Zero emission legislative findings, Section 1.5 (2).

A unit of energy may be produced by two different power sources, and may in fact cost roughly the same in terms of the price a buyer pays. But, as is well known, even when the costs to the buyer of a given unit of energy are the same, the costs to third parties or society as a whole may not. Fossil fuel generation creates an "externality" that may not be reflected in the market price — that is, the extra costs associated with carbon-based pollution. By creating a system for the purchase of ZECs, which represent an environmental attribute detached from electric power itself, the General Assembly has attempted to account for those externalities by giving nuclear power generators a property interest in the environmental benefits of the electrical power they produce.

The dormant Commerce Clause does not prohibit a State, in furtherance of its local public health interests, from establishing a program of this kind. In particular, the ZEC program does not discriminate against other sellers of nuclear power in other states, nor against fossil fuel generators, who in this critical respect are not similarly situated to producers of cleaner energy.

The Commerce Clause authorizes Congress to regulate interstate commerce, but even in the absence of congressional legislation, it has long been established that the "dormant" Commerce Clause restrains discriminatory actions by states impeding interstate commerce. "[T]he Commerce Clause responds principally to state taxes and regulatory measures impeding free private trade in the national marketplace." *Reeves, Inc. v. Stake*, 447 U.S. 429, 436-37 (1980) (noting that *H. P. Hood & Sons v. DuMond*, 336 U.S. 525, 539 (1949), "referr[ed] to 'home embargoes,' 'customs duties,' and 'regulations' excluding imports"). Thus, overt discrimination against interstate commerce or commerce from out-of-state sources, evident on the face of a law or by its indisputable purpose, is subject to heightened scrutiny, under which the law may be sustained only by a showing that less restrictive means would not achieve the law's legitimate local purpose. *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338-39 (2007); *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978); see also *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (upholding State's ban on importing live baitfish because of risks of parasites infecting its waterways). As the Court explained in *City of Philadelphia*,

> [W]here simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected. The clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders. But *where other legislative objectives are credibly advanced and there is no patent discrimination against interstate trade*, the Court has adopted a much more flexible approach, the general contours of which were outlined in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 [(1970)].

437 U.S. at 624 (citations omitted, emphasis added). "The crucial inquiry, therefore, must be directed to determining whether [a law] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Id.*

Pursuant to this inquiry, state laws that may affect interstate commerce — even state laws that may to some extent adversely affect interstate commerce — are not necessarily invalid. The Supreme Court "has never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 443-44 (1960). See also *General Motors v. Tracy*, 519 U.S. 278, 306 (1997) (recognizing "the need to accommodate state health and safety regulation in applying dormant Commerce Clause principles"). The limitations imposed by the dormant Commerce Clause are "by no means absolute," and "the states retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected." *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 36 (1980).

A law that does not discriminate and is directed to "legitimate local concerns, with effects upon interstate commerce that are only incidental," is analyzed under the balancing test described in *Pike*, 397 U.S. at 142. "Under the *Pike* test, we will uphold a nondiscriminatory statute like this one 'unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local concern." *United Haulers*, 550 U.S. at 346 (quoting *Pike*, 397 U.S. at 142).

In *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981), the Minnesota legislature, responding to important environmental concerns, passed a statute banning the use of nonreturnable, nonrefillable containers for the packaging of milk. The law's stated purpose, described in specific

legislative findings, was to encourage recycling and reduce the amount of solid waste generated in the state. *Id.* at 460-61. The plaintiffs, arguing that the law's true purposes were protectionist, alleged that it violated the dormant Commerce Clause. The Court rejected this claim, finding that the statute regulated in an evenhanded, non-discriminatory way, prohibiting in-state and out-of-state plastic containers alike. *Id.* at 471-72. The statute also passed the *Pike* test, the Court held, because the burden on interstate commerce was not clearly excessive "in light of the substantial state interest in promoting conservation of energy and other natural resources and easing solid waste disposal problems . . . ." *Id.* at 473.

In *Hughes v. Alexandria Scrap*, 426 U.S. 794 (1976), the State of Maryland created a bounty program to reduce the number of scrap vehicles in the State awaiting disposal. By making cash payments to incentivize the faster disposal of vehicles, a form of intervention in the market, the legislation had the effect of preferring in-state to out-of-state processors. Despite these practical effects, the Court upheld this action as "commendable" and "legitimate" environmental protection legislation, *id.* at 809-10. The Maryland program obviously had an impact on interstate commerce, but the effect was constitutionally permissible in light of the program's goals and methods, which in effect provided cash subsidies to in-state processors to speed up their activity.

