# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| ELECTRIC POWER SUPPLY ASSOCIATION, *et al.*, | ) ) ) ) | No. 17-cv-01164 |
| Plaintiffs, | ) ) ) | Judge Manish S. Shah |
| v. | ) ) | |
| ANTHONY M. STAR, *et al.*, | ) ) ) | Magistrate Judge Susan E. Cox |
| Defendants | ) | |

**PROPOSED AMICUS BRIEF OF THE INDEPENDENT MARKET MONITOR FOR PJM OPPOSING DEFENDANTS' MOTION TO DISMISS AND SUPPORTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Jeffrey W. Mayes
General Counsel
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Eagleville, Pennsylvania 19403
(610) 271-8053
*jeffrey.mayes@monitoringanalytics.com*

Joseph E. Bowring
President
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Eagleville, PA 19403
(610) 271-8051
*Joseph.Bowring@monitoringanalytics.com*

**Table of Contents**

BACKGROUND AND INTEREST OF AMICUS CURIAE

ARGUMENT

I.  THE CLAIM FOR RELIEF IS PLAUSIBLE................................................................ 4

II.  THE ZEC PROGRAM IS FIELD PREEMPTED. ......................................................... 6

III. THE ZEC PROGRAM IS CONFLICTS PREEMPTED. ............................................ 12

IV. THE ZEC PROGRAM VIOLATES THE DORMANT COMMERCE CLAUSE..... 13

V.  STATES' CLEAN ENERGY POLICIES ARE NOT THREATENED. ...................... 16

VI. INJUNCTIVE RELIEF IS APPROPRIATE AND NECESSARY.............................. 17

CONCLUSION

# TABLE OF AUTHORITIES

## CASES

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008) — 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) — 4

*City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978) — 14

*DeHart v. Town of Austin, Ind.*, 39 F.3d 718 (7th Cir. 1994) — 6

*English v. General Electric Co.*, 496 U.S. 72 (1990) — 6,12

*Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471
    U.S. 707, 715–16 (1985) — 6

*Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016) — 5,6,7,8

*Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355 (1986) — 6

*Maine v. Taylor*, 477 U.S. 131 (1986) — 14

*Mason v. SmithKline Beecham Corp.*, 596 F.3d 387 (7th Cir. 2010) — 12

*McCauley v. City of Chicago*, 671 F.3d 611 (7th Cir. 2011) — 4

*ONEOK, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015) — 9

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*,
    699 F.3d 962 (7th Cir. 2012) — 6

*PPL EnergyPlus, LLC v. Solomon*, 766 F.3d 241 (3d Cir. N.J. 2014). — 8

*Reeves, Inc. v. Stake*, 447 U.S. 429 (1980) — 14

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
    550 U.S. 330 (2007) — 14

## STATUTES

Federal Power Act, 16 U.S.C. § 824(b)(1) — 1

**OTHER**

*Initial Brief of Constellation NewEnergy, Inc. and Exelon Generation*

     *Company LLC*, Ohio P.U.C. Case No. 14-1297 (Feb. 16, 2016)     5

*Supremacy Clause of the U.S. Constitution* (art. 6, cl. 2)     6

Monitoring Analytics, LLC, *2016 State of the Market Report for PJM, v. 2*

     (March 9, 2017)     10

Monitoring Analytics, LLC, *2015 State of the Market Report for PJM, v. 2*

     (March 10, 2016)     10

## BACKGROUND AND INTEREST OF AMICUS CURIAE

The Market Monitor has no financial interest in the outcome of this proceeding. The Market Monitor represents the public interest objectively and independently of the government, the market operator and market participants, including Plaintiffs. The Market Monitor's interest is to promote and protect the competitive wholesale electric power markets and to avoid the burden that would be imposed on its resources in efforts to avert failure of the market if Defendants prevail.

The petition for review in this case concerns a complaint filed by Plaintiffs explaining that Defendants have unlawfully intruded on the exclusive authority of the Federal Energy Regulatory Commission ("FERC") over the sale of electric energy at wholesale in interstate commerce under the Federal Power Act ("FPA"), 16 U.S.C. § 824(b)(1) ("Complaint"). Defendants explain that certain amendments to the Illinois Power Agency Act ("Zero Emissions Credit ("ZEC") Subsidies Program") would allow certain financially distressed nuclear generating plants to forestall retirement and continue operating in spite of market conditions and inconsistent with the federal regulatory approach that relies on competition to ensure just and reasonable rates.

