UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ELECTRIC POWER SUPPLY ASSOCIATION, *et al.*, | | |
| Plaintiffs, | | No. 17 CV 1164 |
| v. | | Judge Manish S. Shah |
| ANTHONY M. STAR, *et al.*, | | Magistrate Judge Susan E. Cox |
| Defendants. | | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTIONS TO DISMISS**

Jonathan S. Massey (*pro hac vice*)
MASSEY & GAIL, LLP
1325 G Street, NW
Suite 500
Washington, DC 20005
Telephone: (202) 652-4511
jmassey@masseygail.com


Leonard A. Gail
Suyash Agrawal
Paul J. Berks
MASSEY & GAIL, LLP
50 East Washington Street
Suite 400
Chicago, IL 60602
Telephone: (312) 283-1590
lgail@masseygail.com
sagrawal@masseygail.com
pberks@masseygail.com

Jonathan D. Schiller (*pro hac vice*)
David A. Barrett (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Telephone: (212) 446-2300
jschiller@bsfllp.com
dbarrett@bsfllp.com


Stuart H. Singer (*pro hac vice*)
William T. Dzurilla (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
wdzurilla@bsfllp.com


Edward J. Normand (*pro hac vice*)
Jason C. Cyrulnik (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
enormand@bsfllp.com
jcyrulnik@bsfllp.com


Dated: April 24, 2017

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ....................................................................................................... 1

FACTS ........................................................................................................................ 3

LEGAL STANDARD ................................................................................................. 8

ARGUMENT .............................................................................................................. 8

I.  DEFENDANTS' ARGUMENTS FAIL AT THE THRESHOLD, BECAUSE THEY ARE FOUNDED ON THE DISPUTED PREMISE THAT THE ZEC PROGRAM WAS ENACTED FOR AN "ENVIRONMENTAL PURPOSE" ...................................... 8

II.  THE COMPLAINT STATES A FIELD PREEMPTION CLAIM BECAUSE THE ZEC PROGRAM "DIRECTLY AFFECTS" WHOLESALE ELECTRICITY PRICES .... 9

    A.  The ZEC Program "Directly Affects" Wholesale Electricity Prices Under Standards Reconfirmed Repeatedly by the Supreme Court .................................. 11

        1.  *Hughes* Mandates Preemption of "Tethered" Subsidies Such As the FEJA ZEC Program ................................................................... 13

        2.  Exelon Misinterprets *EPSA* and *Rochester Gas* ........................................ 17

    B.  The Effects of the ZEC Program on Wholesale Prices Are Far Greater Than Those of a Wide Variety of State Measures That Have Been Held Preempted .... 19

    C.  ZECs Are Not Similar to Renewable Energy Credits ........................................... 21

III.  THE COMPLAINT STATES A CONFLICT PREEMPTION CLAIM BECAUSE THE ZEC PROGRAM STANDS AS AN OBSTACLE TO FERC'S REGULATORY GOALS .................................................................................................................. 24

    A.  The Complaint Alleges the ZEC Program Would Cause "Clear Damage" to FERC's Goals ..................................................................................... 25

    B.  Primary Jurisdiction Does Not Apply ................................................................. 28

IV.  THE COURT HAS EQUITABLE JURISDICTION TO ADJUDICATE PLAINTIFFS' PREEMPTION CLAIMS ...................................................................... 30

    A.  A Federal Court's Equity Power Is Limited Only Where Congress Has Made Manifest Such an Intent ......................................................................... 30

B.       The FPA Does Not Limit the Equity Jurisdiction of Federal Courts.....................32

       1.       Congress Did Not Provide a "Sole Remedy" in the FPA .........................32

       2.       The Relief Plaintiffs Seek Is Not Judicially Unadministrable .................32

V.       THE COMPLAINT STATES A COMMERCE CLAUSE CAUSE OF ACTION ..........33

A.       Plaintiffs Have Standing ........................................................................................33

B.       The ZEC Program Violates the Dormant Commerce Clause ...............................34

C.       Illinois Is a Regulator, Not a Market Participant ..................................................39

D.       The ZEC Program Unduly Burdens Commerce ....................................................40

CONCLUSION...................................................................................................................... 40

## TABLE OF AUTHORITIES

Page

__Cases__

*Air Transp. Ass'n of Am. v. Cuomo*,
   520 F.3d 218 (2d Cir. 2008)................................................................. 32

*All. for Clean Coal v. Miller*,
   44 F.3d 591 (7th Cir. 1995) ......................................................... 34, 37

*Allco Finance Ltd. v. Klee*,
   No. 3:15-CV-608 (CSH), 2016 WL 4414774 (D. Conn. Aug. 18, 2016) ............... 39

*Alliant Energy Corp. v. Bie*,
   277 F.3d 916 (7th Cir. 2002) ................................................................ 34

*Alliant Energy Corp. v. Bie*,
   330 F.3d 904 (7th Cir. 2003) ................................................................ 35

*Anheuser-Busch, Inc. v. Schnorf*,
   738 F. Supp. 2d 793 (N.D. Ill. 2010) ...................................................... 35

*Appalachian Power Co. v. Pub. Serv. Comm'n*,
   812 F.2d 898 (4th Cir. 1987) ................................................................ 21

*Appert v. Morgan Stanley Dean Witter, Inc.*,
   673 F.3d 609 (7th Cir. 2012) .................................................................. 8

*Armstrong v. Exceptional Child Center, Inc.*,
   135 S. Ct. 1378 (2015)................................................................ *passim*

*Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Envtl. Prot.*,
   208 F.3d 1 (1st Cir. 2000) .................................................................... 28

*Aux Sable Liquid Prods. v. Murphy*,
   526 F.3d 1028 (7th Cir. 2008) ........................................................... 24, 26

*Bacchus Imps. Ltd. v. Dias*,
   468 U.S. 263 (1984).................................................................... *passim*

*Bd. of Pub. Works v. Wis. Power & Light*,
   613 F. Supp. 2d 1122 (D. Minn. 2009) .................................................... 29

*Bellsouth Telecomms., LLC v. Louisville/Jefferson Cty. Metro Gov't*,
   No. 3:16-CV-124-TBR, 2016 WL 4030975 (W.D. Ky. July 26, 2016) ................... 31

*Blue Circle Cement, Inc. v. Bd. of Cty. Comm'rs*,
    27 F.3d 1499 (10th Cir. 1994) ............................................................ 13

*Boggs v. Boggs*,
    520 U.S. 833 (1997) ............................................................................ 25

*C & A Carbone, Inc. v. Town of Clarkstown*,
    511 U.S. 383 (1994) ............................................................................ 34

*California Public Utilities Comm'n*,
    133 FERC ¶ 61,05 ................................................................................ 23

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
    520 U.S. 564 (1997) ............................................................................ 35

*Cavel Int'l, Inc. v. Madigan*,
    500 F.3d 551 (7th Cir. 2007) .............................................................. 34

*Cent. Mfg. Co. v. Pure Fishing, Inc.*,
    392 F. Supp. 2d 1046 (N.D. Ill. 2005) ................................................ 34

*City of Philadelphia v. New Jersey*,
    437 U.S. 617 ........................................................................................ 35

*Connecticut Dep't of Public Utility Control v. FERC*,
    569 F.3d 477 (D.C. Cir. 2009) ............................................................ 21

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ............................................................................ 30

*Dean Milk Co. v. City of Madison*,
    340 U.S. 349 (1951) ............................................................................ 38

*Dep't of Revenue v. Davis*,
    553 U.S. 328 (2008) ............................................................................ 39

*Entergy Nuclear Fitzpatrick, LLC v. Zibelman, No. 5:15-CV-2,*
    30, 2016 WL 958605 (N.D.N.Y. Mar. 7, 2016) .................................. 29

*Exodus Refugee Immigration, Inc. v. Pence*,
    165 F. Supp. 3d 718 (S.D. Ind. 2016) ................................................ 31

*FERC v. Elec. Power Supply Ass'n*,
    136 S. Ct. 760 (2016) ..................................................................... *passim*

*Fiordaliso v. Talen Energy Mktg., LLC*,
    136 S. Ct. 1728 (2016) ........................................................................ 17

*Foster-Fountain Packing Co. v. Haydel*,
    278 U.S. 1 (1928)...................................................................................... 37

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,
    841 F.3d 133 (2d Cir. 2016)........................................................... 31, 32

*Hilmann v. Maretta*,
    133 S. Ct. 1943 (2013)........................................................................ 24

*Hughes v. Alexandria Scrap Corp.*,
    426 U.S. 794 (1976)...................................................................... 38, 39

*Hughes v. Oklahoma*,
    441 U.S. 322 (1979)............................................................................ 38

*Hughes v. Talen Energy Mktg.*,
    136 S. Ct. 1288 (2016).................................................................. *passim*

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987)............................................................................ 26

*Johnson v. U.S. Office of Personnel Management*,
    783 F.3d 655 (7th Cir. 2015) ............................................................ 15

*Metro. Milwaukee Ass'n of Commerce v. Milwaukee Cty.*,
    431 F.3d 277 (7th Cir. 2005) .............................................................. 9

*Minnesota v. Clover Leaf Creamery Co.*,
    449 U.S. 456 (1981)...................................................................... 37, 38

*Miss. Power & Light Co. v. Miss. ex rel. Moore*,
    487 U.S. 354 (1988).................................................................. *passim*

*Municipalities of Groton v. FERC*,
    587 F.2d 1296 (D.C. Cir. 1978) ........................................................ 21

*N. Nat. Gas Co. v. State Corp. Comm'n*,
    372 U.S. 84 (1963)...................................................................... *passim*

*N.J. Realty Title Ins. Co. v. Div. of Tax Appeals*,
    338 U.S. 665 (1950)............................................................................ 13

*Nantahala Power & Light Co. v. Thornburg*,
    476 U.S. 953 (1986)...................................................................... 19, 20

*Nationwide Freight Sys., Inc. v. Ill. Commerce Comm'n*,
    784 F.3d 367 (7th Cir. 2015) ............................................................ 30

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
    508 U.S. 656 (1993) ............................................................................... 34

*New Energy Co. v. Limbach*,
    486 U.S. 269 (1988) ............................................................................... 33

*New England Power Generators Ass'n, Inc. v. FERC*,
    757 F.3d 283 (D.C. Cir. 2014) ............................................................... 21

*New York v. FERC*,
    535 U.S. 1 (2002) ................................................................................... 11

*Norfolk S. Ry. Co. v. Pa. Pub. Util. Comm'n*,
    No. 09-835, 2010 WL 1253551 (W.D. Pa. Mar. 24, 2010) .................... 28

*North Dakota v. Swanson*,
    No. 11-3232 (SRN/SER), 2012 WL 4479246 (D. Minn. Sept. 30, 2012) ............................. 29

*Nw. Cent. Pipeline v. State Corp. Comm'n*,
    489 U.S. 493 (1989) ........................................................................ 16, 25

*Oneok, Inc. v. Learjet, Inc.*,
    135 S. Ct. 1591 (2015) .................................................................. *passim*

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*,
    511 U.S. 93 (1994) ......................................................................... 34, 35

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970) ....................................................................... 33, 40

*Porter v. Warner Holding Co.*,
    328 U.S. 395 (1946) ............................................................................... 31

*PPL EnergyPlus, LLC v. Hanna*,
    977 F. Supp. 2d 372 (D.N.J. 2013) .............................................. 1, 24, 26

*PPL EnergyPlus, LLC v. Nazarian*,
    753 F.3d 467 (4th Cir. 2014) ........................................................ *passim*

*PPL EnergyPlus, LLC v. Nazarian*,
    974 F. Supp. 2d 790 (D. Md. 2013) .............................................. 16, 29

*PPL EnergyPlus, LLC v. Solomon*,
    766 F.3d 241 (3d Cir. 2014) ................................................................. 16

*Pub. Utils. Comm'n v. FERC*,
    900 F.2d 269 (D.C. Cir. 1990) ............................................................. 11

*Reeves, Inc. v. Stake*,
    447 U.S. 429 (1980)................................................................................ 39

*Retail Indus. Leaders Ass'n v. Fielder*,
    475 F.3d 180 (4th Cir. 2007) ................................................................ 13

*Rochester Gas & Electric Corp. v. Public Service Comm'n*,
    754 F.2d 99 (2d Cir. 1985)................................................................... 18

*S.D. Mining Ass'n v. Lawrence Cty.*,
    155 F.3d 1005 (8th Cir. 1998) .............................................................. 13