"The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values." *United Haulers Ass'n*, 550 U.S. at 344 (quoting *Maine v. Taylor*, 477 U.S. at 151) (emphasis added). No less than Maryland preserving its aesthetic vistas by removing hulks for recycling, Maine keeping parasites out of its waters, or Minnesota reducing plastic waste in its landfills, Illinois is advancing public health and protecting the environment by adopting a credit-based system to reduce the emissions of air pollutants by energy generators. As long as there is no

21

overt discrimination between in-state and out-of-state producers in pursuit of these values (and there is none on the face of the challenged legislation), the dormant Commerce Clause does not prevent the State from seeking to address these important local concerns.

In *Clover Leaf Creamery*, the opponents of the Minnesota statute, like Plaintiffs here, argued that the real purpose of the law was to further local economic interests — to favor in-state pulpwood industries over out-of-state producers of plastic containers — and cited individual legislators' statements that the law conferred economic benefits on in-state interests. The Supreme Court nevertheless refused to go behind the legislature's expressed purposes, absent information forcing the Court to conclude that those purposes "could not have been a goal of the legislature." 449 U.S. at 463 n.7 (citation and internal quotation marks omitted); *id.* at 471 n.15; see also *Alliance of Auto Mfrs. v. Gwadosky*, 430 F.3d 30 (1st Cir. 2005) (holding, concerning dormant Commerce Clause challenge, that incidental effect of helping State's car dealers does not invalidate legitimate consumer-protection purpose of the law); *Construction Materials Recycling Ass'n Issues & Educ. Fund v. Burack*, 686 F. Supp. 2d 162, 169 (D. N.H. 2010) ("Although supporters touted the beneficial effect that the legislation would have on the state's virgin timber producers, their statements as a whole demonstrate that their principal concern was with what they believed were the adverse public health and environmental effects of burning [construction and demolition] debris."). While certain members of the General Assembly and the Governor may have believed that the continuation of operations at Illinois nuclear power plants would preserve jobs, those possible subjective motivations do not undercut the legislature's findings focusing on the public health benefits tied to nuclear power generation. To call the detailed legislative findings nothing more than a "sham" (Complaint, pars. 58-61) is to state a legal conclusion unsupported by sufficient well-pleaded facts and is tantamount to presuming that the Illinois legislature acted in bad faith when asserting a public health rationale

22

for the ZEC program.

As discussed above, the Illinois legislation creating ZECs is not identical to, but is largely similar to, the REC programs in Illinois and many other States, which are an accepted part of energy and environmental policy. Such programs allow the environmental attributes of renewable energy sources, such as wind and solar, to be bought and sold in the market, and ZEC programs are functionally similar for the nuclear power industry. FERC has explicitly endorsed the trading of RECs as outside its regulatory oversight. The value of ZECs is pegged to the social cost of carbon, a measure the Seventh Circuit has approved in other regulatory litigation. *Zero Zone, Inc. v. U.S. Dep't. of Energy*, 832 F.3d 654, 677 (7th Cir. 2016). The social cost of carbon is an estimate that includes "changes in net agricultural productivity, human health, property damages from human flood risk, and the value of ecosystem services." *Id.* at 677 n.22 (citing 79 Fed. Reg. at 17,777). The General Assembly's use of this measure in its complex regulatory ZEC legislation carries a presumption of correctness, and Plaintiffs' challenge, which would in effect have the program struck down in its entirety on dormant Commerce Clause grounds, should be rejected as a matter of law.

## Conclusion

For the foregoing reasons, Plaintiffs' complaint should be dismissed.

Respectfully submitted,

 /s/ *Thomas Ioppolo*
Thomas Ioppolo
*tioppolo@atg.state.il.us*
Assistant Attorney General
100 W. Randolph St., 11th Floor
Chicago, IL 60601
(312) 814-7198

Richard S. Huszagh
*rhuszagh@atg.state.il.us*
Assistant Attorney General
100 W. Randolph St., 12th Floor
Chicago, IL 60601
(312) 814-2587

April 10, 2017