PJM Interconnection, L.L.C. ("PJM"), operates a centrally dispatched, competitive wholesale electric power market that, as of December 31, 2016, had installed generating capacity of 182,449 megawatts (MW) and 986 members including

1

market buyers, sellers and traders of electricity in a region including more than 65 million people in all or parts of Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia and the District of Columbia.

PJM is regulated by the FERC under an approach that relies on regulation through competition to ensure the lowest possible electricity prices for consumers. Competition means that decisions about whether to enter the market, to exit the market and to remain in the market are made by suppliers based on the market fundamentals. Potential and existing suppliers must believe that the market fundamentals will determine the success or failure of their investment or they will not invest, the market will not sustain adequate supply, and the federal regulatory approach will fail. The ZEC Subsidies Program is incompatible with the PJM market design, threatens the foundations of the PJM market and interferes with the federal regulatory scheme.

The ZEC Subsidies Program originates from the fact that competitive markets result in the exit of uneconomic and uncompetitive generating units. The ZEC Subsidies Program would provide subsidies to specific, uneconomic generating units. Regardless of the specific rationales offered by unit owners for the subsidies, the proposed solution for the selected generating units is to provide out of market subsidies in order to keep uneconomic units in the market. The ZEC Subsidies Program is not designed to serve the public interest. These subsidies were requested by the owners of specific

2

uneconomic generating units in order to improve the profitability of those specific generating units. These subsidies were not requested to accomplish broader social goals. Broader social goals can be met with market based mechanisms available to all market participants on a competitive basis and without discrimination.

The Market Monitor and entities like it are established by the FERC to monitor each organized electric wholesale market and to protect the public interest in regulation through competition. Movant is responsible to independently and objectively monitor "[a]ctual or potential design flaws in the PJM Market Rules,""[s]tructural problems in the PJM markets that may inhibit a robust and competitive market," and "[t]he potential for a Market Participant to exercise market power or violate any of the PJM or FERC Market Rules." The issues raised in this case have important and direct implications for these areas of responsibility.

The Market Monitor has actively participated in a number of matters involving owners of units seeking subsidies to forestall retirement of financially distressed units or to enable uneconomic new entry under various pretexts. The Market Monitor was granted leave to participate as amicus curiae in litigation pending in the U.S. District Court for the Southern District of New York concerning substantially identical issues. *See* Order [Granting Motion to File Amicus Brief], Doc. 96, *Coalition For Competitive Energy v. Zibelman*, No. 1:16-cv-8164 (S.D.N.Y. Jan. 1, 2017).

**ARGUMENT**

## I.  THE CLAIM FOR RELIEF IS PLAUSIBLE.

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In reviewing the sufficiency of a complaint under this standard, the court must accept as true all well pleaded factual allegations. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

The Complaint easily meets this test. *See* Complaint at 11–31. The facts that Plaintiffs present show that the ZEC program is designed to subsidize specific uneconomic units that would otherwise retire, contrary to the operation of the federal approach to regulating the wholesale electricity through competition. Plaintiffs argue that the ZEC program is a subsidy designed to improve the profits of specific units and it is not an environmental policy. The ZEC program is not by design about reducing carbon emissions. No rational policy approach to reducing carbon emissions would focus on keeping two uneconomic units in existence.

Exelon argues (at 8–11) that the ZEC program, designed to benefit its uneconomic units, is the same as state Renewable Energy Credits ("RECs") program, which are available to any units that meet general standards. The Complaint explains (at 23–25) why the ZEC program is unlike the existing Illinois REC program, which is designed to reduce carbon emissions and is open to competition from any seller. Illinois' and other states' authority to pursue such programs have not been challenged.

The nature of the ZEC program is a question of fact on which Plaintiffs have established a presumption in their favor on this dispositive motion.