*Schneidewind v. ANR Pipeline Co.*,
    485 U.S. 293 (1988)....................................................................... *passim*

*Seminole Tribe of Fla. v. Florida*,
    517 U.S. 44 (1996)............................................................................... 31

*Thompson v. Ill. Dep't of Prof'l Regulation*,
    300 F.3d 750 (7th Cir. 2002) .................................................................. 8

*Tri-Corp Hous. Inc. v. Bauman*,
    826 F.3d 446 (7th Cir. 2016) ................................................................ 32

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
    550 U.S. 330 (2007)............................................................................. 35

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
    261 F.3d 245 (2d Cir. 2001)................................................................. 39

*United States ex rel. Sheet Metal Workers Int'l Ass'n v. Horning Invs., LLC*,
    828 F.3d 587 (7th Cir. 2016) .......................................................... 28, 29

*United States v. Locke*,
    529 U.S. 89 (2000)............................................................................... 10

*United States v. New York*,
    708 F.2d 92 (2d Cir. 1983)................................................................... 32

*Verizon Md., Inc. v. Pub. Serv. Comm'n*,
    535 U.S. 635 (2002)............................................................................. 30

*Verizon Wireless (VAW) LLC v. City of Rio Rancho*,
    476 F. Supp. 2d 1325 (D.N.M. 2007) ................................................. 28

*W. Lynn Creamery, Inc. v. Healy*,
    512 U.S. 186 (1994)....................................................................... *passim*

*Weinberger v. Romelo-Barcelo,*
   456 U.S. 305 (1982) ............................................................................ 31

*Wheelabrator Lisbon, Inc. v. Connecticut Dep't of Public Utility Control,*
   531 F.3d 183 (2d Cir. 2008) ............................................................ 23

*WSPP Inc.,*
   139 FERC ¶ 61,061 (2012) .......................................................... *passim*

**Statutes**

16 U.S.C. § 824 ......................................................................................... 2

16 U.S.C. § 824(b)(1) ............................................................................. 3, 11

16 U.S.C. § 825m(a) ................................................................................. 32

16 U.S.C. § 825p ....................................................................................... 32

16 U.S.C. § 824d(a) ............................................................................ 3, 11, 18

16 U.S.C. § 824e(a) ............................................................................ 3, 11, 18

20 ILCS 3855/1-75(d-5) ............................................................................ 4

20 ILCS 3855/1-75(d-5)(1)(B) .......................................................... 5, 9, 14

20 ILCS 3855/1-75(d-5)(1)(B)(i) ............................................................... 5

20 ILCS 3855/1-75(d-5)(1)(B)(iii) ............................................................. 5

20 ILCS 3855/1-75(d-5)(1)(C) .......................................................... 5, 15, 36

42 U.S.C. § 1396a(a)(30)(A) ..................................................................... 31

42 U.S.C. § 1396c .................................................................................... 31

42 U.S.C. § 16451 ...................................................................................... 6

**Other Authorities**

Act of Dec. 7, 2016,
   Sec. 1.5, 2016 Ill. Legis. Serv. P.A. 99-906 (S.B. 2814) (West) ................................. 4

Christopher M. Crane, President & CEO, Exelon Corp., Remarks at Ill. Mfrs.' Ass'n Annual
   Meeting (Dec. 7, 2012),
   http://www.exeloncorp.com/newsroom/events/Event%20Documents/Speech_Crane_Remarks
   %20to%20the%20Illinois%20Manufacturers'%20Association%202012.pdf ......................... 27

Exelon, The Merger of Exelon and Pepco Holdings: Five Things You May Not Know,
http://www.exeloncorp.com/company/Documents/Five-things-you-may-not-know.pdf .........27

Felix Cebulla & Mark Z. Jacobson, *Alternative Renewable Energy Scenarios for New York* (Nov. 8, 2016),
http://web.stanford.edu/group/efmh/jacobson/Articles/I/NYNuclearVsRenewables.pdf ..........9

ILL. COMMERCE COMM'N, ET AL., POTENTIAL NUCLEAR POWER PLANT CLOSINGS IN ILLINOIS 5 (Jan. 5, 2015) ...................................................................................................................... 22

S.A. 3, S.B. 1585, 99th Gen. Assemb. (Ill. May 12, 2016),
http://www.ilga.gov/legislation/99/SB/PDF/09900SB1585sam003.pdf, .................................. 9

William Von Hoene, Jr., Chief Strategy Officer, Exelon Corp., "Energy in Tomorrow's Competitive Marketplace," (Apr. 5, 2013),
http://www.exeloncorp.com/newsroom/Documents/speech_VonHoene_Booth_040513.pdf. 27

## INTRODUCTION

"The FPA leaves no room either for direct state regulation of the prices of interstate wholesales or for regulation that would indirectly achieve the same result."

*–U.S. Supreme Court*[1]

"The [New Jersey] Act conflicts with FERC's stated reliance on market forces to determine wholesale energy prices. FERC has determined that rates for wholesale energy should be determined by market forces so that the rates are neither too high nor too low to meet the FPA's requirement that wholesale energy rates be just and reasonable."

*–Exelon Corporation*[2]

"It's outrageous that Exelon and ComEd are again requesting a bailout when they are both profitable companies. This proposal would force consumers to pay more only to boost the companies' profits further. The legislature has more important matters to address than padding ComEd and Exelon's profits."

*–Illinois Attorney General Lisa Madigan*[3]

Illinois's Zero-Emission Credit ("ZEC") program is directly aimed at altering the outcome of federally regulated wholesale electricity auctions to avoid closing two inefficient nuclear plants owned by Intervenor-Defendant Exelon. The ZEC subsidy enables these unprofitable plants to continue operating when the auction market would otherwise dictate they close. In so doing, the subsidy severely disrupts the functioning of a competitive, FERC-regulated market. Because the ZEC legislation is aimed at the wholesale electricity market, it is preempted under a long line of Supreme Court cases, culminating last year in *Hughes v. Talen Energy Marketing* holding a similar Maryland program field-preempted. Defendants assert that the ZECs are similar to renewable energy credits ("RECs"). But RECs are made available to all providers of renewable energy, are not tied to the wholesale price of electric energy, and are not

---

[1] *Hughes v. Talen Energy Mktg.*, 136 S. Ct. 1288, 1297 (2016) (quoting *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 780 (2016) ("*EPSA*")).
[2] Complaint ¶ 89f, *PPL EnergyPlus, LLC v. Hanna*, 977 F. Supp. 2d 372 (D.N.J. 2013) (Civil Action No. 11-745) ("N.J. Complaint").
[3] Statement of Ill. Attorney General Lisa Madigan, "Attorney General Madigan: No Bailout for Exelon or ComEd" (May 24, 2016), http://www.illinoisattorneygeneral.gov/pressroom/2016_05/20160524.html.

intended to affect the wholesale electricity markets or upset the outcome or consequences of a FERC-approved tariff. ZECs are alleged by Plaintiffs to do all these things, and are thus different from RECs.

Even if the ZEC subsidy were not field preempted, it is conflict preempted because it frustrates the federal policy, established by the Federal Energy Regulatory Commission ("FERC") pursuant to the Federal Power Act ("FPA"), 16 U.S.C. § 824 *et seq.* – that "just and reasonable" rates are those determined by the auction process. Defendants ask this Court to determine, as a matter of law, that no matter how severely the Illinois ZEC distorts the wholesale market by keeping inefficient plants alive, that the program is not conflict-preempted for frustrating federal policy. Such a determination would be unprecedented, and contrary to Exelon's own prior submissions in other settings.

Defendants also ask this Court to become the first court in the country to hold that preemption suits involving the FPA are barred because a federal court lacks equity jurisdiction to declare and enjoin a preempted state law. The Supreme Court's decision in *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015), involving a far different Medicaid provision, does not require or support such a result.

Finally, the Illinois ZEC program is a textbook example of protectionist legislation that is forbidden by the dormant Commerce Clause. It was enacted to favor two Illinois nuclear plants that participate in multistate electricity markets at the expense of other participants in those markets. Just as the Seventh Circuit held a protectionist Illinois plan to favor in-state coal producers could not stand, Illinois's subsidization of Exelon's nuclear facilities violates the Commerce Clause. There is certainly no basis upon which to short-circuit the fact-intensive examination of discrimination and burden on interstate commerce that this claim entails.

## FACTS

Defendants and Intervenors (collectively "Defendants") do not (and on motions to dismiss cannot) dispute the detailed factual allegations of the Complaint regarding (i) the FERC regulatory regime and the functions of the Midcontinent Independent System Operator, Inc. ("MISO") and PJM Interconnection, L.L.C. ("PJM"), Compl. ¶¶ 29-31; (ii) the roles and operation of MISO's and PJM's energy and capacity markets, *id.* ¶¶ 32-42; (iii) the factual and legislative history of the Illinois's Future Energy Jobs Act ("FEJA") and intended operation of FEJA's ZEC program, *id.* ¶¶ 54-64; (iv) the damages (lost revenues) Plaintiffs will suffer, *id.* ¶ 66; and (v) the massive and highly disruptive effect the ZEC program would have on FERC-regulated power markets, *id.* ¶¶ 45-50, 65.[4]

The FPA grants FERC exclusive regulatory jurisdiction over "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce." *Id.* ¶ 26; 16 U.S.C. § 824(b)(1). This exclusive authority extends to the imposition of any charges "in connection with" wholesale rates and the enacting of any "rules and regulations affecting or pertaining to such rates or changes." Compl. ¶ 26; 16 U.S.C. §§ 824d(a), 824e(a). FERC is empowered to ensure that any rates and charges for wholesale electricity are "just and reasonable." Compl. ¶ 28; 16 U.S.C. §§ 824d(a), 824e(a).

In exercising its regulatory rate-setting authority, FERC employs competitive market-based auctions to establish "just and reasonable" wholesale electricity rates. Compl. ¶ 29. FERC has authorized MISO and PJM to administer and oversee the auctions for electricity used in Illinois. *Id.* ¶ 30. MISO and PJM conduct two main types of wholesale auctions: energy and capacity. *Id.* ¶ 31. "Energy" auctions, which include both "day ahead" and "real time" auctions,

---

[4] Because the facts concerning these matters are set forth fully in the Complaint and in Plaintiffs' Memorandum in support of the motion for preliminary injunction, we summarize them here.

ensure that sufficient generation resources are deployed to meet the actual amount of electricity ("load") used by consumers.  *Id.* ¶ 32.  Generators bid the price they will accept to supply a specified quantity of electrical energy.  *Id.* ¶¶ 34-35.  In "capacity" auctions, generators sell contracts to deliver specific quantities of electricity at specified times in the future.  *Id.* ¶ 38. Both types of auctions employ "stacking" of bids from lowest to highest until the requisite amount of energy or capacity is covered.  *Id.* ¶¶ 35, 41.  The price of the highest-stacked successful bid sets the "market clearing price" or "locational-based marginal price" for that auction, which all successful bidders then receive.  *Id.*

FERC-approved auction markets improve the efficiency of electricity generation by sending price signals to current and potential market participants.  Rising prices in the capacity market induce existing generators to invest in additional infrastructure or signal to new generators to enter the market.  *Id.* ¶ 40.  Conversely, falling prices signal inefficient generators to leave the marketplace and discourage investments that would create an oversupply.  *Id.* Because nuclear power plants run continuously at maximum output, and have no option but to sell this electricity in the wholesale auctions, nuclear plants typically bid as "price takers" in the auctions.  *Id.*  This means that nuclear plants bid at prices so low that they are certain to clear the auction and "take" whatever the market clearing price ends up being, significantly reducing market prices and the revenues of competitors.  *Id.* ¶ 36

The recent increased availability of inexpensive natural gas has pushed market prices below the point of economic viability for some nuclear generators.  *Id.*  In Illinois, Exelon announced the planned closure of two nuclear plants—Clinton and Quad Cities—allegedly losing some $800 million over the past seven years.  *Id.* ¶ 47, 54, 54.  Thereafter, at Exelon's urging, the Illinois Legislature passed FEJA, requiring Illinois utilities to purchase ZECs from

the nuclear plants, with the cost passed directly to retail customers as a surcharge on their monthly electricity bills.  20 ILCS 3855/1-75(d-5).