The ZEC program does closely resemble recently attempted and failed programs in Ohio intended to preserve failing coal units. Proponents of those programs attempted to use other pretexts. *See* Ohio P.U.C. Case Nos. 16-1297 and 14-1693. Exelon properly opposed those programs. *See* Initial Brief of Constellation NewEnergy, Inc. and Exelon Generation Company LLC, Ohio P.U.C. Case No. 14-1297 (Feb. 16, 2016) ("The expressed reason for the Retail Rate Stability Rider ("Rider RRS") is retail rate stability. The Companies claim that the Rider RRS will produce a net present value for the wire customers over the eight-year term, and that failure to have the Rider RRS will reduce reliability and harm the local economy where the plants are located. In fact, the record shows that the plants are not likely to close and that if the plants are needed for reliability, PJM has processes to maintain the needed plants. Most important, the record shows that Rider RRS is likely to produce hundreds of millions of dollars of losses that will have to be paid to FES (via the Companies) by the captive wire customers.").

Accordingly, if Plaintiffs are granted appropriate deference on this dispositive motion, and their well pleaded factual allegations are accepted as true, the motion will be denied and the case will proceed. Defendants will have the opportunity at hearing to explain the clear divergence between the design and operation of the ZEC program and its asserted purpose.

5

## II.  THE ZEC PROGRAM IS FIELD PREEMPTED.

The Supremacy Clause of the U.S. Constitution (art. 6, cl. 2), provides that federal law preempts state law, rendering it inoperative, (1) when the express language of a federal statute declares that preemption; (2) when Congress intends the federal government to occupy a field exclusively, such as when the federal regulatory scheme is so pervasive that it may be assumed Congress "left no room for the States to supplement it"; or (3) when state law actually conflicts with federal law because it is impossible to comply with both, or because state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English v. General Electric Co.*, 496 U.S. 72, 78–79 (1990) (citations and internal quotation marks omitted); *see also Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 984 (7th Cir. 2012); *DeHart v. Town of Austin, Ind.*, 39 F.3d 718, 721 (7th Cir. 1994). "Pre-emption may result not only from action taken by Congress itself," but also from "a federal agency acting within the scope of its congressionally delegated authority." *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 369 (1986); *see also Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715–16 (1985).

The Supreme Court recently invalidated a Maryland program providing subsidies to incent uneconomic new entry, holding that the Supremacy Clause field preempts any state regulation that effectively alters the wholesale rate a generator will receive. *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288, 1297–99 (2016). The

Supreme Court examined the substance of how the program operated, and, finding prohibited interference, rejected the state policy rationale. It did not matter to the Supreme Court that the state policy rationale was credible in *Hughes*, unlike the rationale in this case. *See Hughes* at 1298 ("States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates, as Maryland has done here.") There is no material difference between subsidies for uneconomic entry (*Hughes*) and subsidies for uneconomic avoidance of exit (this case). The rationale for *Hughes* applies with equal force to the ZEC program.

The ZEC program is designed to set a different rate for specific units owned by Exelon that is higher than the competitive market rate established under the regulatory scheme adopted by the FERC to regulate interstate wholesale sales of electric power. The ZEC program was adopted because Exelon argued that market based wholesale rates were not high enough to avoid market exit. The ZEC program transfers the risk that these units are not competitive in the wholesale markets from Exelon to customers in Illinois, who must pay the subsidy directly, and to all the other owners of generation in the PJM market, by suppressing energy and capacity prices. By keeping units in the market that would otherwise exit the market, the ZEC program suppresses prices in the PJM energy and capacity markets for all suppliers in the entire PJM market. If uneconomic supply is artificially retained in the market as a result of subsidies, the result will be to suppress market prices. If this ZEC precedent is established, other unit

owners in Illinois and in other states in the PJM market will seek comparable subsidies, further affecting prices and eventually destroying the market.

Exelon attempts to distinguish *Hughes* be arguing (at 11–17) that "ZEC payments do not directly alter a wholesale price" and that "payments are *not* conditioned on selling in the wholesale market" [emphasis in original]. *Hughes* does not require an explicit condition of payments on participation. The rationale in *Hughes* is the linkage between the wholesale price received by specific units and wholesale prices. Plaintiffs have explained that linkage (at 23–25). Moreover, PJM market rules require Exelon to offer the units into the PJM capacity market if the units do not retire. An explicit participation requirement would have been superfluous and would have further exposed the true nature of the ZEC program. Exelon does not assert that the units will not continue to sell energy in the PJM energy market. The ZEC subsidy program explicitly links the subsidy amount to the energy market price.[4]

In another New Jersey case with facts very similar to *Hughes*, but involving no explicit condition on capacity market participation, the U.S. Court of Appeals for the Third Circuit found field preemption. *See PPL EnergyPlus, LLC v. Solomon*, 766 F.3d 241 (3d Cir. N.J. 2014). Subsidies in that case were provided through contracts for

---

[4]     *See* Complaint Exhibit A.

differences. Plaintiffs show (at Exhibit A) that the subsidies in this case operate as contract for differences.