FEJA's ZEC program is claimed to compensate nuclear generators for their alleged lack of carbon emissions.  Compl. ¶¶ 58, 60; Act of Dec. 7, 2016, Sec. 1.5, 2016 Ill. Legis. Serv. P.A. 99-906 (S.B. 2814) (West).  But the ZEC program actually is just a mechanism to provide out-of-market funding to Clinton and Quad Cities.  Compl. ¶¶ 58, 61.  It was enacted solely to save jobs and property tax revenues at the subsidized generators.  *Id.* ¶ 88.

FEJA states that eligibility for ZECs is determined through a procurement process run by the Illinois Power Agency ("IPA"), with winners determined by "public interest criteria."  *Id.* ¶ 59 (citing 20 ILCS 3855/1-75(d-5)(1)(C)).  But the procurement process is a sham: Clinton and Quad Cities have been pre-determined to be the "winners" of the "process"  as the only Illinois nuclear plants threatening to close and thus in need of "preservation."  *Id.*  Indeed, before the procurement process even started, on the same day the governor signed the bill, Exelon reversed its decision to close the plants, and within days it announced new hiring and capital improvements and added hundreds of millions of dollars in ZEC revenue to the earnings projections it made to investors.  *Id.* ¶¶ 9, 61.

The ZEC subsidies are set by a formula directly tethered to FERC-regulated wholesale market prices.  *Id.* ¶ 63.  At its onset, the ZEC subsidy amount is to be $16.50 per MWh (the so-called "social cost of carbon"[5] minus a "Price Adjustment."  *Id.*; *see id.* Ex. A.  This "Price Adjustment" is the amount "by which the market price index for the applicable delivery year" exceeds the baseline market price of $31.40 per MWh.  *Id.* ¶ 63; *id.* Ex. A; *see* 20 ILCS 3855/1-

---

[5] From June 1, 2017, through May 31, 2023, the statute sets the social cost of carbon at $16.50 per MWh. Compl. ¶ 63; 20 ILCS 3855/1-75(d-5)(1)(B)(i).  Beginning June 1, 2023, this figure will increase by $1.00 each year for the remainder of the program.  *Id.*

75(d-5)(1)(B). The yearly "market price index" is based on the sum of energy forward prices averaged over the preceding year and the combined average capacity market prices established by PJM and MISO for a given delivery year. *Id.* Ex. A.; *see* 20 ILCS 3855/1-75(d-5)(1)(B)(iii); ECF No. 38-3 (DeRamus Decl.) ¶¶ 43-44. In other words, the "market price index" is the sum of actual capacity prices and actually traded energy futures prices. *See* Compl. Ex. A; *see also* ECF No. 38-3 ¶¶ 43-44. The "Price Adjustment" thus directly tethers the ZEC price to wholesale market prices, a fact essentially conceded by Defendants. *See* Def. Br. at 6.

Moreover, the ZEC payments are directly tethered to participation by the Clinton and Quad Cities plants in the wholesale market. The generation of ZECs is dependent upon Clinton and Quad Cities producing and selling their electricity, and they can only do so in FERC-approved wholesale auctions. Compl. ¶¶ 36, 64. Because nuclear plants operate continuously at maximum output and cannot store their electricity, the plants have no alternative but to bid in the MISO and PJM auctions. *Id.* ¶ 36. Indeed, as a designated "Exempt Wholesale Generator" under the Public Utility Holding Company Act, 42 U.S.C. § 16451 *et seq.*, Clinton can only sell its electricity at wholesale. *Id.* ¶ 56. This means that, for each megawatt-hour of electricity the plants produce and sell at the auctions, they will receive a premium, in the form of a ZEC payment, on top of the market clearing price. *Id.* ¶¶ 7, 46.

This premium will enable the otherwise uneconomic Clinton and Quad Cities plants to remain operating, thereby suppressing market prices for other bidders in PJM and MISO auctions. *Id.* ¶¶ 46, 49. By increasing energy supply above economically-efficient levels, the plants will drive down prices and reduce revenues for other market participants throughout the

multi-state coverage areas of PJM and MISO.  *Id.* ¶¶ 30, 46.[6]  Likewise, subsidizing these plants drives down capacity-market prices, undermining FERC's competitive market goals, threatening the viability of more efficient generators, including those owned by Plaintiffs, and discouraging investment in new, efficient, and flexible generators, including those using truly low-carbon technologies.  *Id.* ¶¶ 46, 48 50.

While depressed prices might benefit consumers in the short-run, the longer-term loss of efficient generators and a competitive market will cost consumers $2.8 billion to $3.1 billion per year.  *Id.* ¶ 49.  Even the supposed short-term price benefits will be substantially offset by utilities passing on the cost of ZECs to ratepayers.  *Id.* ¶¶ 11, 46, 49.

Contrary to Defendants' claims, Illinois's ZEC program is distinguishable from "Renewable Energy Credit" ("REC") programs.  Although Illinois has characterized ZECs, like RECs, as payments for the environmental attributes of electricity generation, any similarity is purely superficial.  While REC programs vary from state to state, a typical program provides credits for each megawatt-hour of electricity generated by a qualified renewable generator, such as wind or solar.  *Id.* ¶ 51.  Moreover, the price of RECs is not fixed by the state nor tethered to wholesale market revenues deemed inadequate by the state, and RECs , and RECs are not intended to upset the outcome or consequences of a FERC-approved tariff.  *Id.* ¶¶ 52-53.  Unlike ZECs, RECs are traded openly in competitive markets separate from wholesale energy markets, where the value of RECs rises and falls based on market forces and competition among renewable generators and load-serving entities ("LSEs").  *Id.*  Because RECs are independent

---

[6] There is a difference between PJM's and MISO's markets in that the majority of MISO's footprint is vertically integrated (i.e., the local utility has the monopoly on producing, transmitting and distributing energy), while the majority of PJM states have restructured their electric industries to allow for competition in the production of electricity.  Illinois is the only state within MISO that has fully restructured its markets to rely on competitive forces to set prices for energy and capacity.

from wholesale electricity sales, RECs do not have the same market-distorting effects that ZECs

will have on FERC-approved wholesale electricity markets. *See id.*

## LEGAL STANDARD

In deciding a Rule 12(b)(6) motion to dismiss, the court must draw all reasonable

inferences that favor the plaintiffs, construe the allegations of the complaint in the light most

favorable to the plaintiffs, accept as true all well-pleaded facts and allegations in the complaint,

and deny the motion if any claims are plausible. *Appert v. Morgan Stanley Dean Witter, Inc.*,

673 F.3d 609, 622 (7th Cir. 2012). The motion must be decided solely on the allegations of a

plaintiff's "complaint, any exhibits attached thereto, and supporting briefs." *Thompson v. Ill.*

*Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002).

## ARGUMENT

**I.      DEFENDANTS' ARGUMENTS FAIL AT THE THRESHOLD, BECAUSE THEY**
**ARE FOUNDED ON THE DISPUTED PREMISE THAT THE ZEC PROGRAM**
**WAS ENACTED FOR AN "ENVIRONMENTAL PURPOSE"**

Throughout their briefs, Defendants premise their arguments on the notion that the

purpose of FEJA's ZEC program is to "avoid the emission of airborne pollutants," "to promote

environmental benefits," Def. Br. at 1-2, and to prevent the replacement of nuclear plants "by

fossil fuel-burning plants that emit large quantities of these harmful pollutants," Exelon Br. at 1.

These statements, however, directly contradict the allegations of the Complaint, which must be

accepted as true for Rule 12(b)(6) purposes.

Plaintiffs allege and will prove that "the clear and actual purpose of FEJA was to save

jobs and local tax revenues associated with these plants, as demonstrated by the very name of the

law—Future Energy **Jobs** Act. FEJA is not environmental legislation; it is just a mechanism to

provide out-of-market funding to Clinton and Quad Cities." Compl. ¶ 58. As alleged in the

Complaint and set forth above, the "procurement process" set forth in FEJA "is a sham, as

8

Clinton and Quad Cities have been pre-determined to be the 'winners' of the ZEC contracts." *Id.* ¶ 59. PJM's Independent Market Monitor agrees that Exelon lobbied for ZECs "to improve the profitability of those specific units" and ***not*** "to accomplish broader social goals." ECF No. 38-8 at 4.[7]

In light of the Complaint's well-pleaded allegations of pretext, the motions to dismiss fail at the threshold. *See Metro. Milwaukee Ass'n of Commerce v. Milwaukee Cty.*, 431 F.3d 277, 281-82 (7th Cir. 2005) (holding ordinance preempted where proffered motive determined to be a "pretext" rather than a "reasonable, good-faith measure for enabling Milwaukee County to get a better quality of service from its contractors").

## II. THE COMPLAINT STATES A FIELD PREEMPTION CLAIM BECAUSE THE ZEC PROGRAM "DIRECTLY AFFECTS" WHOLESALE ELECTRICITY PRICES

Even assuming that the ZEC program has a valid environmental purpose, the motions to dismiss are meritless. Exelon contends that "*WSPP*, *EPSA*, and *Hughes* make clear" that the ZEC program "falls comfortably within states' jurisdiction over generation facilities." Exelon Br. at 17. But *Hughes* unanimously ***struck down*** a similar state program; *EPSA* ***upheld*** FERC's jurisdiction over a practice that does not involve the wholesale sale of electricity at all, and *WSPP* states explicitly that the sale of an "environmental attribute" ***is within*** FERC jurisdiction

---

[7] Although not required, ¶ 61 of the Complaint sets forth evidence of the true purpose of the ZEC program, and Plaintiffs will present extensive additional evidence at the preliminary injunction hearing. The original version of FEJA expressly set the ZEC price at the difference between the nuclear generator's costs minus energy and capacity revenues, *see* S.A. 3, S.B. 1585, at 82-83, 99th Gen. Assemb. (Ill. May 12, 2016), http://www.ilga.gov/legislation/99/SB/PDF/09900SB1585sam003.pdf, but this price formula was changed in the final version in response to *Hughes*, *see* 20 ILCS 3855/1-75(d-5)(1)(B). Simple science and economics also demonstrate the pretextual nature of the purported "environmental purpose" of the ZEC program, because Illinois could get cleaner air at a much lower cost by replacing the electricity from the nuclear plants with clean, green electricity from solar, hydro, and wind-powered renewable generators that will remain in operation for decades. *See* Felix Cebulla & Mark Z. Jacobson, *Alternative Renewable Energy Scenarios for New York* (Nov. 8, 2016), http://web.stanford.edu/group/efmh/jacobson/Articles/I/NYNuclearVsRenewables.pdf (subsidizing nuclear plants to stay open "increases both $CO_2$ and costs relative to the renewable scenarios").

if it is "in connection with" or "affects" jurisdictional rates or charges, or is not "independent" of wholesale electricity sales. *Hughes*, 136 S. Ct. at 1299; *EPSA*, 136 S. Ct. at 773-82; *WSPP Inc.*, 139 FERC ¶ 61,061, at ¶¶ 22-23 (2012).

These cases refute the assertion by the State Defendants, Br. at 11, that the ZEC program survives because Illinois has not expressly "set rates for interstate wholesale sales" or acted to "regulate those sales." That could also have been said of the "contract for differences" invalidated in *Hughes* because Maryland did not set the rate for the interstate sale (it, like Illinois here, added to that rate) and did not seek to regulate the sale transaction itself. "States interfere with FERC's authority by disregarding interstate wholesale rates FERC has deemed just and reasonable." *Hughes*, 136 S. Ct. at 1298-99.

In addition, contrary to Defendants' assertions, *Hughes* does **not** hold or imply that a state measure is valid as long as it does not expressly "condition payment of funds on capacity clearing the auction"; *EPSA* does **not** suggest that a state program survives FPA preemption as long as it does not "establish the amount of money a [purchaser] will hand over in exchange for [wholesale] power"; and *WSPP* does **not** say that subsidy payments are outside FERC's jurisdiction as long as they are made "in a transaction separate from the wholesale sale of electricity." Def. Br. at 10-16; Exelon Br. at 9-17. As shown below, Defendants fundamentally misunderstand these decisions and FPA preemption law.[8] Indeed, Defendants have failed to cite

---

[8] Contrary to Defendants' contention (Def. Br. at 8; Exelon Br. at 7-8), there is no presumption against preemption. No presumption is "triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000); *see PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 477 (4th Cir. 2014) ("*Nazarian II*") ("The presumption 'is almost certainly not applicable here because the federal government has long regulated wholesale electricity rates.' . . . [And] even were we to apply the presumption, we would find it overcome by the text and structure of the FPA, which unambiguously apportions control over wholesale rates to FERC." (citation omitted)).

even one decision where any similar state subsidy program was upheld, and in most cases they cite, the courts actually struck down state programs or upheld FERC jurisdiction.