NRDC argues (at 4–5) that *EPSA*, *Hughes* and *OneOK* "make clear that exclusive rate setting jurisdiction is narrowly construed, and federal and state jurisdiction is in part concurrent." None of these cases find concurrent jurisdiction on setting wholesale rates. These cases do not support the proposition that in response to arguments from a supplier that market prices are too low for specific units, a state may create a subsidy for those units in order to avoid retirement of those units.

State Defendants cite case law that relies upon a finding of fact that the effect on the wholesale rates is incidental and concerns state policy matters that require that federal regulations meet higher than normal standards to create field preemption. The facts of this case do not justify applying higher standards. The ZEC program is designed to subsidize failing units and to allow them to ignore market exit signals directly contrary to the regulatory design adopted by the FERC. At this stage of the proceeding, Plaintiffs are entitled to the presumption that the facts are as they allege and are not as Defendants assert.

The effects of the ZEC program if allowed will be direct and consequential. The detrimental effects will not be mitigated. Defendants point out that there is a proceeding at FERC seeking to protect the market from the direct and immediate effects of the ZEC program and similar subsidy schemes by mitigating the offer behavior in the

PJM capacity market of the recipients of subsidies. The referenced mitigation does not exist and therefore cannot be relied on to protect markets from the ZEC subsidies. The referenced mitigation, if approved, would affect only the capacity market and not the energy market. Because the FERC currently does not have a quorum, there is no prospect that even this limited mitigation will even be reviewed let alone approved in time for the PJM three year forward capacity market auction that will run during the week beginning on May 10, 2017. For the same reason, it is extremely unlikely that the Market Monitor would be able to obtain timely relief upon filing a complaint or making a referral for anticompetitive market behavior, if warranted. In addition, the identified mitigation proposals address only the capacity market and do not address the impacts on the wholesale energy market where the price suppressive impacts would be immediate and unmitigated. The energy market is a much more significant source of revenues in PJM markets than the capacity market. Total energy market payments were about three times the level of capacity market payments in the last few years in PJM.[5]

No mitigation should be necessary because preemption doctrine should protect the federal regulatory approach in the first instance. Federal regulators should not be

---

[5]  Monitoring Analytics, LLC, 2016 State of the Market for PJM, v. 2 (March 9, 2017) at 16 (Table 8-1); 2015 State of the Market Report for PJM, v. 2 (March 10, 2016) at 14 (Table 8-1), which can be accessed at: *<http://www.monitoringanalytics.com/reports/PJM_State_of_the_Market/2016.shtml>*.

required to implement uncertain mitigation measures when the constitution protects their authority to implement markets as they intend them to operate.

Exelon argues (at 17–20) that effects on auction prices do not trigger field preemption. This argument is misplaced. This case is not about any effects on rates, but, rather, anticompetitive effects on rates. Anticompetitive effects directly interfere with the federal regulatory approach. The anticompetitive effects here are the same as the effects that were the basis for the field preemption found in *Hughes*.

PJM markets must result in prices that are just and reasonable under the Federal Power Act. Prices regulated through competition are not just and reasonable if they do not reflect competitive behavior. The ZEC program is designed to subsidize specific units so that they receive an effective price that is higher than the competitive level because it will equal the market price plus the subsidy adder. The specific units will have an incentive to make offers in the capacity market that are less than they would otherwise make as a result of the subsidy, will remain in service as a result of the subsidy, and will continue to produce substantial amounts of energy as a result of the subsidy. As a result, Exelon's competitors will receive prices that are lower than the competitive level both in the capacity market and in the energy market. Participants in the market are entitled to be paid the competitive market price regardless of its level. The ZEC program interferes with the competitiveness of the PJM market design and denies participants the right to a price determined by a competitive market. If this ZEC

precedent is established, other unit owners in Illinois and in other states in the PJM market will seek comparable subsidies, further affecting prices and eventually destroying the market.