Under the FPA, FERC has exclusive regulatory authority over "the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1); *Hughes*, 136 S. Ct. at 1292. This exclusive authority extends to the imposition of any charges "in connection with" wholesale rates, and the enacting of any "rules and regulations affecting or pertaining to such rates or charges." 16 U.S.C. §§ 824d(a), 824e(a). Intervenor Exelon concedes that FERC has exclusive jurisdiction over wholesale rates, but incorrectly asserts (Br. at 17-18) that FERC's jurisdiction over measures affecting rates is not exclusive. *See Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 374 (1988) ("States *may not regulate* in areas where FERC has properly exercised its jurisdiction to determine just and reasonable wholesale rates or to insure that agreements *affecting wholesale rates* are reasonable." (emphasis added)); *Pub. Utils. Comm'n v. FERC*, 900 F.2d 269, 274 (D.C. Cir. 1990) ("Cases are legion affirming the exclusive character of FERC jurisdiction where it applies, both under the NGA and under the analogous provisions of the Federal Power Act" (citations omitted)). Accordingly, for the Court to hold that the ZEC program is not preempted would mean that it is outside the area in which FERC can regulate.

The ZEC program is field preempted by FERC's exclusive regulatory authority because, under the facts alleged, the program "affects," "pertains to," or is "connected with" wholesale electricity rates.[9]

## A.    The ZEC Program "Directly Affects" Wholesale Electricity Prices Under Standards Reconfirmed Repeatedly by the Supreme Court

---

[9] Exelon incorrectly asserts that *New York v. FERC*, 535 U.S. 1, 25 (2002), holds that states may regulate a particular matter, even if it "directly affects" wholesale rates, so long as FERC has not decided to regulate it. Exelon Br. at 18. The case says nothing at all about a state's ability to regulate in the absence of FERC regulation.

For decades, courts and FERC have construed the FPA terms "affects," "pertains to," and "connected with," and the Supreme Court has reconfirmed these longstanding interpretations in a trio of recent cases: *Hughes*, *EPSA*, and *Oneok, Inc. v. Learjet, Inc*., 135 S. Ct. 1591 (2015). In *EPSA*, the Court made clear that FERC's authority preempts state "rules or practices that *directly* affect the [wholesale] rate." 136 S. Ct. at 774 (emphasis in original) (internal quotation marks omitted). In *Oneok*, the Court held that whether a state regulation "directly" affects wholesale rates depends on "the *target* at which the state law *aims*." 135 S. Ct. at 1599 (emphasis in original); *see also EPSA*, 136 S. Ct. at 776-77 (citing *Oneok*). Thus, "measures *aimed directly at* interstate purchasers and wholesalers for resale" are field preempted. *Oneok*, 135 S. Ct. at 1600 (emphasis in original) (quoting *N. Nat. Gas Co. v. State Corp. Comm'n*, 372 U.S. 84, 94 (1963)). But those aimed at "subjects left to the States to regulate," such as generally applicable state antitrust laws, blue sky laws, tax laws, and recycling laws, are not field-preempted because their impact on interstate wholesale rates is incidental or indirect. *Id.* at 1600-01. State Defendants admit that the ZEC "may have an incidental effect on FERC-approved wholesale rates," Br. at 6, but, unlike general-application laws, the effect here on the wholesale market is the aim and purpose of the litigation. If ZECs did not alter the effective rate received by the subsidized nuclear plants, and thereby keep them in the market at the cost of other market participants, the ZEC would not achieve its intended purpose.

In *Hughes*, the Supreme Court applied the principles of *EPSA* and *Oneok* to hold that a Maryland program which subsidized the cost of a new in-state generating plant was field preempted. Even though the subsidy was for the legitimate purpose of "encourag[ing] construction of new in-state generation," it was "*aimed directly* at interstate purchasers and wholesalers for resale" and thus constituted an invalid "intru[sion] on FERC's authority over

12

interstate wholesale rates." 136 S. Ct. at 1298-99 (emphasis in original) (citing *Oneok*, 135 S. Ct. at 1600). Accordingly, even a state's "legitimate purpose" does not excuse direct intrusion on FERC's authority.

                1.     *Hughes* Mandates Preemption of "Tethered" Subsidies Such As the FEJA ZEC Program

Exelon argues that *Hughes* is distinguishable because it preempts only programs that require auction participation and "condition payment of funds on capacity clearing the auction." Exelon Br. 11-17. Although this is legally incorrect, as shown below, the Complaint alleges such a condition exists as a factual matter, because the nuclear plants "have no alternative to selling their output in the MISO and PJM energy auctions." Compl. ¶ 36. In fact, PJM's rules require Quad Cities to participate in the capacity auctions. *See* PJM Open Access Transmission Tariff at Attachment DD § 6.6 (June 27, 2016), http://www.pjm.com/media/documents/merged-tariffs/oatt.pdf. The nuclear plants can receive ZECs only if they produce electricity, and they can dispose of the electricity only by selling it in the auctions. *Id*.[10] Defendants' entire argument fails for this reason alone.

While *Hughes* states that "[n]othing in this opinion should be read to *foreclose* Maryland and other States from encouraging production of new or clean generation through measures untethered to a generator's wholesale market participation," *id.* at 1299 (emphasis added, internal

---

[10] Nor can *Hughes* be read to allow state measures that in reality intrude on exclusive federal jurisdiction just because they do not contain express language to that effect. A *de facto* or implicit requirement is enough. *See, e.g.*, *N.J. Realty Title Ins. Co. v. Div. of Tax Appeals*, 338 U.S. 665, 673 (1950) ("Our inquiry is narrowed to whether in practical operation and effect the tax is in part a tax upon federal bonds . . . .regardless of the accounting label employed in describing it."); *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 192-95 (4th Cir. 2007) (preempting law that "effectively mandated" conduct subject to exclusive federal jurisdiction, as it left employers with no other "rational choice" but to follow a certain course); *S.D. Mining Ass'n v. Lawrence Cty.*, 155 F.3d 1005, 1011 (8th Cir. 1998) ("[T]he ordinance's effect is a de facto ban on mining in the area" and is therefore preempted.); *Blue Circle Cement, Inc. v. Bd. of Cty. Comm'rs*, 27 F.3d 1499, 1508 (10th Cir. 1994) (local law imposing "explicit or de facto" ban on federally encouraged activity can be preempted).

quotation marks omitted), at most this means the validity of other types of programs was left for future decision. The *Hughes* Court stressed:

> [A] State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable. A State must rather give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority. . . . States interfere with FERC's authority by disregarding interstate wholesale rates FERC has deemed just and reasonable, even when States exercise their traditional authority over retail rates or, as here, in-state generation.

*Id.* at 1298-99 (emphasis added) (quoting *Miss. Power & Light*, 487 U.S. at 373); *see id.* at 1300 (Sotomayor, J., concurring) (Maryland's actions "must be preempted" because it "has acted to guarantee CPV a rate different from FERC's 'just and reasonable' rate and has thus contravened the goals of the Federal Power Act"); *id.* at 1301 (Thomas, J., concurring) ("By 'fiddling with the effective . . . price' that CPV receives for its wholesale sales, Maryland has 'regulate[d]' wholesale sales.").

As much as the subsidies in *Hughes*, if not more, ZECs are "tethered" to the favored generators' wholesale market participation. The ZEC price is subject to an annual adjustment that is expressly determined with reference to wholesale prices—as wholesale prices go up, the ZEC price goes down, and *vice versa*. Compl. ¶ 63; 20 ILCS 3855/1-75(d-5)(1)(B).[11] "In effect, the ZEC price formula establishes a 'price collar' (or 'revenue collar') for subsidized nuclear plants at $47.90 / MWh, which largely eliminates their risks from changes in wholesale market prices." ECF No. 38-3 ¶ 40. The "price collar" operates similarly to the contract-for-differences

---

[11] The price adjustment formula is determined by the amount "by which the market price index for the applicable delivery year exceeds the baseline market price index for the consecutive 12-month period ending May 31, 2016." 20 ILCS 3855/1-75(d-5)(1)(B). Both the "market price index" and the "baseline market price index" are based on the sum of specified PJM and MISO energy and capacity prices. *Id.* The formula is reprinted in full as Exhibit A of the Complaint. Exelon's argument that no particular generator receives the exact composite PJM and MISO price, Br. at 25, has no legal significance – it is the tying of the ZEC to wholesale market prices that is important. There was no consideration in *Hughes*, for example, as to whether the price used in the "contract for differences" was in fact received by a particular generator.

structure in *Hughes,* in that it guarantees that the nuclear plants will receive sufficient revenues to justify their continued operation. Thus, the ZEC value, which is based on actual energy and capacity prices, *id.* ¶¶ 44-45, is inherently tethered to wholesale market outcomes and establishes that Illinois was "aiming at" changing wholesale market outcomes. Illinois has "fiddled with the effective price," by guaranteeing the nuclear generators a higher price than the free-market auction prices under FERC regulation, and thus has impermissibly "interfere[d] with FERC's authority by disregarding interstate wholesale rates FERC has deemed just and reasonable." *Hughes*, 136 S. Ct. at 1299.

There is no merit to Exelon's claim (Br. at 14) that Plaintiffs lack standing to challenge the price collar provision of the ZEC program. In light of the collar, the ZEC price varies annually—upward or downward—based on wholesale electricity prices. The price collar underscores that the subsidy is improperly tethered to the wholesale price of electricity. Defendants cannot "divorce" for separate analysis "two parts of an integrated regulation." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994). Exelon's reliance on *Johnson v. U.S. Office of Personnel Management*, 783 F.3d 655, 663 (7th Cir. 2015), is misplaced, as *Johnson* involved an injury "caused by amendments to a different regulation" than the one that suffered the alleged legal infirmity. *Id.* In contrast, Plaintiffs' challenge to the unlawful ZEC subsidies targets a single regulatory measure. Plaintiffs do not lose standing because it is possible the state could have designed a subsidy that would have an even more deleterious effect on plaintiffs.

Additionally, the key factor in the award of ZECs to a nuclear plant is a determination that the plant would "cease to exist" without the subsidy, *i.e.*, that wholesale prices are too low to keep the plant in business. 20 ILCS 3855/1-75(d-5)(1)(C). Because the ZECs are the causal agent of the nuclear generators continuing to sell power into the FERC-jurisdictional markets,

ZECs are unavoidably "tethered" to the PJM and MISO wholesale markets.  Moreover, because the plants have no alternative but to bid as "price takers" to ensure that they "clear" the auctions, they inevitably force down the price received by all competitors.  Compl. ¶¶ 36, 56; ECF No. 38-3 ¶¶ 25, 36, 79.[12]

As Defendants do now, Maryland argued in *Hughes* that a subsidy was something other than an "adjustment" of the interstate wholesale rate.  The Maryland program involved a state-mandated "contract for differences" requiring that LSEs pay the favored generator a supplement on top of the FERC auction price.  *See Hughes*, 136 S. Ct. at 1294-95.  The state argued that the contract did not change the auction price and was analogous to a "traditional bilateral contract" or a "hedging contract" and was merely "compensation for construction of a plant."  The Supreme Court and the lower courts unanimously rejected these arguments.  *Id.* at 1299 & n.12; *Nazarian II*, 753 F.3d at 475- ("[S]tates are barred from relying on mere formal distinctions in 'an attempt' to evade preemption."); *PPL EnergyPlus, LLC v. Nazarian*, 974 F. Supp. 2d 790, 840 (D. Md. 2013) ("*Nazarian I*"); *accord PPL EnergyPlus, LLC v. Solomon*, 766 F.3d 241, 254 (3d Cir. 2014) (New Jersey program preempted even though it "artfully steps around" the auctions and does not "formally upset the terms of a federal transaction" (quoting *Nazarian*

---

[12] Contrary to Exelon's assertion (Br. at 22), the ZEC program is not the "reverse of a pollution tax."  A pollution tax would apply equally to all carbon-emitting sources, in proportion to their CO2 output.  It would have a clear purpose to lower carbon emissions in a non-distortionary and non-discriminatory manner.  The ZEC program, in contrast, is a discriminatory subsidy provided to selected in-state nuclear plants, and only those plants, so they remain in the market to preserve jobs and tax revenue when market forces indicate they should leave.