## III. THE ZEC PROGRAM IS CONFLICTS PREEMPTED.

The ZEC program is also conflicts preempted. To sustain that claim, Plaintiffs must show an "actual conflict" between the program and federal law. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76-77 (2008); see also *English*, 496 U.S. at 90; *Mason v. SmithKline Beecham Corp.*, 596 F.3d 387, 390 (7th Cir. 2010).

Plaintiffs have shown an actual and direct conflict. *See* Complaint at 11–31. The federal regulatory approach results in a market price that provides a signal to customers and to investors in generating units. When competitive prices result in units being uneconomic, the units exit the market. More than 20,000 MW of units have left the PJM market since 2011 as a result of competitive forces. Subsidies received under the ZEC program are specifically calibrated to avoid that result for specific units owned by Exelon. The effect of such subsidies would be to suppress the wholesale electric price below the competitive level, exactly contrary to the federal regulatory approach which relies on competition to establish just and reasonable rates as required in the Federal Power Act.

The ZEC program directly conflicts with the federal regulatory approach, and if such conflicts are permitted, the federal regulatory approach will not be viable. If this

ZEC precedent is established, other unit owners in Illinois and in other states in the PJM market will seek comparable subsidies, further affecting prices and eventually destroying the market.

Exelon argues (at 20–24) that Plaintiff's theory of the case has no limiting principle, would invalidate legitimate programs, and is based on the false premise that competition and low prices are the only valid policy concerns. None of these criticisms have merit. Plaintiff's theory explicitly excludes RECs. Plaintiff's theory excludes carbon credits markets. Plaintiff's theory excludes state environmental regulations. Plaintiff's theory does not include state action concerning generation where the wholesale market is shielded from anticompetitive effects. Low prices are not the issue. Prices in the PJM market are at historically low levels as a result of low gas prices and competition. But competitive prices should be as low as possible but no lower. The ZEC subsidies would result in market prices below the competitive level. Those prices are not sustainable. A virtue of competitive markets is that they can most efficiently procure power that reflects a variety of concerns, including environmental and reliability concerns. A weakness of competitive markets is that they are vulnerable to interventions if not protected.

## IV. THE ZEC PROGRAM VIOLATES THE DORMANT COMMERCE CLAUSE.

The "dormant" Commerce Clause restrains discriminatory actions by states impeding interstate commerce. "[T]he Commerce Clause responds principally to state

taxes and regulatory measures impeding free private trade in the national marketplace." *Reeves, Inc. v. Stake*, 447 U.S. 429, 436-37 (1980) (noting that *H. P. Hood & Sons v. DuMond*, 336 U.S. 525, 539 (1949), "referr[ed] to 'home embargoes,' 'customs duties,' and 'regulations' excluding imports"). Overt discrimination against interstate commerce or commerce from out of state sources, evident on the face of a law or by its indisputable purpose, is subject to heightened scrutiny, under which the law may be sustained only by a showing that less restrictive means would not achieve the law's legitimate local purpose. *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338-39 (2007); *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978); see also *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (upholding State's ban on importing live baitfish because of risks of parasites infecting its waterways). The Court explained in *City of Philadelphia*:

> [W]here simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected. The clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders. But *where other legislative objectives are credibly advanced and there is no patent discrimination against interstate trade*, the Court has adopted a much more flexible approach, the general contours of which were outlined in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 [(1970)]. 437 U.S. at 624 (citations omitted, emphasis added).

"The crucial inquiry, therefore, must be directed to determining whether [a law] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Id.*

14

The ZEC program by design subsidizes specific uneconomic units in Illinois. There is no legitimate local concern. Carbon emissions are by definition not a local issue. The ZEC program provides no subsidies to other energy sources in Illinois that could reduce carbon emissions. The ZEC program provides no subsidies to units or resources outside of Illinois that could provide the same reduction of carbon emissions at lower cost. The ZEC program does not provide for competition to reduce carbon emissions. Illinois has a RECs program that addresses that same issue. There is no showing that the Illinois RECs program is inadequate or explanation for why it cannot be fixed if it is. Illinois could directly regulate carbon emissions from units in Illinois. Illinois could create a carbon credits market or participate in existing carbon markets. Although any of these options would better serve the asserted purpose of reduced carbon emissions, none would subsidize specific Illinois units, which is the true purpose of the ZEC program.