*II*)).[13] *See also* Brief of Exelon, *et al.*, in Opposition to Petition for Writ of Certiorari at 26, *Fiordaliso v. Talen Energy Mktg., LLC*, 136 S. Ct. 1728 (2016) (No. 14-694) ("Exelon Cert. Opp.") ("[N]o creative refashioning can change the fact that the [New Jersey subsidy] by both design and intent supplants FERC-approved rates.").

Indeed, as Exelon itself alleged in the New Jersey case, state-mandated price adders "bring about precisely the harms that FERC sought to avoid by instituting market-based regulation" and "prevent[] true market forces from setting energy prices, thus undermining FERC's implementation of the FPA." N.J. Complaint ¶¶ 78, 89f. The same is true here. The ZEC price collar acts like the contract for differences struck down in *Hughes* by ensuring that the ZEC price decreases if wholesale market prices increase and increases (up to a cap) if wholesale market prices decrease. The decisions reached unanimously by sixteen judges and Justices in the Maryland and New Jersey subsidy cases require a similar result here.

### 2. Exelon Misinterprets *EPSA* and *Rochester Gas*

Exelon's claim (Br. at 11-13) that *EPSA* "rejected" Plaintiffs' position is baseless. Quite the contrary, *EPSA* took a broad view of FERC jurisdiction and strongly supports Plaintiffs' position. *EPSA* reaffirmed FERC's power over practices that "directly affect" wholesale rates and held that FERC could regulate "demand response," a practice in which "operators of wholesale markets pay electricity consumers for commitments not to use power at certain times."

---

[13] Exelon (Br. 19) quotes *Solomon* as stating that the "law of supply-and-demand is not the law of preemption," but ignores the Third Circuit's holding, which struck down the New Jersey program. The Third Circuit specifically rejected the contention, made by Exelon here, that the program was valid under *Northwest Central Pipeline v. State Corp. Comm'n*, 489 U.S. 493 (1989), 766 F.3d at 254. *Northwest Central* involved a Kansas regulation canceling gas producers' entitlements to certain quantities of gas if production were too long delayed. The Supreme Court found that field preemption was not warranted "merely because purchasers' costs and hence rates might be affected" by the regulation. 489 U.S. at 512. In the instant case, it is certain that costs and rates will be severely affected (not just "might"), and the ZEC program forces purchases by interstate wholesale electricity buyers.

*EPSA*, 136 S. Ct. at 767, 774.  Demand-response transactions do not even involve the sale of wholesale electricity, yet the Court held that FERC had jurisdiction because demand response "directly affects" wholesale rates.  *Id*. at 775.

Exelon tries to turn the *EPSA* holding on its head by focusing on the Court's rejection of a claim that, by exercising jurisdiction over demand response, FERC was effectively regulating retail rates.  136 S. Ct. at 775-80.  The Court found that FERC was not precluded from "altering consumers' incentives to purchase" electricity even though doing so would "increas[e] effective retail rates."  *Id*. at 777.  Exelon argues that states likewise must be free to take actions that "effectively" increase rates (Br. at 13).  This argument ignores, however, that the FPA only prevents FERC from regulating retail rates, but states are expressly prohibited *both* from regulating wholesale rates *and* from taking actions that "affect," "pertain to," or are "connected with" wholesale rates.  16 U.S.C. §§ 824d(a), 824e(a).  Thus, "a FERC regulation does not run afoul of § 824(b)'s proscription [of retail regulation] just because it affects—even substantially— the quantity or terms of retail sales."  *EPSA*, 136 S. Ct. at 776.  On the other hand, a state regulation that substantially affects the quantity or terms of wholesale sales is preempted.[14]

Exelon's reliance (Br. at 7, 15) on *Rochester Gas & Electric Corp. v. Public Service Comm'n*, 754 F.2d 99 (2d Cir. 1985), is similarly misplaced.  Central to the Second Circuit's holding was its finding that the policy of the New York Public Service Commission ("PSC") to consider federally-regulated wholesale sales when it set state-jurisdictional retail rates would ***not*** affect the wholesale-market decisions of the utility at issue.  *See* 754 F.2d at 102 ("[W]e do not believe that PSC's [policies] materially affect [the utility's] incidental sales decisions."); *id*. (the

---

[14] *See, e.g.*, *Miss. Power & Light*, 487 U.S. at 371 (states prohibited from *de facto* regulation of wholesale rates); *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 307-08 (1988) (state action preempted even though it did not involve the amount of money a purchaser will hand over for wholesale energy); *N. Nat. Gas.*, 372 U.S. at 90-93 (same); *Nazarian II*, 753 F.3d at 476 (FPA preempts state action that "effectively supplants the [wholesale] rate generated by the auction").

utility did not argue that "but for the imputation policy it would engage in a lesser level of incidental sales"). The Second Circuit expressly distinguished a situation—like the instant case—where state law affects a utility's decisions in the federally regulated wholesale sphere. *See id.* ("[W]e are not faced with a situation where a state commission has [issued an order] in an effort to force the utility to change its position toward such [wholesale] sales."). Here, of course, Illinois is attempting to do just that—to force LSEs to buy ZECs to sustain electricity sales by in-state nuclear plants that would otherwise close.

### B. The Effects of the ZEC Program on Wholesale Prices Are Far Greater Than Those of a Wide Variety of State Measures That Have Been Held Preempted

The *Hughes* decision followed a long line of cases which held that state laws were preempted, even in situations where their effects on price were much less direct than the impact of Illinois's ZEC program. In *Schneidewind*, for example, the Court unanimously struck down a Michigan statute requiring natural gas companies to obtain state approval before issuing securities. 485 U.S. at 296-97, 310.[15] Even though this statute did not change the terms of wholesale sale agreements, explicitly deal with pricing, or require any payments, it was preempted as "amount[ing] to a regulation of rates and facilities," and thus "an attempt to regulate matters within FERC's exclusive jurisdiction." *Id.* at 307-08. Unlike generally applicable blue sky laws, the preempted provision applied "only to utilities" and was directed at "matters within FERC's exclusive jurisdiction"—specifically, "the control of rates and facilities of natural gas companies." *Id.* at 308 & n.11. If a state law that merely requires approval of a gas company's issuance of securities is an unconstitutional "regulation of rates and facilities," it

---

[15] Although *Schneidewind* involved regulation of natural gas companies under the Natural Gas Act, courts have "routinely relied on [Natural Gas Act] cases in determining the scope of the [Federal Power Act], and vice versa." *Hughes*, 136 S. Ct. at 1298 n.10.

19

follows *a fortiori* that the ZEC program cannot stand because of its far greater direct and substantial effect on wholesale prices than the Michigan statute invalidated in *Schneidewind*.

As *Schneidewind* demonstrates, *Hughes* broke no new ground, but instead applied established FPA-preemption principles. The *Hughes* Court also relied upon *Mississippi Power & Light* and *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986), which upheld preemption of state efforts to deny utilities' recovery of costs required by FERC-directed power allocations. Because power allocations affect rates, the FPA barred states from making a "*de facto* reallocation*" by "substituting their own determinations of what would be just and fair." *Miss. Power & Light*, 487 U.S. at 371; *accord Nantahala Power & Light*, 476 U.S. at 966. The same applies here: Illinois cannot give the nuclear generators a *de facto* higher wholesale price than what FERC has determined to be just and reasonable.

Similarly, in *Northern Natural Gas,* the Court struck down two Kansas regulatory orders requiring interstate pipeline companies to purchase gas "ratably" from all wells connected with its pipeline system. 372 U.S. at 88-89. The Kansas Supreme Court rejected preemption, finding that the statute "in no way involves the price of gas," but the Supreme Court reversed, observing that its "inquiry is not at an end because the orders do not deal in terms with prices or volumes of purchases." *Id.* at 90-92. The instant case is easier since FEJA deals explicitly "in terms with prices or volumes of purchases." Even though a state may act "to conserve its natural resources," the Supremacy Clause does not permit "the particular means chosen by Kansas to exercise the conceded power," because "those means threaten effectuation of the federal regulatory scheme." *Id.* at 93. The Kansas orders "could seriously impair the Federal Commission's authority to regulate the intricate relationship between the purchasers' cost structures and eventual costs to wholesale customers." *Id.* at 92. By the same logic, the ZEC

20

program is field preempted because it directly subverts FERC's ability to regulate the wholesale markets comprehensively, effectively, and uniformly.

The decisions in *Hughes*, *Schneidewind*, *Mississippi Power*, *Nantahala*, and *Northern Natural Gas* make clear that a state regulation "directly affecting," "aimed at" or "targeting" wholesale rates is field-preempted even if (i) its purpose is laudable; (ii) it is within an area of traditional state jurisdiction; and (iii) it does not expressly alter wholesale rates.[16]  Under these and many other cases,[17] the Illinois ZEC program is field-preempted.

### C.    ZECs Are Not Similar to Renewable Energy Credits

ZECs are different from RECs, which are state-created and state-issued instruments certifying that electric energy was generated pursuant to certain renewable energy requirements and standards.  Unlike ZECs, RECs are not dependent upon or priced with respect to the wholesale price of electricity.  Compl. ¶¶ 51-53; ECF No. 38-3 ¶¶ 47-49.  RECs are broadly available to anyone who produces renewable energy, without regard to economic need or location; in contrast, ZECs are only available to specifically selected, non-viable nuclear plants in danger of closing, as determined by the Illinois IPA.  *Id.*  Unlike ZECs, RECs are not intended to affect the wholesale electricity markets or upset the outcome or consequences of a FERC-

---

[16] Exelon cites (Br. at 5) *Connecticut Dep't of Public Utility Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009), but fails to note that the D.C. Circuit rejected the state's position and held that, notwithstanding state rights, FERC had jurisdiction to review installed capacity requirements, which arguably required generators to install additional capacity, because this was within FERC's "broad power over practices affecting wholesale rates." *Id.* at 481, 485.  The court reaffirmed its prior decision in *Municipalities of Groton v. FERC*, 587 F.2d 1296, 1302 (D.C. Cir. 1978), which explicitly holds that FERC's jurisdiction encompasses **any** charge that "affects the fee that a participant pays for power and reserve service [*i.e.,* capacity], irrespective of the objective underlying that charge." *Id.* at 482-84,

[17] *See, e.g.*, *New England Power Generators Ass'n, Inc. v. FERC*, 757 F.3d 283, 290 (D.C. Cir. 2014) (FERC has exclusive jurisdiction over resources, "whether self-supplied, state-sponsored, or otherwise," that "directly impact" auction clearing prices); *Appalachian Power Co. v. Pub. Serv. Comm'n*, 812 F.2d 898, 902 (4th Cir. 1987) (preempting state attempt to regulate FERC-approved transmission agreement because, "[a]lthough the [agreement] does not explicitly set a dollar rate for the transmission and sale of electricity in commerce, it has the same effect as if it did in that *it creates the obligations owed by or payable to utility companies for the privilege of exchanging interstate electricity*" (emphasis added).

21

approved tariff. *Id.* ¶¶ 52-53, 62. Thus, in contrast to the ZEC program, state measures establishing REC programs are more similar to the laws of "broad applicability" aimed at "all businesses in the marketplace" that are presumptively not preempted. *See Oneok*, 135 S. Ct. at 1601.

In addition, the REC price is typically determined by a competitive market for renewable energy credits, not by a state dictate based on how much the favored plant will receive from wholesale electric market sales. Compl. ¶¶ 51-53; *see* ECF No. 38-3 ¶ 49, Table 1. "REC programs do not limit eligibility to suppliers whose wholesale market revenues are less than their costs; nor do states use REC price formulas that change the value of RECs based on wholesale market prices." ECF No. 38-3 ¶ 47. Further, RECs involve subsidies for renewable generating facilities which produce relatively small amounts of electricity (typically a few percentage points of total capacity) compared to nuclear facilities, which supply about one-quarter of Illinois's capacity.[18] Nuclear plants also operate continuously, while REC-eligible facilities are "intermittent," given that they are dependent on wind or solar conditions. Thus, any impact of RECs on wholesale markets is far less significant the market distortion caused by ZECs.