The Complaint alleges facts sufficient to demonstrate that the ZEC program is "basically a protectionist measure" and is not "directed to legitimate local concerns." The ZEC program's structure is not consistent with the purpose of advancing environmental objectives. The ZEC program's structure shows that its purpose is to subsidize certain units that are failing in the market design established under FERC's regulatory approach.

In arguing that no violation of the Commerce Clause results from the ZEC program, Defendants cite cases (at 17–23) that do not confine the program's benefits to local resources as the ZEC program does. The programs considered in the cited cases concern programs addressing local issues. The carbon issue is global and not local. Reliance on the cases cited by Defendants is misplaced.

If an after the fact rationale unrelated to the actual economic purpose of the program can save the ZEC program from scrutiny under the Commerce Clause, then there is no protectionist measure that could not be adopted if a plausible incidental effect is the reduction of carbon emissions. Any measure could be adopted without regard to whether it has a rational economic basis or whether alternative programs could address the same issue efficiently and without raising protectionist concerns.

## V.     STATES' CLEAN ENERGY POLICIES ARE NOT THREATENED.

NRDC argues (at 13–15) that adopting Plaintiff's preemption arguments could undercut traditional state authority and jeopardize states' clean energy initiatives. NRDC's concerns are misplaced. Adoption of programs, such as RECs and multi-state carbon credit markets or specific limits on carbon emissions, is a valid exercise of state authority because those programs are structured consistent with their purpose and do interfere and conflict with the federal regulation of wholesale energy rates through competition. The wholesale power markets have adapted competitively to state environmental policies which addressed specific pollutants rather than specific units.

Preemption of the ZEC program will not threaten state environmental policies. The ZEC program is not an environmental program. Preemption of the ZEC program preempted will prevent environmental concerns from being used as pretext for invalid objectives that harm the public interest by undermining competitive wholesale power markets.

## VI. INJUNCTIVE RELIEF IS APPROPRIATE AND NECESSARY.

The Market Monitor supports Plaintiff's motion for a preliminary injunction and agrees that the Complaint meets the applicable test.

Plaintiffs are likely to prevail. The reasoning recently applied by Supreme Court to find preemption in *Hughes* applies with the same force to the facts presented in this case. In the interim Plaintiffs will suffer irreparable harm and have no legal means to avoid it. The Market Monitor agrees with Plaintiffs Witness DeRamus that, "[i]f allowed to proceed, the Illinois ZEC program will cause immediate and long-term harm to wholesale market participants." DeRamus Decl. ¶ 81. Suppressed prices will harm the wholesale market and cannot be undone, starting immediately in the energy markets, but also in the PJM capacity market auction that will commence May 10, 2017, and set capacity market prices for the delivery year three years in the future, from June 1, 2020, through May 31, 2021.

In its status report filed in this docket April 20, 2017, Exelon explains that FERC currently lacks a quorum and cannot act. This means that FERC will not be able to

approve mitigation measures or act on complaints or referrals filed by the Market Monitor or others. Urgent action is needed from the court to ensure that the PJM market design operates as intended and in the public interest. The motion for a preliminary injunction should be granted.

## CONCLUSION

Movant respectfully requests that the court consider the arguments raised on brief as it resolves the issues raised in these proceedings.

Dated: April 24, 2017                    Respectfully submitted,

_____

Jeffrey W. Mayes
General Counsel
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Eagleville, Pennsylvania 19403
(610) 271-8053
*jeffrey.mayes@monitoringanalytics.com*

Joseph E. Bowring
President
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Eagleville, PA 19403
(610) 271-8051
*Joseph.Bowring@monitoringanalytics.com*

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 24, 2017, the above motion was filed electronically with the United States District Court for the Northern District of Illinois, Eastern Division. Notice of this filing will be sent electronically to the parties by operation of the Court's electronic filing system.

Jeffrey W. Mayes
General Counsel
Monitoring Analytics, LLC
2621 Van Buren Avenue, Suite 160
Eagleville, Pennsylvania 19403
(610) 271-8053
*jeffrey.mayes@monitoringanalytics.com*