Nor has it ever been held that all RECs are *per se* valid, as Defendants' argument assumes. For example, in *WSPP Inc.*, relied on by Movants (Def. Br. at 14-15; Exelon Br. at 8-11), FERC found that a REC transaction is *within* federal jurisdiction if it "affects" or is "connected with" wholesale rates:

> Nevertheless, although a transaction may not directly involve the transmission or sale of electric energy, the transaction could still fall under the Commission's jurisdiction because it is "in connection with" or "affects" jurisdictional rates or charges.

139 FERC ¶ 61,061, at ¶ 22.

---

[18] ILL. COMMERCE COMM'N, ET AL., POTENTIAL NUCLEAR POWER PLANT CLOSINGS IN ILLINOIS 5 (Jan. 5, 2015).

A REC transaction, even if "unbundled" (sold separately) is non-jurisdictional only if it is "independent" of a wholesale electricity sale, *id*. ¶¶ 23-24, and "independence" cannot not be created by separating contracts "pertain[ing] to the same transaction," *id*. ¶ 26. The *WSPP* standard echoes the Supreme Court's statements that state actions are preempted when they are "tethered" or "aimed at" wholesale markets.[19] Given that ZEC subsidies would allow Illinois to distort the wholesale market, ZECs plainly "affect" the market and are thus subject to FERC's exclusive jurisdiction. And because Illinois utilities are forced to buy ZECs in an amount proportional to their retail sales, which in turn are proportional to their wholesale electricity purchases, ZEC purchases are not "independent" from wholesale electricity purchases.[20]

Notwithstanding *WSPP*'s plain language, Defendants attempt to spin the decision as support for their position. They incorrectly assert that ZECs are "just like RECs in all material respects" and claim *WSPP* gives states the ability, regardless of impact on FERC markets, to provide tethered ZEC subsidies so long as they "are not sold in the same transaction as the electricity." Exelon Br. at 2, 14-15; Def. Br. at 14. But as just noted, ZECs are far different from RECs, and state-forced ZEC purchases are not "independent" from wholesale electricity

---

[19] *WSPP* renders irrelevant the short *dicta* relied on by Exelon from FERC's earlier decision in *California Public Utilities Comm'n*, 133 FERC ¶ 61,059, at ¶ 31 n.62. *See* Exelon Br. at 9-10, 23. Moreover, the *dicta* concerns RECs, which are not tied to the price of capacity or energy; ZECs are. Also irrelevant is *Wheelabrator Lisbon, Inc. v. Connecticut Dep't of Public Utility Control*, 531 F.3d 183, 190 (2d Cir. 2008), which involved only the question whether an electricity purchase contract between private parties included RECs as well as electricity. The Second Circuit accepted FERC's conclusion that this contractual interpretation issue was governed by state law. *Id*. at 190.

[20] Some states require fossil fuel generators to purchase emissions allowances (payments for the right to sell electricity that produces emissions) in order to sell wholesale electricity. FERC in *WSPP* noted that wholesale sales of electric energy that require the use of an emissions allowance ***are within*** FERC's jurisdiction because they may "affect" wholesale rates. 139 FERC ¶ 61,061, at ¶ 23. ZECs are the same thing on the buyer's side—buyers are required to purchase ZECs in order to buy wholesale electricity. ZECs directly affect wholesale rates and thus are within FERC's jurisdiction.

purchases.  *See also* ECF No. 68-1 (*amicus* American Wind Energy Association) at 5-10.  At the very least, the fact issue whether ZECs are "independent" precludes Rule 12(b)(6) dismissal.

Defendants imply that in *WSPP*, FERC generally disclaimed jurisdiction as to "unbundled RECs."  *See* Def. Br. at 14-15; Exelon Br. at 8-11.  But *WSPP* made no such sweeping ruling.  The phrases "unbundled RECs" and "unbundled REC transactions" were ***defined terms*** applying ***only*** to three specific REC products on which the petitioner requested a jurisdictional ruling.  *WSPP*, 139 FERC ¶ 61,061, at ¶ 5.  *WSPP* was an uncontested proceeding not involving the constitutionality of any REC program, and FERC carefully limited the decision "based on available information."  *Id.* ¶ 24.  *WSPP* does not support Defendants' interpretation of FERC jurisdiction, nor does this case require the Court to make any decision on RECs.

## III.  THE COMPLAINT STATES A CONFLICT PREEMPTION CLAIM BECAUSE THE ZEC PROGRAM STANDS AS AN OBSTACLE TO FERC'S REGULATORY GOALS

Even if the ZEC subsidy were not field preempted, it is conflict preempted because it frustrates the federal policy that just and reasonable rates – which FERC is statutorily authorized and indeed ***obligated*** to set – must be established by the auction process.  A state measure is conflict preempted by federal law if "the state law stands as an obstacle to the accomplishment and execution of" congressional objectives.  *Oneok*, 135 S. Ct. at 1595 (internal quotation marks omitted); *accord Hilmann v. Maretta*, 133 S. Ct. 1943, 1949-50 (2013); *Nazarian II*, 753 F.3d at 478; *Hanna*, 977 F. Supp. 2d at 410; *see also Aux Sable Liquid Prods. v. Murphy*, 526 F.3d 1028, 1033 (7th Cir. 2008).  Unlike field preemption, conflict preemption applies even if the state measure at issue is not "directly aimed" at FERC-jurisdictional wholesale sales.  *Oneok*, 135 S. Ct. at 1602.  Two of the lower court decisions in the Maryland and New Jersey cases invalidated the state programs on the independent basis of conflict preemption.  *See Nazarian II*, 753 F.3d at 478-80; *Hanna*, 977 F. Supp. 2d at 410-11.  The other appellate decisions did not reach the

24

conflict-preemption question; and in finding field preemption, no court has held or suggested that the programs were not conflict preempted. The allegations of clear damage to federal goals, distortion of the wholesale market in keeping inefficient plants alive, and changing the bidding and results of the auctions for both capacity and energy, are factual allegations that must be deemed true and that require that the conflict preemption claim be allowed to proceed.

### A. The Complaint Alleges the ZEC Program Would Cause "Clear Damage" to FERC's Goals

Exelon admits that a state program is conflict preempted by the FPA if it would cause "clear damage" to FERC's goals. Exelon Br. at 20 (quoting *Nw. Cent. Pipeline Corp.*, 489 U.S. at 522). That ends the matter for Rule 12(b)(6) purposes, because Plaintiffs have pleaded clear and massive damage, amounting to billions of dollars, to the FERC-mandated auction process and have alleged that the ZEC program would undermine the very competitive market structures that underpin FERC's auctions. Compl. ¶¶ 6-8, 10-11, 45-50, 72-74, 78-82; *accord* ECF No. 38-3 ¶¶ 52-98.[21] Indeed, Exelon itself alleged that for these same reasons the New Jersey program was conflict preempted. N.J. Complaint ¶¶ 89, 89d (state subsidy "erects obstacles to FERC's achievement of its regulatory goals in the wholesale capacity and energy markets" by "chilling private investment in new generation," because investors will fear losing "expected market share to comparatively inefficient facilities that can sell capacity at artificially low prices owing to a state-ordered subsidy").

The State Defendants, by contrast, appear to argue that the ZEC provisions are not conflict preempted because "no action taken under the ZEC program occurs in the FERC regulated wholesale market." Br. at 14. This is, first, incorrect, as the aim of the measure is

---

[21] *Northwest Central* found no conflict preemption simply because plaintiff failed to prove its allegation that the regulation "prevents the attainment of FERC's regulatory goals," 489 U.S. at 522, but here at the Rule 12(b)(6) stage our allegations must be accepted as true.

directed at and tied to the wholesale market, as shown above, but second, conflict preemption occurs regardless of whether the action is in the wholesale market (which would mean it is clearly field preempted). A state law is conflict-preempted if it "would undermine the purpose" of a federal law. *Boggs v. Boggs*, 520 U.S. 833, 844 (1997). For example, states may enact environmental protection measures, but such a law must yield "if it interferes with the methods" prescribed by federal law. *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). State measures that "have the potential to undermine this [federal] regulatory structure" are preempted, as states cannot "do indirectly what they could not do directly." *Id*. at 494-97 (preempting Vermont nuisance law as an obstacle to full implementation of the Clean Water Act).

As in *Ouellette*, the ZEC program will fundamentally undermine FERC's goal of free and fair energy markets, in which competitive forces set "just and reasonable" electricity prices. As explained by the PJM Independent Market Monitor, which FERC has charged with protecting the integrity of the wholesale energy markets, "[t]he ZEC Subsidies Program is incompatible with the PJM market design, threatens the foundations of the PJM market and interferes with the federal regulatory scheme." ECF No. 30 ¶ 6.

Following a plenary trial in the New Jersey action, the district court found that "[t]he effects described by the witnesses demonstrate that the . . . imposition of a government imposed price creates an obstacle to the Commission's preferred method for the wholesale sale of electricity in interstate commerce." *Hanna*, 977 F. Supp. 2d at 411. Citing *Hanna*, the Fourth Circuit reached the same conclusion in *Nazarian II*, reasoning that the Maryland subsidy program "has the potential to seriously distort the PJM auction's price signals," which serve a variety of objectives and on which market participants rely, such that "Maryland's initiative disrupts this scheme by substituting the state's preferred incentive structure for that approved by

FERC." 753 F.3d at 478-79 (internal quotation marks and citations omitted); *see Aux Sable*, 526 F.3d at 1036-37 (local road weight restriction conflict-preempted as an obstacle to Congress' goal of "uniform standards for commercial motor vehicles utilizing the Interstate and other federal highways"). The nature of the subsidy—a contract for differences in *Hughes* and a price collar in the FEJA—are effectively identical in their impact on the market.

Until it was on the receiving end of subsidies, Exelon itself condemned the market disruption and competitive harm that they caused by enabling subsidized generating plants "to sell their energy output for less than the market price, or even less than it costs to produce":

> *This artificially lowers prices, hurts effective market competition and threatens more reliable clean energy sources. The loss of these sources could lead to serious electricity reliability problems, costing consumers more and making it more difficult to meet the nation's climate goals*.[22]

As Exelon's CEO put it: "We don't believe in taxpayer subsidies for mature technologies"—a subsidy "*distorts the wholesale market, undermining other, more reliable clean energy sources*."[23] And as Exelon's Chief Strategy Officer added:

> Exelon opposes all subsidies for utility-scale generation . . . .
> . . . .
> . . . *Local and regional fixes to a national problem cause market distortions, leading to uneven results that will inevitably fall short*. . . .
> . . . .
> When it comes to meeting state RPS requirements, we believe *the market should be allowed to find the cheapest, most effective means of achieving our goals*. Experience has often shown that the incentive to innovate and drive toward ever-better solutions and technology is stifled when government is picking the winners and losers.[24]

---

[22] Exelon, The Merger of Exelon and Pepco Holdings: Five Things You May Not Know 2 (emphasis added), http://www.exeloncorp.com/company/Documents/Five-things-you-may-not-know.pdf.

[23] Christopher M. Crane, President & CEO, Exelon Corp., Remarks at Ill. Mfrs.' Ass'n Annual Meeting, 3-4 (Dec. 7, 2012) (emphasis added), http://www.exeloncorp.com/newsroom/events/Event%20Documents/Speech_Crane_Remarks%20to%20the%20Illinois%20Manufacturers'%20Association%202012.pdf

[24] William Von Hoene, Jr., Chief Strategy Officer, Exelon Corp., "Energy in Tomorrow's Competitive Marketplace," 5-6 (Apr. 5, 2013) (emphasis added), http://www.exeloncorp.com/newsroom/Documents/speech_VonHoene_Booth_040513.pdf.

The ZEC program interferes with FERC's regulatory objective because it keeps inefficient nuclear generating units in the wholesale markets, allowing them to ignore the financial losses they realize as a result of their participation in the FERC-jurisdictional markets. These mounting losses convinced Exelon to retire Quad Cities and Clinton—which it in fact committed to do before being bailed out. Through their continued participation in the FERC-jurisdictional markets, the subsidized plants will artificially depress prices in the wholesale energy and capacity markets below the level established by FERC. ECF No. 38-3 ¶¶ 81, 84, 87.

Exelon's response is that preemption of any state regulation that affects wholesale markets would be "overbroad," because "not every state regulation that incidentally affects federal markets is preempted." Br. at 21 (quoting *Nazarian II*). But the effects here are alleged to be a "direct and transparent impediment to the functioning of the PJM markets," just as the Fourth Circuit found the Maryland subsidy program to be in *Nazarian II*. 753 F.3d at 480. Defendants ask this Court to make the extraordinary ruling that as a matter of law, no matter how severe the alleged market distortion caused by the ZEC program, it is not conflict preempted. That unprecedented position should be rejected.

## B. Primary Jurisdiction Does Not Apply

The federal courts' deep experience in resolving questions of federal preemption defeats Exelon's argument (Br. at 24-25) that, in effect, FERC has primary jurisdiction over Plaintiffs' claim of conflict preemption. "Primary jurisdiction is a permissive doctrine that applies when resolving a claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States ex rel. Sheet Metal Workers Int'l Ass'n v. Horning Invs., LLC*, 828 F.3d 587, 592 (7th Cir. 2016) (internal quotation marks omitted). "Federal courts uniformly have concluded that primary jurisdiction

abstention does not apply to cases involving federal preemption." *Norfolk S. Ry. Co. v. Pa. Pub. Util. Comm'n*, No. 09-835, 2010 WL 1253551, at *2 (W.D. Pa. Mar. 24, 2010) (collecting cases). "The question of whether a local law is preempted by federal law is within the expertise of courts, not agencies." *Verizon Wireless (VAW) LLC v. City of Rio Rancho*, 476 F. Supp. 2d 1325, 1340 (D.N.M. 2007) (collecting cases); *see, e.g.*, *Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Envtl. Prot.*, 208 F.3d 1, 4-5 (1st Cir. 2000).

Indeed, in a part of its decision that was not appealed in *Hughes*, the Maryland district court rejected the argument that Exelon presents here. *See Nazarian I*, 974 F. Supp. 2d at 839. In line with the reasoning in that decision, the fact that it is within FERC's jurisdiction to consider the impacts of state legislation on auction rates does not "strip this Court of jurisdiction" to resolve the distinct issue, removed from any FERC expertise, of whether the state legislation operates in contravention of the Supremacy Clause of the Constitution. *Id.*; *see also Entergy Nuclear Fitzpatrick, LLC v. Zibelman*, No. 5:15-CV-230, 2016 WL 958605, at *8 (N.D.N.Y. Mar. 7, 2016) (rejecting essentially the same argument that Exelon presents here); *North Dakota v. Swanson*, No. 11-3232 (SRN/SER), 2012 WL 4479246, at *9 (D. Minn. Sept. 30, 2012) (declining to invoke primary jurisdiction in consideration of plaintiffs' argument that "the issue of preemption is a question that the Court—and not FERC—should decide").

This precedent makes perfect sense. The issue of whether the FPA preempts state law is not one that has "been placed within the special competence of an administrative body." *Horning*, 828 F.3d at 592. With respect to the requested relief, moreover, "Plaintiffs are not asking that this Court determine a price or rate for . . . energy and capacity sales that would be fair." *Nazarian I*, 974 F. Supp. 2d at 839; *accord Bd. of Pub. Works v. Wis. Power & Light*, 613 F. Supp. 2d 1122, 1131 (D. Minn. 2009) (rejecting argument for primary jurisdiction where the

court's decision "will not determine what rate would be reasonable"). Contrary to Exelon's assumption, the core premise of Plaintiffs' claim for conflict preemption is that the ZEC program unavoidably interferes with the process that FERC has decided is the proper way to establish just and reasonable rates.[25]

## IV. THE COURT HAS EQUITABLE JURISDICTION TO ADJUDICATE PLAINTIFFS' PREEMPTION CLAIMS

Contrary to Defendants' arguments, the relevant question is not whether the FPA authorizes a "private cause of action" or "private suits." *See* Def. Br. at 16-17; Exelon Br. at 25-29. Rather, the issue is the Court's equitable power to enjoin the ZEC program on preemption grounds.

### A. A Federal Court's Equity Power Is Limited Only Where Congress Has Made Manifest Such an Intent

The Supreme Court[26] and Seventh Circuit[27] have "long recognized" that in suits by private parties, "the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong*, 135 S. Ct. at 1384. This equity power "reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.* Nothing in *Armstrong* supports the State Defendants' assertion that the equity authority of federal courts is limited to

---

[25] Defendants' argument is similar to the one that was rejected in *Hughes*, 136 S. Ct. at 1298 n.11, to the effect that states may enact otherwise preempted programs because FERC may have the ability to adjust its rules to mitigate the adverse effects. The issue for preemption purposes, however, is whether the state has interfered with federal policy, which it has here, not whether federal regulations could be changed. Similarly, the request by certain plaintiffs for FERC to limit the effects of ZECs by applying a Minimum Offer Price Rule is irrelevant to the judicial determination of whether the state action is preempted, particularly because it is unclear that FERC will act.

[26] *See, e.g.*, *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645-46 (2002) (exercising jurisdiction over suit by telecommunications carriers asserting preemption of state order); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 388 (2000) (enjoining state statute barring certain foreign transactions in face of federal statute imposing conflicting sanctions).

[27] *See, e.g.*, *Nationwide Freight Sys., Inc. v. Ill. Commerce Comm'n*, 784 F.3d 367, 369-71 (7th Cir. 2015) (exercising jurisdiction over claim that FAA Authorization Act preempts Illinois Commerce Commission investigations).

situations where a plaintiff would otherwise be a defendant in a state regulatory proceeding. Br. at 16.

While Congress may limit a federal court's equity power to enjoin state action, it must make its intent unmistakably clear. *See id.* at 1385; *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73-74 (1996). "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Weinberger v. Romelo-Barcelo*, 456 U.S. 305, 313 (1982) (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)).

*Armstrong* held that the Medicaid Act precludes healthcare providers from invoking federal equity jurisdiction to enjoin state reimbursement at rates lower than required under the Act, 42 U.S.C. § 1396a(a)(30)(A). In *Armstrong*, the "sole remedy" that Congress provided for a state's failure to make proper reimbursement was "the withholding of Medicaid funds by the Secretary of Health and Human Services." *Armstrong*, 135 S. Ct. at 1385 (citing 42 U.S.C. § 1396c). Further, reasoning that the Act's remedy provision "by itself" might not preclude equitable relief, the Court concluded that it did so "when combined with the judicially unadministrable nature of § 30(A)'s text." *Id.* As the Court explained, "It is difficult to imagine a requirement broader and less specific than § 30(A)'s mandate that state plans provide for payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of . . . care and services.'" *Id.* In applying the

*Armstrong* framework to other federal statutes, other Courts, including in this Circuit, have found that this high standard for denying federal equitable power has not been met.[28]

## B.     The FPA Does Not Limit the Equity Jurisdiction of Federal Courts

### 1.     Congress Did Not Provide a "Sole Remedy" in the FPA

Under the FPA, the "sole remedy" for violations is not limited to loss of funding, agency fines, or other administrative action.  To the contrary, in addition to granting FERC's authority to file compliance actions, 16 U.S.C. § 825m(a), the FPA expressly gives district courts exclusive jurisdiction over "*all suits in equity* and actions at law."  16 U.S.C. § 825p (emphasis added). This phrase has a broad meaning that recognizes the history of private injunction suits; it certainly does not prohibit them.  *See, e.g.*, *E. Hampton*, 841 F.3d at 145-46; *Air Transp. Ass'n of Am. v. Cuomo*, 520 F.3d 218, 221-22 (2d Cir. 2008); *United States v. New York*, 708 F.2d 92, 93-94 (2d Cir. 1983).  Congress clearly has *not* "adopted a system that limits private enforcement to particular methods" under the federal agency regime.  *Tri-Corp Hous. Inc. v. Bauman*, 826 F.3d 446, 448 (7th Cir. 2016).

### 2.     The Relief Plaintiffs Seek Is Not Judicially Unadministrable

Plaintiffs' claims involve subject matter—state regulations affecting wholesale energy rates—that federal courts have addressed for decades.[29]  Plaintiffs are ***not***, as Exelon claims (Br. at 28), asking the Court to set reasonable rates for wholesale electricity transactions.  Rather, this

---

[28] *See, e.g.*, *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 728 (S.D. Ind. 2016) (Refugee Act of 1980 does not preclude an equitable action and its anti-discrimination provisions are the types of standards "routinely enforce[d]" by courts), *aff'd*, 838 F.3d 902 (7th Cir. 2016); *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144-47 (2d Cir. 2016) (equitable relief allowed under Airport Noise and Capacity Act, which has neither a sole remedy provision, nor a judicially unadministrable standard); *Bellsouth Telecomms., LLC v. Louisville/Jefferson Cty. Metro Gov't*, No. 3:16-CV-124-TBR, 2016 WL 4030975, at *4-6 (W.D. Ky. July 26, 2016) (same with respect to Pole Attachment Act).

[29] *See, e.g.*, *Hughes*, 136 S. Ct. at 1297; *Miss. Power & Light Co.*, 487 U.S. at 369-70; *Schneidewind*, 485 U.S. at 308; *N. Nat. Gas Co.*, 372 U.S. at 90-92.

action seeks only to ensure that prices set by means of FERC-mandated auctions are not impacted by ZEC subsidies. Unlike *Armstrong*, where the plaintiffs effectively asked the court to determine rates under a complex Medicaid formula, Plaintiffs here ask the Court only to decide whether, as in *Hughes*, a state regulatory program "impermissibly intrudes upon the wholesale electricity market, a domain Congress reserved to FERC alone." *Hughes*, 136 S. Ct. at 1292. The federal courts are well equipped to address the question of whether, in Exelon's words (Br. at 28), a "coherent regulatory policy" exists so as to preempt contrary state law. This is a traditional legal determination that federal courts regularly make in preemption cases, as they did in *Hughes*. The Court can address these issues without engaging in the "judgment-laden" review that would have been required in *Armstrong*. *See Armstrong*, 135 S. Ct. at 1385; *see id.* at 1389 (Breyer, J., concurring) (examining courts' familiarity with subject matter in addressing the issue of administrability).

## V. THE COMPLAINT STATES A COMMERCE CLAUSE CAUSE OF ACTION

### A. Plaintiffs Have Standing

Exelon attacks Plaintiffs' standing to bring their discrimination-based claim under the dormant Commerce Clause. Br. at 32-33.[30] As an initial matter, a party suffering competitive injury, even indirectly, has standing to challenge discriminatory state subsidy programs. *See, e.g.*, *W. Lynn Creamery*, 512 U.S. at 202 ("[A] burden placed at any point will result in a disadvantage to the out-of-state producer."); *New Energy Co. v. Limbach*, 486 U.S. 269, 279-80 (1988) (invalidating fuel tax credit given only to ethanol produced in-state); *Bacchus Imps. Ltd. v. Dias*, 468 U.S. 263, 267 (1984) (finding standing where tax raised the price of imported liquor relative to exempted in-state beverages).

---

[30] Exelon does not contest Plaintiffs' standing to bring a dormant Commerce Clause claim under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).

Here, Plaintiffs have alleged inability to compete on equal footing in the interstate wholesale market. Compl. ¶¶ 13-14, 65-66, 90-93. The Seventh Circuit recognizes that this type of injury establishes standing for a Commerce Clause claim:

> The Illinois Coal Act allegedly impinges on Alliance's members' rights to compete on an equal footing in interstate commerce. This injury is particular to suppliers and others who deal or are attempting to sell western coal to Illinois utilities. Despite the absence of evidence of specific lost deals, this competitive injury is neither 'conjectural' nor 'hypothetical'—the injury is not a particular lost sale but the 'inability to compete on an equal footing.'

*All. for Clean Coal v. Miller*, 44 F.3d 591, 594 (7th Cir. 1995) (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)).

Among other things, a member of Plaintiff EPSA owns a nuclear facility in Pennsylvania that is precluded from participating in the Illinois ZEC program, even though that plant competes in the same PJM wholesale market as the subsidized Exelon facilities. *See* Compl. ¶ 15; ECF No. 38-3 44 n.93.[31] In addition, because the PJM and MISO grids operate on a multistate basis, the subsidized Exelon plants can export electricity outside Illinois, thereby competing with power generated by Plaintiffs' out-of-state plants, both nuclear and non-nuclear. Compl. ¶¶ 65-66. This "discriminates in favor of local firms," *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 554 (7th Cir. 2007), and Plaintiffs suffer "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994).

### B. The ZEC Program Violates the Dormant Commerce Clause

The "dormant" component of the Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by

---

[31] Because standing implicates jurisdiction, the Court may consider facts outside the complaint. *See, e.g.*, *Alliant Energy Corp. v. Bie*, 277 F.3d 916, 919-20 (7th Cir. 2002); *Cent. Mfg. Co. v. Pure Fishing, Inc.*, 392 F. Supp. 2d 1046, 1047 (N.D. Ill. 2005).

burdening out-of-state competitors." *W. Lynn Creamery*, 512 U.S. at 192; *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994). "[R]egulating interstate commerce in such a way as to give those who handle domestic articles of commerce a cost advantage over their competitors handling similar items produced elsewhere constitutes such protectionism." *Or. Waste*, 511 U.S. at 106.

A dormant Commerce Clause claim turns on a "sensitive, case-by-case analysis" of classic fact issues, including the "purposes and effects" of the law at issue. *See, e.g., W. Lynn Creamery,* 512 U.S. at 201. While certain discriminatory measures can be determined to be per se invalid on their face, the nature of the market and the practical effect of the law typically cannot be decided until after an evidentiary record is developed. *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 337 (2007) (dormant Commerce Clause decision based on record built after "protracted discovery"). Indeed, Defendants' arguments are largely based on their own interpretations of facts relating to the operation of the ZEC program, the motivations behind its passage, and the relative burdens and benefits of the law—all of which are controverted by the Complaint.

Three situations trigger *per se* Commerce Clause invalidity: (1) the rule discriminates against interstate commerce on its face, *see, e.g.*, *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 575 (1997); (2) the rule has the effect of favoring in-state economic interests over out-of-state interests, *see, e.g.*, *Anheuser-Busch, Inc. v. Schnorf*, 738 F. Supp. 2d 793, 802 (N.D. Ill. 2010); or (3) the rule harbors a discriminatory purpose, *see, e.g.*, *Bacchus Imps.*, 468 U.S. at 270. Where a rule meets any of the foregoing tests, it is invalid as a *per se* violation unless the State demonstrates that the rule "advances a legitimate local purpose that cannot adequately be served by reasonable nondiscriminatory alternatives." *Alliant Energy*

35

*Corp. v. Bie*, 330 F.3d 904, 911 (7th Cir. 2003) (quoting *Or. Waste*, 511 U.S. at 100-01).[32]
Indeed, as the State Defendants recognize, Br. at 19-20 (quoting *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624), "where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected."

Plaintiffs have adequately pleaded that the ZEC program discriminates in each of the foregoing ways. *First*, ZECs solely benefit certain in-state wholesale producers of nuclear energy in Illinois, to the disadvantage of out-of-state producers who compete in the wholesale market. Compl. ¶¶ 58-59;[33] Moreover, the purported "procurement process," based on "public interest criteria," is a sham,[34] as Clinton and Quad Cities have been pre-determined to be the "winners" of the ZEC contracts. Compl. ¶ 59; *see* FACTS, *supra* pp. 4-7; *supra* Part I.

Among other things, FEJA directs the IPA to consider reports under House Resolution 1146; one such report, titled "Potential Nuclear Power Plant Closings," identifies the Clinton and Quad Cities plants. Compl. ¶ 60; *see supra* note 18. Moreover, with "preservation of zero emission facilities" as a key factor in the "public interest" determination, Clinton and Quad Cities, are the only Illinois nuclear plants in danger of closing. Compl. ¶ 60; 20 ILCS 3855/1-75(d-5)(1)(C).

---

[32] Ironically, Exelon agreed with this position in the New Jersey case, where it asserted that a regulation violates the dormant Commerce Clause where "its intent and effect are to discriminate in favor of in-state generation and against out-of-state generation," N.J. Complaint ¶ 100; such regulations must be "subject to the strictest scrutiny," *id.* ¶ 106; and "state laws favoring in-state economic interests over out-of-state economic interests" are "nearly *per se*" invalid, *id.* ¶ 99.

[33] It does not matter that only some in-state actors are benefitted. *See Bacchus Imps.*, 468 U.S. at 271 ("[T]he effect of the exemption is clearly discriminatory, in that it applies only to locally produced beverages, even though it does not apply to all such products. Consequently, as long as there is some competition between the locally produced exempt products and non-exempt products from outside the State, there is a discriminatory effect.").

[34] Exelon argues that by calling the procurement process a "sham," Plaintiffs have impugned the integrity of the IPA and ICC by suggesting that they would flout their statutory duties. Exelon Br. at 35 n.15. Plaintiffs have done no such thing. By selecting the pre-determined winners, the Illinois agencies are doing precisely what they have been commanded to do by the statute.

The complaint alleges further facts showing that FEJA is designed solely to protect the Clinton and Quad Cities plants. Exelon, the plants' owner, lobbied extensively, and the very name of the law—the Future Energy **Jobs** Act—evidences its true purpose. Compl. ¶¶ 58-59. Exelon has boasted that the ZEC program "ensures the continued operations of Clinton and Quad Cities for at least 10 years." *Id.* ¶ 61.

*Second*, even if FEJA were facially neutral with respect to interstate commerce, for the same reasons set forth immediately above, the Complaint alleges that the ZEC program has the clear *effect* of favoring in-state economic interests over out-of-state interests.

*Third*, the ZEC program was intended to be protectionist regulation. When Governor Rauner signed the bill into law, he declared: "The Future Energy Jobs bill protects taxpayers, ratepayers, and *the good-paying jobs at the Clinton and Quad Cities' plants*." Compl. ¶ 61. The legislation is an effort to save in-state jobs at the expense of out-of-state generators. The ZEC program seeks to prop up in-state interests by protecting uneconomic businesses from interstate competition. *See id.* ¶¶ 57, 58. Those objectives are constitutionally impermissible. *See Bacchus Imps.*, 468 U.S. at 270 (invalidating law meant to stimulate local fruit wine industry); *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 10 (1928) (invalidating law that sought to preserve in-state shrimp packing businesses).

The Seventh Circuit has made clear that such laws are preempted. In *Alliance for Clean Coal*, it struck down a protectionist energy measure, rejecting several defenses similar to those asserted here:

- The law was an impermissible "non-too-subtle attempt to prevent Illinois electric utilities from switching" to lower cost out-of-state options for coal. *Id.* at 595.

- "[T]he Illinois Coal Act, like the milk-pricing order in *West Lynn*, has the same effect as a 'tariff or customs duty—neutralizing the advantage possessed by lower cost out of state producers.'" *Id.* (quoting *W. Lynn Creamery*, 512 U.S. at 194).

37

- The law "cannot continue to exist merely because it does not facially compel the use of Illinois coal or forbid the use of out-of-state coal." *Id.* at 596. "[E]ven ingenious discrimination is forbidden by the Commerce Clause." *Id.* (citing *W. Lynn Creamery*, 512 U.S. at 201).

Citing *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981), Defendants argue that the Court cannot look beyond the environmental purpose articulated by the Legislature. Def. Br. at 20-21; Exelon Br. at 34-35. This is wrong. In its Commerce Clause analysis, the Court stated: "If a state law purporting to promote environmental purposes is in reality simple economic protectionism, . . . a virtually *per se* rule of invalidity applies." *Id.* at 471 (internal quotation marks omitted). "Commerce Clause analysis differs from analysis under the 'rational basis' test. Under the Commerce Clause, a court is empowered to disregard a legislature's statement of purpose if it considers it a pretext." *Id.* at 476 n.2 (Powell, J., concurring in part and dissenting in part); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951).

Factually, *Clover Leaf* is inapplicable here because, in contrast to the ZEC program, Minnesota prohibited "all milk retailers from selling their products in plastic, nonreturnable milk containers, without regard to whether the milk, the containers, or the sellers were from outside the State." 449 U.S. at 471-72. This conclusion rested, among other things, on the record developed at trial; Plaintiffs here should be afforded the same opportunity to prove their allegations.

Finally, Plaintiffs allege in detail, Compl. ¶¶ 14, 89, and will prove at trial, that "nondiscriminatory alternatives would seem likely to fulfill the State's purported legitimate local purpose more effectively." *Hughes v. Oklahoma*, 441 U.S. 322, 338 (1979); *Dean Milk*, 340 U.S. at 354 (a state "cannot" discriminate against interstate commerce, "even in the exercise of its unquestioned power to protect the health and safety of its people, if reasonable nondiscriminatory alternatives, adequate to conserve legitimate local interests, are available").

### C.    Illinois Is a Regulator, Not a Market Participant

Exelon claims (Br. at 37-39) that *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976), exempted "subsidy" programs from the reach of the Commerce Clause.  It did not.  Rather, *Alexandria Scrap* recognized that in situations where a state is acting as a direct market participant, it is not subject to the same constraints as when it acts to regulate commerce.

In *Alexandria Scrap*, the state itself became a market participant by spending its own funds to engage in the existing market for "removal of automobile hulks from Maryland streets and junkyards."  *Id.* at 808-09.  The Court held that the Commerce Clause does not restrict a state's ability to act like any other participant in that market – by purchasing and paying for the things it wished to buy.  By contrast here, Illinois has not acted as a participant in the existing wholesale energy market, nor has it created a new market.  Illinois is not acting to facilitate commerce, spending state funds, or taking ownership of any goods.  Rather, only after the commerce is complete—that is, only after a subsidized Illinois plant sells a KWh of power into the wholesale market—does the state step in and require LSEs (and ultimately ratepayers) to make an additional payment for that electricity to keep the struggling plants afloat against more efficient competition.  Thus, the state has promulgated the ZEC program as a ***regulator*** and is subject to dormant Commerce Clause analysis.  *See Dep't of Revenue v. Davis*, 553 U.S. 328, 339 (2008); *Reeves, Inc. v. Stake*, 447 U.S. 429, 435-37 (1980).

This point is reinforced by *Allco Finance Ltd. v. Klee*, No. 3:15-CV-608 (CSH), 2016 WL 4414774, at *20 (D. Conn. Aug. 18, 2016) (appeal noticed), also cited by Exelon, which considered a REC program in Connecticut.  The court there held that it first must "determine, as a threshold matter, 'whether a state or local government is regulating.'"  *Id.* at *23 (citing *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 254 (2d Cir. 2001)).  The court contrasted activities where the state is acting in the same manner as private market

participants act with the more limited things states can do when they regulate by exercising "governmental powers that are unavailable to private parties." *Id.* Here, of course, Illinois is imposing regulatory requirements on energy transactions; it is not purchasing electricity as a participant in the wholesale energy market.

### D. The ZEC Program Unduly Burdens Commerce

Even where a law is not clearly discriminatory on its face, in purpose or in effect, it is unconstitutional if its burden on commerce is "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. This analysis implicates classic fact issues that cannot be resolved on the pleadings: "If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id*.

Plaintiffs allege that the impacts of the ZEC program on interstate commerce far outweigh any claimed environmental benefits, in two distinct ways: (1) the Complaint alleges the ZEC program imposes market-distorting burdens that will drive out of the market and deter entry of more cost-efficient, environmentally friendly out-of-state generators, Compl. ¶¶ 45-50; and (2) reduction of carbon emissions can be achieved through, or more effectively by, means that do not discriminate against interstate commerce or frustrate competitive markets, *id.* ¶¶ 14, 89. Plaintiffs are entitled to discovery and trial on these issues.

### CONCLUSION

For the reasons stated above, the motions to dismiss should be denied.

40

Dated:  April 24, 2017

Respectfully submitted,

By:  /s/ Stuart S. Singer
     Stuart S. Singer

Jonathan S. Massey (*pro hac vice*)
MASSEY & GAIL, LLP
1325 G Street, NW,
Suite 500
Washington, DC 20005
Telephone: (202) 652-4511
jmassey@masseygail.com

Jonathan D. Schiller (*pro hac vice*)
David A. Barrett (*pro hac vice*)
BOIES SCHILLER FLEXNER, LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Telephone: (212) 446-2300
jschiller@bsfllp.com
dbarrett@bsfllp.com

Leonard A. Gail
Suyash Agrawal
Paul J. Berks
MASSEY & GAIL, LLP
50 East Washington Street, Suite 400
Chicago, IL 60602
Telephone: (312) 283-1590
lgail@masseygail.com
sagrawal@masseygail.com
pberks@masseygail.com

Stuart H. Singer (*pro hac vice*)
William T. Dzurilla (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
wdzurilla@bsfllp.com

Edward J. Normand (*pro hac vice*)
Jason C. Cyrulnik (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
enormand@bsfllp.com
jcyrulnik@bsfllp.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on April 24, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users.

By: /s/ Stuart H. Singer